**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| SUSAN PFANNENSTIEL: | ) | |
| AMBER HARRINGTON; | ) | |
| NATASHA MCCURDY; | ) | |
| REBECCA CORAZZIN-MCMAHAN; | ) | |
| KIMBERLY MEADER; | ) | |
| and | ) | |
| JARAH COOPER; | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 2021-CV- _____ |
| | ) | |
| STATE OF KANSAS; | ) | |
| HERMAN JONES, in his individual capacity; | ) | |
| JASON DE VORE, in his individual capacity; | ) | |
| KRAIG KNOWLTON, in his individual capacity; | ) | |
| MICHAEL MURPHY, in his individual capacity; | ) | |
| ANDREW DEAN, in his individual capacity; | ) | |
| ERIC SAUER, in his individual capacity; | ) | |
| SCOTT PROFFITT, in his individual capacity; | ) | |
| EDNA CORDNER, in her individual capacity; | ) | |
| BRUCE HYMAN, in his individual capacity; | ) | |
| WESLEY LUDOLPH, in his individual capacity; | ) | |
| and | ) | |
| THOMAS CATANIA, in his individual capacity; | ) | |
| | ) | |
| Defendants. | ) | |

**<u>COMPLAINT</u>**

COMES NOW, Plaintiffs Susan Pfannenstiel, Amber Harrington, Natasha McCurdy, Rebecca Corazzin-McMahan, Kimberly Meader, and Jarah Cooper, through their counsel, Kelly J. Trussell of the law firm of SLOAN, EISENBARTH, GLASSMAN, MCENTIRE & JARBOE, L.L.C., and for their claims against the Defendants, the Plaintiffs allege as follows:

## INTRODUCTION

This civil action is brought by Susan Pfannenstiel, Amber Harrington, Natasha McCurdy, Rebecca Corazzin-McMahan, Kimberly Meader, and Jarah Cooper to obtain redress for the unlawful employment discrimination they have suffered and for violations of their constitutional rights while employed by the State of Kansas through the Kansas Highway Patrol.  While employed, Plaintiffs suffered sexual harassment, gender discrimination, and a hostile work environment within the agency.

The Plaintiffs have engaged in protected activities under Title VII by opposing those unlawful actions and their employer responded with retaliatory actions, including termination, constructive discharge, and/or loss of employment duties.  The Defendants have infringed on the Plaintiffs' constitutional rights through acts of gender discrimination, sexual harassment, and a hostile work environment in violation of the Equal Protection Clause of the Fourteenth Amendment.  Additionally, the Plaintiffs have suffered violations of their First Amendment right to free speech by Defendants' acts of retaliation, as well as conduct that silenced their free speech; placing them in fear of employment termination if they exercised their right and spoke out against discrimination.

## PARTIES

1.      Susan Pfannenstiel ("Pfannenstiel") is a Kansas resident.

2.      Pfannenstiel was employed as the Human Resources Director for the Kansas Highway Patrol until September 1, 2020.

3.      Amber Harrington ("Harrington") is a Kansas resident.

4.      Harrington is currently employed as a Captain at the Kansas Highway Patrol.

5.      Natasha McCurdy ("McCurdy") is a Kansas resident.

6.     McCurdy is currently employed as a Trooper at the Kansas Highway Patrol.

7.     Rebecca Corazzin-McMahan ("Corazzin-McMahan") is a Kansas resident.

8.     Corazzin-McMahan was employed as a Public Service Administrator I at the Kansas Highway Patrol from September 2017 until December 13, 2019.

9.     Kimberly Meader ("Meader") is a Kansas resident.

10.    Meader was employed as a Senior Administrative Specialist at the Kansas Highway Patrol until October 9, 2020.

11.    Jarah Cooper ("Cooper") is a Kansas resident.

12.    Cooper was employed as a Trooper at the Kansas Highway Patrol from July 2017 until December 31, 2020.

13.    Defendant State of Kansas is a named defendant in this action because the Kansas Highway Patrol ("KHP") is a political subdivision of the State of Kansas with its headquarters office located in Topeka, Kansas.

14.    Defendant State of Kansas is an employer with over 500 employees in the State of Kansas.

15.    Defendant Herman Jones is the Superintendent for KHP; Plaintiffs' allegations against him are in his individual capacity.

16.    Defendant Jason De Vore is the Assistant Superintendent for KHP; Plaintiffs' allegations against him are in his individual capacity.

17.    Defendant Kraig Knowlton is the Director of the Office of Personnel Services for Kansas Department of Administration; Plaintiffs' allegations against him are in his individual capacity.

18.    Defendant Michael Murphy is a Major for KHP; Plaintiffs' allegations against him are in his individual capacity.

19.     Defendant Andrew Dean is a Major for KHP; Plaintiffs' allegations against him are in his individual capacity.

20.     Defendant Eric Sauer is a Major for KHP; Plaintiffs' allegations against him are in his individual capacity.

21.     Defendant Scott Proffitt is a Lieutenant for KHP; Plaintiffs' allegations against him are in his individual capacity.

22.     Defendant Edna Cordner is a Lieutenant for KHP; Plaintiffs' allegations against her are in her individual capacity.

23.     Defendant Bruce Hyman is a Captain for KHP; Plaintiffs' allegations against him are in his individual capacity.

24.     Defendant Wesley Ludolph is a Captain for KHP; Plaintiffs' allegations against him are in his individual capacity.

25.     Defendant Thomas Catania was a Lieutenant for KHP for all times relevant to the allegations in this Complaint; Plaintiffs' allegations against him are in his individual capacity.

## JURISDICTION

26.     This Court has jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1331 (federal question claims) and 42 U.S.C. § 2000e (Title VII claims).

27.     All conditions precedent to jurisdiction under 42 U.S.C. § 2000e-5 have been met, including: (i) charges of employment discrimination and retaliation were filed with the Equal Employment Opportunity Commission and the Kansas Human Rights Commission within 300 days of the commission of the unfair employment practices; (ii) Notifications

of Right to Sue were received from the EEOC; and (iii) this Complaint has been filed within

90 days of the receipt of the Notifications of Right to Sue. *See Letters Attached.*


## VENUE

28.    Venue is proper in this district under 28 U.S.C. § 1391 (general venue) and 42 U.S.C §

2000e (Title VII claims).

## FACTUAL ALLEGATIONS

29.    Plaintiffs reallege and incorporate by reference each and every paragraph of this Complaint

as though fully set forth herein.

30.    Plaintiff Pfannenstiel was hired by the State of Kansas in 1999.

31.    Plaintiff Harrington was hired by the State of Kansas in 2000.

32.    Plaintiff McCurdy was hired by the State of Kansas in 2016.

33.    Plaintiff Corazzin-McMahan was hired by the State of Kansas in 2017.

34.    Plaintiff Meader was hired by the State of Kansas in 2017.

35.    Plaintiff Cooper was hired by the State of Kansas in 2017.

36.    In April 2019, Governor Laura Kelly appointed Herman Jones to the position of

Superintendent of KHP, for the State of Kansas.

37.    The Superintendent position carries with it the rank of Colonel within KHP.

38.    In May 2019, Superintendent Col. Herman Jones selected Jason De Vore to the position of

Assistant Superintendent of KHP, for the State of Kansas.

39.    The Assistant Superintendent position carries with it the rank of Lt. Colonel within KHP.

40.    Defendant Michael Murphy carries the rank of Major within KHP.

41.    Defendant Andrew Dean carries the rank of Major within KHP.

42.     Defendant Eric Sauer carries the rank of Major within KHP.

43.     Defendant Scott Proffitt carries the rank of Lieutenant within KHP.

44.     Defendant Edna Cordner carries the rank of Lieutenant within KHP.

45.     Defendant Bruce Hyman carries the rank of Captain within KHP.

46.     Defendant Wesley Ludolph carries the rank of Captain within KHP.

47.     Defendant Thomas Catania is believed to now be employed by KHP in a civilian capacity, but for all times relevant to this Complaint, he was employed by KHP and carried the rank of Lieutenant within KHP.

48.     Defendants Murphy, Dean, Sauer, Proffitt, Cordner, Hyman, Ludolph, and Catania were all under the chain of command of Col. Jones and Lt. Col. De Vore.

49.     KHP Superintendent Col. Herman Jones and KHP Assistant Superintendent Lt. Col. Jason De Vore, directly and through the chain of command, created and allowed a hostile work environment of sexual harassment and gender discrimination within KHP.

50.     Plaintiffs acted in opposition of the hostile work environment and sexual harassment and gender discrimination actions within KHP.

51.     All Plaintiffs suffered acts of gender discrimination and hostile work environment while employed with the State of Kansas at KHP.

52.     For all times relevant to this Complaint, all Plaintiffs had employment supervisors that were within the chain of command at KHP.

53.     Additionally, while Pfannenstiel had employment supervisors within KHP, as the Human Resources Director of KHP, Pfannenstiel additionally reported to employment supervisors within the Office of Personnel Services, under Kansas Department of Administration.

54.  Kraig Knowlton is employed as the Director of the Office of Personnel Services for Kansas Department of Administration, a political subdivision of the State of Kansas.

55.  Defendant Knowlton, through actions alleged in this Complaint, perpetuated the acts of gender discrimination, sexual harassment, and hostile work environment and caused further acts of discrimination, sexual harassment, retaliation, and hostile work environment.

**Pfannenstiel Directly Suffered Sexual Harassment and Gender Discrimination**

56.  Plaintiffs reallege and incorporate by reference each and every paragraph of this Complaint as though fully set forth herein.

57.  On or about October 10, 2019, Pfannenstiel received Instant Messages from Col. Jones that were of a sexual nature and were offensive.

58.  On or about October 11, 2019, Pfannenstiel continued to receive Instant Messages from Col. Jones, like the day before, that were of a sexual nature and were offensive.

59.  Pfannenstiel immediately reported these messages to her KHP supervisor, Major Scott Harrington, and told him that Col. Jones's messages and behavior were sexual harassment.

60.  Pfannenstiel also reported the messages containing items of sexual harassment to her supervisor at Kansas Department of Administration.

61.  On or about December 3, 2019, Major Michael Murphy entered Pfannenstiel's KHP office and shut the door behind him.

62.  Murphy told Pfannenstiel he wanted to demonstrate to her what he interpreted to be inappropriate workplace behavior.

63.  Murphy walked over to Pfannenstiel, who was seated at her desk, and attempted to grab her hands that were placed in her lap.

64.     Pfannenstiel told Murphy that he was in her personal space and that he needed to leave; Murphy laughed at her, but then complied.

65.     Murphy's action intimidated Pfannenstiel and during all future interactions with him she purposely kept Murphy at a physical distance from her.

66.     On September 1, 2020, Pfannenstiel ended her employment with the State of Kansas by retiring earlier than she would have, due to the discrimination, retaliation, and hostile work environment she suffered at KHP.

67.     Pfannenstiel's early retirement amounted to her receiving less retirement funds than if she had remained employed one more month.

68.     Pfannenstiel suffering from health issues directly related to the stress of the hostile work environment and discrimination within KHP could not continue her employment.

69.     Pfannenstiel's early retirement from employment amounted to a constructive discharge by the State of Kansas.

**Harrington Directly Suffered Sexual Harassment and Gender Discrimination**

70.     Plaintiffs reallege and incorporate by reference each and every paragraph of this Complaint as though fully set forth herein.

71.     On or about August 1, 2019, while attending a meeting in the Colonel's conference room, Harrington was physically touched on her back by Col. Jones in Lt. Col. De Vore's presence.

72.     Harrington told Col. Jones that his touching of her was highly inappropriate, to which he responded by laughing, walking back over to her, repeated the touching, and told her "there, I take it back."

73.     On or about August 13, 2019, Harrington reported this incident to Majors Josh Kellerman and Scott Harrington.

74.     Majors Kellerman and Harrington told Harrington to contact the KHP Director of Human Resources to discuss and report this incident, and she did so.

75.     On or about November 7, 2019, Harrington reported to Majors Kellerman and Harrington that during a meeting she was again physically touched and felt singled out, in a gender discriminatory manner, by Col. Jones.

76.     Harrington stated that she previously told Col. Jones that she did not want him to physically touch her, but that he continued to do so.

77.     Major Harrington told Harrington to report the incident to the KHP Director of Human Resources, and she did so.

78.     On or about December 27, 2019, Harrington reported to Major Harrington that she was again physically touched, and felt singled out in a gender discriminatory manner, by Col. Jones.

79.     Harrington also reported this incident to the KHP Director of Human Resources.

80.     Harrington felt, and continues to feel, uncomfortable around Jones because he has repeatedly touched her even after she told him to not do so.

81.     Harrington reported this incident through email to Pfannenstiel, Director of Human Resources, with the statement, "this makes the third time he has placed his hands on me after I have specifically told him not to touch me again."

82.     On or about January 13, 2020, Pfannenstiel reported this incident to Craig Kibbe, her supervisor at Department of Administration by forwarding Harrington's email to him.

83.   Harrington's direct supervisor, Major Andrew Dean, has engaged in a pattern or practice of discrimination actions against her regarding her employment duties.

84.   Major Dean treats Harrington's employment supervision differently than he treats the male captains under his supervision.

85.   Harrington has been shut out of information regarding changes that directly impact her Troop, undermining her authority to command her Troop, and preventing her from effectively performing her job duties.

86.   Major Dean has placed employment duty demands on Harrington that make it impossible to perform her duties and succeed in her command of Troop K.

87.   On or about September 16, 2020, Harrington emailed Dean outlining his directives placed on her to complete the ordered tasks and stating that they were impossible to perform and that he was intentionally setting her up for failure of those tasks.

88.   Within her email, Harrington stated that none of the male captains under Dean's command were given the same directives as she was and that "you are intentionally setting me up for failure in an attempt to create the perception that I am incapable of performing my duties as a Captain."

89.   Major Dean's discriminatory pattern or practice of placing restrictions and demands on Harrington's command of Troop K, and his direct micromanagement of her employment duties, have continued and have left her in fear of losing her employment.

90.   Under information and belief, Major Dean's discriminatory actions against Harrington were authorized, or at least known, by Lt. De Vore and Col. Jones.

**McCurdy Directly Suffered Sexual Harassment and Gender Discrimination**

91.     Plaintiffs reallege and incorporate by reference each and every paragraph of this Complaint as though fully set forth herein.

92.     On or about April 19, 2019, McCurdy attended a training with other Troopers.

93.     At that training, Col. Jones introduced himself as the new Colonel and stated he wanted to meet the Troopers.

94.     Col. Jones simply shook the hands of every other Trooper, all males, until he approached McCurdy.

95.     McCurdy extended her hand to Col. Jones for a handshake, however, Col. Jones grabbed her hand and pulled her in for a physically uncomfortable and tight full chest-to-chest hug.

96.     McCurdy did not personally know Col. Jones, nor did she have any previous personal relationship with him.

97.     On or about September 7, 2019, McCurdy was on-duty providing security along the sidelines of the KU football game.

98.     McCurdy was the only female Trooper present, though there were other male Troopers also present and on-duty.

99.     Col. Jones greeted the male Troopers only by shaking their hands, but when McCurdy outstretched her hand to him, he again pulled her in for a physically uncomfortable and tight full chest-to-chest hug.

100.    In February 2020 McCurdy was at Troop B headquarters when she encountered Col. Jones.

101.    McCurdy was walking toward the front desk and passed Col. Jones in the hallway while he was on his way to speak with a Captain.

102.  Col. Jones grabbed McCurdy and again pulled her into a full hug as he passed her in the hall.

103.  On or about June 19, 2020, McCurdy was on special assignment as a coach at the KHP recruit academy.

104.  McCurdy was sitting with other coaches eating her home-packed lunch at a table with academy instructors and command staff.

105.  Col. Jones, sitting at the end of the same table, attempted to address McCurdy by shouting, "Woman! Woman! Hey Woman!"

106.  McCurdy turned and acknowledged Col. Jones by looking at him.

107.  Col. Jones asked McCurdy if she was eating her own food and McCurdy responded by stating, "Yes, Sir."

108.  Col. Jones responded to McCurdy by stating, "That's my girl!"

109.  This singling out of McCurdy, with the references to her gender by Col. Jones, was uncomfortable and humiliating for McCurdy, as well as to her peers at the table.

110.  Afterwards, her peers at the table told McCurdy that they felt Col. Jones's treatment of her and his words to her were demeaning.

111.  In June 2020, McCurdy spoke with the KHP Human Resources Director and reported all of these instances of sexual harassment and discrimination by Col. Jones.

112.  McCurdy also encouraged another female employee to formally report her gender discrimination complaints when she confided those events to McCurdy.

**Meader Directly Suffered Sexual Harassment and Gender Discrimination**

113.  Plaintiffs reallege and incorporate by reference each and every paragraph of this Complaint as though fully set forth herein.

114.   On or about October 24, 2019, Major Scott Harrington noticed that Meader was visibly upset and asked her why she was upset.

115.   Meader detailed to Major Harrington a sexual harassment incident by Col. Jones and stated that another employee had witnessed it.

116.   Col. Jones had walked over to Meader and picked up both of her hands, stated to her "my hands are so cold," and attempted to warm his hands with hers; Meader withdrew her hands from him.

117.   Meader relayed these details to Major Harrington and stated that she was intimidated by Col. Jones.

118.   Major Harrington encouraged Meader to report any sexual harassment to the KHP Director of Human Resources.

119.   Major Harrington then called Meader's direct supervisor, Major Josh Kellerman, and informed him of her report of sexual harassment.

120.   Major Harrington also called the KHP Director of Human Resources to report the sexual harassment.

121.   On or about October 31, 2019, Meader reported another sexual harassment incident regarding Col. Jones to Major Harrington.

122.   Meader reported to Major Harrington that she was scared of Col. Jones, she did not want him to put his hands on her, and that he made unwelcome sexual comments to her nearly every time he saw her.

123.   Meader reported to Major Harrington that while she was sitting down and eating lunch with another female employee, Meader was physically touched and then verbally sexually harassed by Col. Jones upon him entering the room.

124.   Col. Jones stood behind Meader, placed his hands on both of her shoulders, and began physically shaking her.

125.   Col. Jones then asked her why she always "shakes it" for him when he is around.

126.   Col. Jones walked away from Meader singing loudly and repeatedly, "shake it for me!"

127.   Major Harrington relayed this information to Major Kellerman, the direct supervisor of Meader.

128.   On or about November 5, 2019, Meader met with the KHP Director of Human Resources and reported both the October 24, 2019, and October 31, 2019, incidents of harassment.

129.   Meader told the Director of Human Resources that she was uncomfortable, in fear of what might happen next, and that she did not want to lose her job.

130.   On or about February 21, 2020, Meader reported to Major Harrington and Major Kellerman that another incident of sexual harassment by Col. Jones had occurred.

131.   Meader relayed the details of the incident to Major Harrington, which included physical touching, of a sexual nature, along with inappropriate comments, of a sexual nature.

132.   Col. Jones came up to Meader from behind, so close to her that she could physically feel his presence.

133.   Col. Jones stood there for an uncomfortably long period of time, put his hands on Meader's back and asked her, "does this make you feel uncomfortable?"

134.   Meader, uncomfortable, and unsure of what to say or do, responded affirmatively that she was uncomfortable.

135.   Col. Jones was so close to Meader when he asked his question that she could feel his breath on the back of her neck and it made her feel scared and disgusted.

136.   Col. Jones then laughed at Meader and walked away stating he was "a funny man."

137.   Major Harrington reported this incident to Meader's supervisor, Major Kellerman, as well as to the KHP Director of Human Resources.

138.   On March 3, 2020, Meader interviewed with the investigator for the Department of Administration.

139.   Meader reported the details of the sexual harassment she suffered by Col. Jones to the investigator.

140.   On or about May 27, 2020, Meader returned to the office after working remotely due to COVID policies.

141.   Upon her return, Meader was immediately sexually harassed by Col. Herman by an inappropriate physical touching, of a sexual nature.

142.   Col. Jones slid his hand down her arm, touched her across her legs, grabbed her left hand, made a statement that he welcomed her back to the office, and then proceeded to rub the back of her shoulders.

143.   Meader was in distress over this incident.

144.   Meader reported this incident directly to the KHP Director of Human Resources as well as to Major Harrington.

145.   Major Harrington reported the incident to the KHP Director of Human Resources and to Major Kellerman, Meader's supervisor.

146.   Major Kellerman told Meader that she was legally protected from retaliation for reporting the sexual harassment and gender discrimination and that she could confirm that with KHP Human Resources.

147. Major Kellerman also told Meader that she could continue to work from home, based upon COVID policies, and that this would also prevent Col. Jones from further sexually harassing her.

148. On July 23, 2020, Majors Harrington and Kellerman's employment was terminated.

149. With the loss of Majors Harrington and Kellerman at the office, Meader believed she had no supervisor to effectively protect her from the sexual harassment, hostile work environment, and discrimination she was suffering.

150. On or about July 27, 2020, Meader's new supervisor, Major Eric Sauer, told her that he was surprised she had the nerve to come back to work, referencing that Majors Harrington and Kellerman were no longer there.

151. Meader continued to suffer a discriminatory hostile work environment.

152. After the Majors' termination, the only person Meader trusted to confide in was a female co-worker that also worked on her floor of the building with her and had witnessed the harassment of Meader by Col. Jones.

153. On or about September 14, 2020, Major Sauer told her that she was not to take her breaks or lunches with this co-worker, or anyone else, on her work floor of the building.

154. This action by Major Sauer alienated Meader from her peers and left her with no other employees to provide her support for the sexual harassment she suffered.

155. Due to the sexual harassment, hostile work environment, and discrimination Meader suffered by KHP, Meader could no longer tolerate working at KHP and resigned her employment effective October 9, 2020.

156. Meader's resignation amounts to a constructive discharge by her employer.

**Corazzin-McMahan Directly Suffered Gender Discrimination When KHP Treated Her Differently Than a Male Coworker for the Same Action**

157.    Plaintiffs reallege and incorporate by reference each and every paragraph of this Complaint as though fully set forth herein.

158.    On or around August 19, 2019, KHP Lt. John McMahan and Corazzin-McMahan informed Lt. McMahan's supervisor, Capt. Wesley Ludolph, that they had entered a romantic dating relationship.

159.    While disclosing the relationship to Capt. Ludolph, Corazzin-McMahan expressed her concern that her supervisor, Lt. Thomas Catania, would take retaliatory actions against her.

160.    On or about August 20, 2019, Lt. McMahan's now ex-wife filed a claim with KHP's Professional Standards Unit ("PSU"), making allegations that Lt. McMahan and Corazzin-McMahan were engaged in an inappropriate romantic relationship while on-duty.

161.    The allegations that an on-duty relationship occurred were later deemed false after PSU's investigation.

162.    On or about September 9, 2019, Corazzin-McMahan received a request to provide a letter to PSU regarding the facts of her relationship with Lt. McMahan.

163.    Corazzin-McMahan cooperated and fully responded to PSU's request for information.

164.    Corazzin-McMahan admitted that she was in a romantic relationship with Lt. McMahan after his then-wife had filed for divorce, but before that divorce was officially finalized in court.

165.    In September 2019, Corazzin-McMahan was entitled to a routine employment performance evaluation, though none was provided to her.

166.    On or about September 12, 2019, Corazzin-McMahan was relieved of the majority of her employment duties via an email from Lt. Catania.

167.   On or about September 12, 2019, Lt. Catania sent out an email to notify of the staffing change, including two of the civilian employees under Corazzin-McMahan's supervision, but excluding Corazzin-McMahan, within the email recipients.

168.   On or about September 20, 2019, Lt. McMahan and Corazzin-McMahan were married.

169.   After October 12, 2019, Ludolph spoke to Lt. McMahan, as Corazzin-McMahan's husband, regarding her employment issues with KHP.

170.   Ludolph told Lt. McMahan that Corazzin-McMahan had employment issues, though he did not specify to Lt. McMahan what those issues were, nor did he disclose any of this information to Corazzin-McMahan.

171.   On or about November 15, 2019, Corazzin-McMahan's employment supervision was temporarily reassigned to Capt. Ludolph.

172.   Under information and belief, Capt. Ludolph was following his chain of command's orders regarding Corazzin-McMahan's adverse employment actions.

173.   Under information and belief, Capt. Ludolph reported to and received instructions and orders from Major Michael Murphy and Lt. Col. De Vore.

174.   On or about November 18, 2019, Capt. Ludolph issued a letter of reprimand to both Lt. McMahan and Corazzin-McMahan, which concluded that while they were not engaged in a romantic relationship while on-duty, they did engage in a romantic relationship prior to McMahan's divorce decree being finalized by a court.

175.   The letter concluded that action was, by Merriam-Webster Dictionary's definition, "infidelity."

176.   The letter also cited to the Kansas Statutes Annotated 21-5511, which is a criminal statute setting forth the criminal elements for "adultery."

177. The letter concluded that if they engaged in these actions in the future, it may result in disciplinary action.

178. Lt. McMahan suffered no other actions regarding his employment for his role in engaging in a romantic relationship with Corazzin-McMahan while he was still legally married to another.

179. However, Corazzin-McMahan suffered adverse employment actions for her role in engaging in a romantic relationship with McMahan while he was still legally married to another.

180. From September through December 2019, Corazzin-McMahan suffered a hostile work environment and adverse employment actions.

181. Corazzin-McMahan was intentionally isolated and given only menial tasks to perform.

182. Corazzin-McMahan suffered verbal ridicule and harassment from co-workers regarding the relationship with her husband Lt. McMahan.

183. Corazzin-McMahan was removed from decision-making meetings which directly interfered with her employment responsibilities with grant payments.

184. Corazzin-McMahan was excluded from communications to her employee subordinates and she was removed from supervisory decision-making and leadership meetings.

185. Corazzin-McMahan complained to her supervisors that these actions were improper adverse employment actions directly related to her relationship and marriage with Lt. McMahan; she notified Ludolph in-person and through emails with attachments to reference her concerns.

186. Corazzin-McMahan's employment duties were never reinstated.

187.  On or about November 21, 2019, Corazzin-McMahan met with KHP Human Resources and requested the past-due performance evaluation be completed.

188.  The performance evaluation was never completed for Corazzin-McMahan.

189.  Corazzin-McMahan applied to the open paralegal position at KHP General Headquarters, a position that she was qualified for.

190.  Corazzin-McMahan was not granted an interview for the paralegal position.

191.  Due to the hostile work environment and adverse employment actions against her, including her loss of her employment duties, Corazzin-McMahan resigned her employment effective December 13, 2019.

192.  Corazzin-McMahan's resignation amounts to a constructive discharge by her employer.

## Cooper Directly Suffered Gender Discrimination

193.  Plaintiffs reallege and incorporate by reference each and every paragraph of this Complaint as though fully set forth herein.

194.  Cooper was transferred to KHP Troop C on or about October 18, 2020.

195.  Cooper was engaged to Trooper Lucas Byron, a male, who was also assigned to Troop C.

196.  On or about October 21, 2020, Cooper was assigned to the KHP office in Manhattan, Kansas, and Trooper Byron was assigned to work a construction zone in Junction City, Kansas.

197.  On his way to his assignment, Trooper Byron went to the KHP office to deliver a water bottle to Cooper.

198.  Lt. Proffitt counselled both Cooper and Trooper Byron regarding the delivery of the water bottle while on-duty.

199. Lt. Proffitt told Cooper that while it was acceptable for zone members to run errands for each other, it was not acceptable for Trooper Byron to run an errand for Cooper on company time.

200. Cooper relayed to Lt. Proffitt that she believed he was discriminating against her because of her relationship status with Trooper Byron.

201. Lt. Proffitt told Cooper that she should expect to be noticed and looked at differently because of her unique situation with Trooper Byron.

202. Lt. Proffitt did not treat Trooper Byron's employment supervision differently than other male troopers.

203. Cooper and Trooper Byron were married on November 7, 2020.

204. As KHP Troopers with Troop C, both Cooper and Trooper Byron were directly supervised by Lt. Proffitt.

205. Lt. Proffitt treated Cooper's employment supervision differently than Trooper Byron regarding their marital relationship status.

206. Lt. Proffitt harassed Cooper in his supervision by routinely questioning her employment duty performance and micromanaging the details of her duty, including specific timing of lunch breaks.

207. Lt. Proffitt did not perform his supervision of male troopers in this manner.

208. Lt. Proffitt engaged in a pattern or practice of surveilling Cooper to determine her whereabouts while employed.

209. Lt. Proffitt did not engage in this pattern or practice for male KHP employees under his employment supervision.

210.   On or about November 4, 2020, Lt. Proffitt drove to the KHP office to determine whether Cooper was present at the office.

211.   Upon not seeing her vehicle at the office, Lt. Proffitt drove to Cooper's apartment complex to visually look for her vehicle.

212.   On or about November 16, 2020, Lt. Proffitt drove to the KHP office to determine whether Cooper was present at the office.

213.   On or about November 19, 2020, Lt. Proffitt was discovered by Trooper Byron as Lt. Proffitt was sitting and watching Cooper's apartment.

214.   Upon discovering Lt. Proffitt, Trooper Byron engaged in a conversation with Lt. Proffitt during which Lt. Proffitt suggested that Cooper was not likely enjoying her job and that Lt. Proffitt was attempting to make her want to leave her employment.

215.   Lt. Proffitt did not perform such surveillance and employment duties micromanagement with male employees under his supervision, therefore, treating Cooper differently.

**Cooper Also Suffered Pregnancy (Gender) Discrimination**

216.   For all times relevant to Cooper's allegations in this Complaint, she was pregnant.

217.   During her pregnancy, Cooper was placed on medical restrictions by her physician.

218.   Cooper relayed her physician's medical restrictions to her supervisors.

219.   KHP Lt. Edna Cordner was in charge of tasking Cooper with limited duty assignments, as related to Cooper's pregnancy status.

220.   On or about October 21, 2020, Cooper was informed by Lt. Cordner that Cooper was to have limited duty restrictions additional to those placed from Cooper's physician.

221.   Lt. Cordner told Cooper that Cooper would adhere to the additional restrictions to ensure that she did not overextend herself.

222.  On or about October 21, 2020, Lt. Scott Proffitt, Cooper's direct supervisor, discussed "command staff's" limited duty plans for her.

223.  Lt. Proffitt told Cooper that he initially discussed assigning Cooper to check VINs for her Troop with Capt. Hyman, however, Capt. Hyman set the restriction that she was to have no personal contact with the public.

224.  Cooper's physician did not recommend any restriction regarding personal contact with the public.

225.  On or about October 21, 2020, Cooper requested the approval from Troop C command staff to attend training courses on November 2-5, 2020, in Topeka, Kansas.

226.  Cooper was previously approved to attend these courses prior to her transfer to Troop C.

227.  Lt. Proffitt told Cooper that Capt. Hyman had refused the approval for her attendance, due to her physician's driving restriction of not driving more than one hour per shift.

228.  Cooper informed Lt. Proffitt that her attendance at the training courses would not violate that restriction.

229.  Cooper then asked Lt. Proffitt if she could still attend the training if she provided KHP with documentation from her physician approving her driving to the training.

230.  Lt. Proffitt responded that he would check with Capt. Hyman.

231.  Cooper then confirmed with Lt. Dax Lewis, who was hosting the training courses, that he would hold her attendance spot for her to allow her time to meet with her physician.

232.  On October 28, 2020, Cooper received the documentation from her physician specifically allowing her to drive to the training.

233.  On October 28, 2020, Cooper faxed the physician documentation to KHP Human Resources and Lt. Proffitt.

234.    On October 28, 2020, Cooper confirmed with Lt. Lewis that her physician had approved her attendance and that her spot was still available for her attendance.

235.    On October 30, 2020, Cooper asked Lt. Proffitt about the status of her approval to attend the training.

236.    Lt. Proffitt informed her that Capt. Hyman had still denied the approval and stated the training spot had been filled.

237.    Due to the gender discrimination, hostile work environment, and adverse employment actions against her, including her loss of employment duties and the increased restrictions placed on her employment duties, Cooper resigned her employment effective December 31, 2020.

238.    Cooper's resignation amounts to a constructive discharge by her employer.

### Pfannenstiel Suffered Retaliation for Reporting the Sexual Harassment of KHP Employees and for Engaging in Acts Opposing KHP's Discrimination

239.    Plaintiffs reallege and incorporate by reference each and every paragraph of this Complaint as though fully set forth herein.

240.    On or about October 11, 2019, Pfannenstiel reported her complaints regarding the inappropriate instant messages she received from Col. Jones to Craig Kibbe, her supervisor within the Department of Administration.

241.    Pfannenstiel also reported the complaints she was receiving regarding other female KHP employees' complaints of discrimination and sexual harassment to Craig Kibbe.

242.    On or about October 25, 2019, Pfannenstiel reported to Major Harrington, her supervisor within KHP, that she had discussed the details of the gender discrimination and sexual harassment of female KHP employees with Craig Kibbe.

243.   On or about February 20, 2020, Pfannenstiel emailed Kraig Knowlton, Director of the Office of Personnel Services for Kansas Department of Administration, providing him with the documentation of Harrington's sexual harassment complaints that Pfannenstiel had collected, as KHP's Director of Human Resources.

244.   Pfannenstiel also stated to Knowlton that she had talked to Harrington and that Harrington was agreeable to meeting with him regarding her complaints.

245.   From October 2019 through July 2020, Pfannenstiel repeatedly reported actions and updates regarding the discrimination and sexual harassment of female KHP employees to Craig Kibbe and Knowlton at the Department of Administration.

246.   On or about March 26, 2020, Knowlton reported the discrimination and harassment allegations of some of the female KHP employees to Will Lawrence, Chief of Staff, and Ryan Wright, Deputy Chief of Staff for the Office of the Governor.

247.   Knowlton specifically named Pfannenstiel as the initiator of the KHP discrimination investigation and stated that "it was her opinion that the individuals were too concerned with the possibility of retaliation" to come forward.

248.   Knowlton's reported information provided many details of Pfannenstiel's personal observations of inappropriate and discriminatory behaviors by KHP's chain of command, as well as provided her opinions that KHP female employees were subjected to workplace discrimination and that Col. Jones and Lt. Col. De Vore behave as if they are "untouchable."

249.   Knowlton's identification of Pfannenstiel and her involvement regarding reporting discrimination placed a target on Pfannenstiel for retaliation by KHP's chain of command.

250. Additionally, in June 2020 Pfannenstiel detailed the actions of discrimination and sexual harassment of female KHP employees to attorneys conducting an investigation requested by the State.

251. Upon information and belief, the investigation conducted by the attorneys provided the State and KHP supervisors with the identification of KHP employees reporting discrimination and sexual harassment, including Pfannenstiel.

252. Following Pfannenstiel's reports of discrimination and harassment of KHP employees to the Department of Administration and the State's hired law firm investigation Col. Jones and Lt. Col. De Vore engaged in a pattern or practice of retaliatory actions against her employment duties.

253. By June 2020, Pfannenstiel's decision making authority, as the Director of KHP Human Resources, was reduced and her professional recommendations regarding the Human Resources department were ignored.

254. Col. Jones and Lt. Col. De Vore made policy changes, without the consultation or review of Pfannenstiel, which directly impacted her staff's ability to properly execute their responsibilities.

255. Col. Jones and Lt. Col. De Vore undermined Pfannenstiel's authority and prevented her from effectively performing her job duties.

256. These employment actions are retaliatory as they are a direct result of Pfannenstiel's actions in opposition to KHP's discrimination and harassment.

**Harrington Suffered Retaliation for Reporting the Sexual Harassment of KHP Employees and Engaging in Acts Opposing KHP's Discrimination**

257. Plaintiffs reallege and incorporate by reference each and every paragraph of this Complaint as though fully set forth herein.

258. On or about February 21, 2020, Harrington met with Kraig Knowlton, Director of the Office of Personnel Services for Kansas Department of Administration.

259. Harrington reported her concerns of the sexual harassment and gender discrimination of herself, and of other female KHP employees, to Knowlton.

260. Knowlton told Harrington that the Department of Administration was planning to initiate an investigation into the complaints.

261. On or about February 28, 2020, Harrington met with an investigator with the Department of Administration and reported the details of the allegations of the workplace sexual harassment and gender discrimination of herself and other female KHP employees.

262. On or about March 26, 2020, Knowlton reported the discrimination and harassment allegations of some of the female KHP employees to Will Lawrence, Chief of Staff, and Ryan Wright, Deputy Chief of Staff for the Office of the Governor.

263. Knowlton specifically named Harrington as a reporter of the KHP discrimination and sexual harassment complaints and stated that she had encouraged other female employees to come forward as well.

264. Knowlton's reported information provided many details of Harrington's personal observations of inappropriate and discriminatory behaviors by KHP's chain of command but placed those details against Harrington in a deliberately negative light toward Col. Jones, Lt. Col. De Vore, and others within chain of command.

265. Knowlton's identification of Harrington and her involvement regarding reporting discrimination placed a target on Harrington for retaliation by KHP's chain of command.

266.   Additionally, in June 2020 Harrington detailed the actions of discrimination and sexual harassment of female KHP employees to attorneys conducting an investigation as requested by the State.

267.   Upon information and belief, the investigation conducted by the attorneys provided the State and KHP supervisors with the identification of KHP employees reporting discrimination and sexual harassment, including Harrington.

268.   On or about September 9, 2020, Harrington filed a formal complaint with the EEOC, alleging discrimination and retaliation, against KHP and the State of Kansas.

269.   Both KHP and the State of Kansas were provided notice of Harrington's EEOC complaint filings.

270.   Following Harrington's reports of discrimination and harassment of KHP employees to KHP Human Resources, the Department of Administration, the State's hired law firm investigation, and the filing of a formal complaint with the EEOC, Harrington's direct supervisor, Major Dean, has engaged in a pattern or practice of retaliatory actions against her employment duties.

271.   Harrington has been shut out of information regarding changes that directly impact her Troop, undermining her authority to command her Troop, and preventing her from effectively performing her job duties.

272.   These employment actions are retaliatory as they are a direct result of Harrington's actions in opposition to KHP's discrimination and harassment.

273.   Major Dean has placed employment duty demands on Harrington that make it impossible to perform those duties and succeed in her command of Troop K.

274. Harrington notified Major Dean that his employment demands and restrictions against her are retaliation for her opposition actions to KHP discrimination.

275. On or about September 16, 2020, Harrington emailed Dean outlining his directives placed on her to complete the ordered tasks and stating that they were impossible to perform and that he was intentionally setting her up for failure of those tasks.

276. Within her email, Harrington stated that none of the male captains under Dean's command were given the same directives as she was and that "you are intentionally setting me up for failure in an attempt to create the perception that I am incapable of performing my duties as a Captain which I believe is directly connected to the fact you are well aware that I filed a formal EEOC complaint against certain members of the KHP for retaliation and sexual discrimination."

277. Major Dean's retaliatory pattern or practice of placing restrictions and demands on Harrington's command of Troop K, and his direct micromanaging of her employment duties, have continued and have left her in fear of losing her employment.

278. Under information and belief, Major Dean's retaliatory actions against Harrington were authorized, or at least known, by Lt. De Vore and Col. Jones.

**Kansas Highway Patrol Created a Hostile Work Environment**

279. Plaintiffs reallege and incorporate by reference each and every paragraph of this Complaint as though fully set forth herein.

280. Leadership at KHP allowed a hostile work environment to flourish.

281. Lt. Col De Vore is known within KHP to openly have the opinion that women do not belong in law enforcement.

282.   Former female KHP employees documented in their exit interviews that they left their employment because of the hostile work environment and discrimination against females within KHP and that they would not endure it any longer.

283.   Col. Jones has openly made offensive sexual jokes in the presence of female KHP employees.

284.   Upon seeing an advertisement for a hotel, which depicted women by a pool dressed in bikinis, on the computer screen of a female KHP employee, Col. Jones stated that the hotel had the best view.

285.   On or about October 28, 2019, a KHP employee reported to KHP Major Scott Harrington that Col. Jones made an inappropriate sexual comment to female KHP employees at the KHP Academy in Salina, stating that he needed to check his "flow" while making sexual body gestures.

286.   The female KHP employee was unhappy about the comments and actions by Col. Jones and stated that she believed them to be inappropriate.

287.   The female KHP employee stated that she tries to "tune out" a lot of what Col. Jones says to her because of the many inappropriate things he says to the female KHP employees.

288.   On or about December 5, 2019, a KHP employee reported to Major Scott Harrington that, while attending the Troop J recruit graduation, Col. Jones again stated to female KHP employees that he needed to check his "flow" while making sexual body gestures.

289.   The female KHP employees also reported that, while it was offensive to them, they were "used to" his inappropriate behavior and that it had become the "norm" when he was in the building.

290.    Col. Jones told a female KHP staff employee that her voice sounded like a phone sex operator.

**The State of Kansas Allowed a Hostile Work Environment to Thrive and Continue**

291.    From at least October 2019 through February 2020, the Department of Administration was receiving information and reports of discrimination and hostile work environment from Pfannenstiel, as the KHP Director of Human Resources.

292.    In February 2020, the Department of Administration began an investigation into the discrimination complaints from KHP employees.

293.    Though information was provided in that investigation that Majors Harrington and Kellerman had personal knowledge of the discrimination and that they had received numerous complaints of discrimination by KHP employees, the Department of Administration did not interview them, nor was there any attempt to communicate with either of them.

294.    On or about February 24, 2020, following another incident report by Meader, Pfannenstiel emailed Knowlton that Majors Kellerman and Harrington are asking what is going to be done and that they were ready to walk Meader into Col. Jones's office and tell him to stop his harassment.

295.    Knowlton responded that his investigation would take time and that "if they're expecting some report or decision from us in the next few days, that's not going to happen."

296.    On or about February 26, 2020, Pfannenstiel emailed Knowlton and stated that the reason Meader had not made a statement or gesture that "clearly" indicated the actions by Col. Jones were unwanted was because "when it happens she simply freezes until he goes away."

297. Pfannenstiel's email directly placed the State of Kansas, through Knowlton, on factual notice that the touching and sexual harassment actions by Col. Jones to Meader was unwanted.

298. On or about March 3, 2020, Pfannenstiel reported to Knowlton that Col. Jones told a female KHP staff employee that she sounds like a phone sex operator.

299. On or about March 5, 2020, Pfannenstiel reported to Knowlton that a long-time employee had resigned in February 2020 for lower paying employment, noting the discrimination and sexual harassment of women in the KHP office as a reason for her leaving.

300. On or about March 5, 2020, Pfannenstiel reported to Knowlton that a long-time employee had transferred to another state agency in September 2019, noting the discrimination and sexual harassment of other women in the KHP office as a reason for her leaving.

301. Pfannenstiel also reported that the September 2019 departing employee stated that the women are targeted with discriminatory comments and a hostile work environment at KHP and that Col. Jones makes demeaning statements which make it obvious that he sees women as lesser beings.

302. On or about March 26, 2020, Knowlton prepared a "*Draft* Preliminary Summary of Findings" ("Summary") regarding the investigation of the female KHP employees reporting complaints of sexual harassment and gender discrimination.

303. Knowlton directed his Summary to Will Lawrence, Chief of Staff, and Ryan Wright, Deputy Chief of Staff, for the Office of the Governor.

304. Knowlton's Summary concluded that the female employees interviewed were not credible, that they were biased against Col. Jones, and explained away any inappropriate behaviors by Col. Jones.

305. Knowlton's Summary specifically stated that although there was a conclusion that Col. Jones had made physical contact with Meader, it could not be categorized as sexual harassment because "the exact nature of the physical contact cannot be ascertained, nor can it be clearly documented that Meader informed Col. Jones that the contact was unwelcome."

306. Knowlton did not inform the female KHP employees who participated in the investigation that a Summary was drafted and sent to the Office of the Governor, along with their identities.

307. Knowlton never provided any of the female KHP employees with a copy of the Summary.

308. Knowlton did not disclose to any of the female KHP employees that he had concluded that they were biased against Col. Jones, and that despite all the information relayed to him, he concluded there was no sexual harassment.

309. Instead, Knowlton avoided providing any of the information in his Summary to the female employees, even when directly asked.

310. On or about April 14, 2020, Harrington emailed Knowlton asking for an update on the Department of Administration's February 2020 investigation because "I need reassurance we have not been forgotten."

311. On or about April 16, 2020, Knowlton responded that "the preliminary findings are currently under review" and that he had "no definitive timeline on when things may be finalized…."

312. On or about May 7, 2020, Harrington emailed Knowlton again asking for a status update on the Department of Administration's investigation.

313.   Knowlton responded to Harrington that "I understand your concern, but as I'm sure you can understand, investigations of this scope take time" and that "all appropriate parties are aware of the matter and are reviewing the information that was uncovered over the course of the investigation."

314.   On or about May 28, 2020, Knowlton informed Pfannenstiel that he had provided the results of the Department of Administration's investigation to the Governor's office, though he would not tell her when the results were sent and stated that he "couldn't remember" when he had done so.

315.   Knowlton gave no information as to the contents of his Summary and he did not disclose to Pfannenstiel that his Summary concluded that the women were not credible and that the State would not be intervening to cease the discrimination and hostile work environment.

316.   Pfannenstiel asked Knowlton if the Governor's Chief of Staff, Will Lawrence, had the investigation results and Knowlton only responded that he had provided the results to the Governor's legal counsel, Clay Britton.

317.   On or about June 3, 2020, Pfannenstiel reported to Knowlton that Meader was back [from working remotely for COVID] one day and already Col. Jones had put his hands on her and that Meader was fearful of further incidents and for her job.

318.   On June 11, 2020, Pfannenstiel emailed Knowlton to inform him of a report she received from the acting captain over KHP's Professional Standards Unit regarding his concerns of Meader's emotional well-being at work.

319.   Pfannenstiel stated in her email to Knowlton that the acting captain is "concerned about her" and "he is very by the book and wants to start asking questions and if necessary do an investigation."

320.   Pfannenstiel stated in her email to Knowlton, referencing a recent suicide within KHP, that she was concerned that something would also happen to Meader or "any of the others" because of the amount of stress that the sexual harassment has added to the work environment.

321.   Pfannenstiel stated in her email to Knowlton that "I need you all to know that we are at a place where we are considering having Kimberly [Meader] work from home simply to avoid this offender [Col. Jones]."

322.   Pfannenstiel stated in her email to Knowlton that if something did not happen soon to correct Col. Jones's behavior, someone was going to confront Jones and the media would be notified.

323.   Pfannenstiel stated in her email to Knowlton that someone within KHP confronting Col. Jones would be "counter-productive in that he will most certainly retaliate."

324.   Pfannenstiel stated in her June 11, 2020 email to Knowlton that she was concerned that "this has drug on too long. I cannot keep telling people 'it's being looked at.'"

325.   Knowlton responded to Pfannenstiel stating "please know that both D of A and the Governor's Office have taken this matter seriously and continue to act diligently towards its resolution" and "the investigation has taken longer than it normally would have" and that "with regard to the [acting captain of PSU] he is certainly free to initiate whatever KHP process he deems appropriate but that might complicate the ongoing inquiry."

326.   On or about June 22, 2020, Pfannenstiel reported to Knowlton that Lt. Col. De Vore openly stated to command level employees that women belong in the home.

327.   On or about June 22, 2020, Pfannenstiel reported to Knowlton that on June 18, 2020, during a new employee orientation for recently hired Trainees, Lt. Col. De Vore stated, "there are two things that will keep you from being successful: your mouth and your zipper."

**The State of Kansas Defended and Excused KHP's Sexual Harassment and Discrimination**

328.   Knowlton's Summary acknowledged that during Harrington's February 28, 2020 interview she told the investigator that Col. Jones does not care that she specifically told him not to touch her and that she finds it offensive and it makes her uncomfortable.

329.   Knowlton's Summary acknowledged that during Meader's March 3, 2020 interview she told the investigator "the more Col. Jones is asked to stop, the more he continues to do it."

330.   Knowlton's Summary acknowledged that during Meader's March 3, 2020 interview the investigator asked Meader what she hopes to happen as a result of the investigation and she stated "that she would just like Col. Jones to stop touching her."

331.   Knowlton's Summary acknowledged that during Pfannenstiel's March 5, 2020 interview the investigator asked Pfannenstiel what she hopes to happen as a result of the investigation and she stated that "Col. Jones needs to be made to stop but that she does not believe that will happen."

332.   Knowlton's Summary acknowledged that during a former KHP female employee's March 4, 2020 interview she stated that "Col. Jones and Lt. Col. De Vore made her feel like she should be in the kitchen."

333.   Knowlton's Summary states that this same former KHP female employee told the interviewer that she made comments "about the bias against women in the agency as part of her exit interview."

334.    Regarding this same former KHP female employee, Knowlton's Summary states that "a review of her exit interview form shows that she cited 'family discord' and 'relations with supervisor' as her reasons for separation."

335.    However, regarding this same former KHP female employee, Knowlton's Summary does not acknowledge that those reasons were only check-mark categories, which provide no option for any discrimination reasons for separation.

336.    Regarding this same former KHP female employee, Knowlton's Summary does not acknowledge her circled answer of "yes" to the very next question on the exit interview: "Did you encounter any discrimination or harassment in your work environment? If yes, briefly describe," nor does it acknowledge her written answer to that question regarding the frequent comments she has witnessed made by Col. Jones to a younger female employee.

337.    Knowlton's Summary concluded that "due to the extremely strong likelihood of bias against Col. Jones" by the female employees making the complaints, it was difficult to wholly substantiate the allegations.

338.    Knowlton's Summary also concluded that while there was enough evidence to conclude that Col. Jones made physical contact with Meader, the conduct cannot be categorized as sexual harassment because it was not "clearly documented that Meader informed Col. Jones that the contact was unwelcome."

339.    Knowlton's Summary also concluded that Col. Jones's "double entendres or questionable statements" could not be clearly defined as sexual harassment because "it is entirely possible that Col. Jones was indeed trying to be funny, but his comments were viewed by others as inappropriate instead."

**The State of Kansas Perpetuated the Discrimination, Harassment,
and Hostile Work Environment**

340.    Plaintiffs reallege and incorporate by reference each and every paragraph of this Complaint as though fully set forth herein.

341.    The State was on direct notice of the discrimination, sexual harassment, and hostile work environment allegations through reports by Majors Harrington and Kellerman, KHP Director of Human Resources, Department of Administration, the interviews of female employees and their reports, the Preliminary Summary of Findings provided to the Governor's office, and the investigation by a private law firm requested by the State.

342.    The State took no actions to cease the sexual harassment, hostile work environment, and discrimination.

343.    Instead, through public statements made by employees of KHP and the Governor's Office, the State publicly excused, explained, and condoned the actions by Col. Jones.

344.    The State's supportive responses of Col. Jones to rebut the female employees' allegations made against Col. Jones increased the severity of the hostile work environment and actions of discrimination against female KHP employees.

345.    On July 23, 2020, Col. Jones ended the KHP employment of Major Harrington and Major Kellerman.

346.    With the loss of Majors Harrington and Kellerman in the chain of command, the KHP female employees believed there was now no supervisor to effectively protect them from the sexual harassment, hostile work environment, and discrimination they were suffering.

347.   Additionally, Col. Jones ending the employment of Majors Harrington and Kellerman had a chilling effect on other male KHP employees' actions to support and assist the female employees' reports of discrimination and harassment.

348.   The State's supportive responses of Col. Jones's decision to end the employment of Majors Harrington and Kellerman also had a chilling effect on other male KHP employees' actions to support and assist the female employees' reports of discrimination and harassment.

349.   The State's supportive responses of Col. Jones had a chilling effect on the female employees, deterring them from reporting the hostile work environment and actions of discrimination against them at KHP.

**Pfannenstiel, Harrington, and Meader were Specifically Named by the Kansas Department of Administration as Employees Reporting the Sexual Harassment of KHP Employees and Acting in Opposition of KHP's Prohibited Discrimination**

350.   Plaintiffs reallege and incorporate by reference each and every paragraph of this Complaint as though fully set forth herein.

351.   Knowlton, Director of the Office of Personnel Services for Kansas Department of Administration, prepared a "*Draft* Preliminary Summary of Findings" ("Summary") regarding the investigation of the female KHP employees reporting complaints of sexual harassment and gender discrimination.

352.   Knowlton's Summary is dated March 26, 2020, and was directed to Will Lawrence, Chief of Staff, and Ryan Wright, Deputy Chief of Staff for the Office of the Governor.

353.   Knowlton's Summary detailed many of the same allegations of sexual harassment and discrimination that are alleged within this Complaint.

354.   Knowlton's Summary specifically identified the women interviewed as reporters of discrimination and sexual harassment at KHP.

355.   Upon information and belief, Col. Jones was informed of Knowlton's Summary and its contents.

**The Law Firm Investigation Requested by the State Identified the Employees Reporting Sexual Harassment and Those Acting in Opposition of KHP's Prohibited Discrimination**

356.   Plaintiffs reallege and incorporate by reference each and every paragraph of this Complaint as though fully set forth herein.

357.   On or about June 17, 2020, Harrington and Meader both reported to Major Harrington that they had met with law firm attorneys that, under information and belief, were hired by the State to conduct an investigation regarding the discrimination allegations made against Col. Jones and KHP.

358.   During Meader's interview, she felt the attorneys made fun of her and blamed her for Col. Jones's conduct toward her.

359.   Meader was told by the attorneys that the reason people were concerned about her was because of her own personal life, which was also to blame for Col. Jones's actions toward her.

360.   Meader did not believe that the investigation was taken seriously, nor would positive results occur from it.

361.   Meader also told the investigation attorneys that female KHP employees had been reporting their discrimination complaints to Major Harrington, Major Kellerman, and KHP Human Resources.

362.   On or about June 23, 2020, one of the attorneys conducting the investigation traveled to Salina to interview McCurdy and another female KHP employee.

363.   During that meeting, the attorney told McCurdy and the other employee that they would be speaking to Col. Jones later that day and that they may mention a few names to him.

364.    McCurdy relayed this statement to the other interviewed employees and it sent panic through the victim employees providing information to the attorneys.

365.    On or about June 23, 2020, Pfannenstiel called one of the attorneys conducting the investigation to ask if it were true that names of the employees reporting the discrimination and sexual harassment would be provided to Col. Jones.

366.    Pfannenstiel was told by the attorney that the employees were covered by law and that retaliation is "illegal."

367.    Pfannenstiel told the attorney that retaliation would be imminent if employees reporting the discrimination and harassment were identified to Col. Jones.

368.    The attorney told Pfannenstiel that any retaliation that happened would have to be taken up by employees filing claims.

369.    The attorney told Pfannenstiel that it would be "impressed upon the Colonel" that retaliation was illegal and also stated that "these things have a way of working themselves out."

370.    Pfannenstiel did not believe that the investigation would positively address the sexual harassment and gender discrimination within KHP.

371.    Under information and belief, the State's requested attorney-conducted investigation of the allegations of sexual harassment and discrimination of KHP female employees identified the employees acting in opposition to discrimination to Col. Jones.

372.    Even if the attorneys did not specifically identify to Col. Jones the employees acting in opposition to discrimination, the attorneys' statements to the female employees that they intended to do so had a chilling effect on the employees and their willingness to come forward to further report harassment, discrimination, and retaliation.

**First Amendment Violations:**

**Pfannenstiel and Harrington Also Exercised Their Free Speech Rights and
Reported KHP's Discrimination to Officials Outside the Agency**

373.   Plaintiffs reallege and incorporate by reference each and every paragraph of this Complaint
as though fully set forth herein.

374.   In November 2019, Harrington met with a Kansas Senator ("Legislator A"). Harrington
provided Legislator A with documentation of her complaints of sexual harassment,
discrimination, retaliation, and intimidation by KHP.

375.   Legislator A told Harrington that they would discuss the issues directly with Gov. Kelly.

376.   Harrington's meeting and discussions with Legislator A were completed in an effort to
inform Legislator A of the female KHP employees' complaints of discrimination and
harassment; to seek guidance regarding reporting their complaints; to discuss these illegal
actions by Col. Jones within KHP; and to inform Legislator A of the low morale within
KHP itself.

377.   Harrington's conversations with Legislator A were in Harrington's personal capacity,
outside the scope of her employment with KHP, to provide information relating to matters
of public interest, and to seek advice on how to report the illegal behaviors of Col. Jones
and Lt. Col. De Vore.

378.   Between November and December of 2019, Harrington spoke with a Representative for
the Kansas House ("Legislator B").   She relayed her knowledge of the retaliation,
discrimination, and sexual harassment of female employees within KHP.

379.   Harrington's discussions with Legislator B were completed in an effort to inform
Legislator B of the female KHP employees' complaints of discrimination and harassment;

to discuss these illegal actions by Col. Jones within KHP; and to inform Legislator B of the low morale within KHP itself.

380. Harrington's conversations with Legislator B were in Harrington's personal capacity, outside the scope of her employment with KHP, and to provide information relating to matters of public interest regarding the illegal discriminatory behaviors of Col. Jones and Lt. Col. De Vore.

381. On or about May 28, 2020, Pfannenstiel informed the president of the Kansas State Troopers Association of the details regarding her personal knowledge of the discrimination and sexual harassment allegations made within this Complaint.

382. Pfannenstiel reported these allegations to him to speak out on matters of public concern regarding the illegal discriminatory behaviors of Col. Jones and Lt. Col. De Vore and did so outside the scope of her employment.

**Pfannenstiel, Harrington, McCurdy, and Meader Exercised Their Free Speech Rights and Reported KHP's Discrimination and Harassment to the Media**

383. Plaintiffs reallege and incorporate by reference each and every paragraph of this Complaint as though fully set forth herein.

384. On or about August 17, 2020, Pfannenstiel, Harrington, McCurdy, and Meader interviewed with a television news journalist, Lara Moritz, to report their knowledge of KHP's sexual harassment and discrimination to the public.

385. During the interviews, Pfannenstiel, Harrington, McCurdy, and Meader withheld their identities from the public to protect them from additional retaliation and harassment by KHP for speaking out to the public.

386. The interviews were televised with their faces shadowed and their voices digitally disguised.

387. The interviews provided detailed information of the discrimination and sexual harassment they experienced as employees of KHP, as well as their fears of retaliation for speaking out against KHP's hostile work environment.

388. Pfannenstiel, Harrington, McCurdy, and Meader completed the interviews to inform the public of the female KHP employees' complaints of discrimination and harassment within the agency; to discuss the illegal actions within KHP; and to inform the public of the hostile work environment within KHP.

389. The interviews were in their personal capacities, outside the scope of their employment with KHP, and were to provide information relating to matters of public concern regarding the illegal discriminatory behaviors of Col. Jones, Lt. Col. De Vore, and others within State of Kansas employment.

390. The interviews have publicly aired on three occasions: October 15, 2020; November 12, 2020; and December 5, 2020.

391. The taped interviews have also been published on social media accounts and shared on various internet platforms by the public.

### KHP Leadership Acted to Silence Employees' First Amendment Rights and Placed Them in Fear of Speaking Out

392. Plaintiffs reallege and incorporate by reference each and every paragraph of this Complaint as though fully set forth herein.

393. Defendant Col. Jones made it clear to KHP employees that he will not tolerate employees speaking out against him, his subordinates, or KHP as an agency.

394.   Col. Jones was aware of anonymous letters sent to Governor Kelly's office and to various Kansas legislators.

395.   On or about February 11, 2020, Pfannenstiel met with Col. Jones and Lt. Col. De Vore in Col. Jones's office.

396.   Col. Jones and Lt. Col. De Vore relayed to her that the Governor's office had received an anonymous letter and Col. Jones and Lt. Col. De Vore accused her of sending it.

397.   The letter to the Governor's office identified Col. Jones as being inappropriate with women at KHP, committing ethics violations regarding failure to use sick/annual leave when he was off, his illegal use of the state issued P-Card, and other items of an illegal nature.

398.   Pfannenstiel told Col. Jones that she did not send the letter but that she also knew there were many people who could have done so within the agency.

399.   Col. Jones told Pfannenstiel that if he found out who sent the letter, or who had anything to do with the information relayed within it, he would "see that they have a parting of the ways with this agency."

400.   Pfannenstiel felt attacked by Col. Jones and believed he was threatening her job with KHP because she was supportive of the female employees' discrimination and harassment complaints and she openly opposed that behavior.

401.   Upon hearing from Col. Jones that he would terminate the employment of anyone relaying information regarding the discrimination complaints made against KHP, Pfannenstiel was placed in fear of speaking out.

402.   The threats made by Col. Jones that he would terminate employment of those speaking out on KHP's discrimination issues had a chilling effect on public speech.

403.    It is well-known by employees within KHP that Col. Jones does not want employees to engage in any public speech that would make KHP "look bad."

404.    Since at least July 23, 2020, Col. Jones has, on multiple occasions, sent out agency-wide emails that contain "cautions" to KHP employees from making statements, as individuals, to the media or on social media platforms that could reflect upon the agency in a negative way.

405.    Col. Jones, Lt. Col. De Vore, and others in the chain of command, were all directly aware of the television interviews of the female KHP employees.

406.    In December 2020, KHP female employees were directly questioned by chain of command as to whether they were one of the females on the television interviews with Lara Moritz.

407.    The questioning was presented in a hostile manner placing female employees in fear that they would be fired if it were discovered they had participated in the interview.

408.    McCurdy was specifically warned by a male KHP employee that other Troop and command supervisors were interrogating female employees as to whether they were part of the interviews.

409.    While McCurdy was not asked directly, the information that KHP supervisors were demanding to know who interviewed placed her in fear of speaking out.

410.    Col. Jones's statements that he would not tolerate any speech by employees that placed KHP in a negative public light directly put employees in fear of retaliation and had a chilling effect on KHP employees' free speech rights.

**COUNT 1: Pfannenstiel**
**42 U.S.C. § 1983**
**FOURTEENTH AMENDMENT**
**EQUAL PROTECTION VIOLATION**
**GENDER DISCRIMINATION**
**(Alleged against Defendants Jones, De Vore, Murphy, and Knowlton)**

411.    Plaintiffs reallege and incorporate by reference each and every paragraph of this Complaint as though fully set forth herein.

412.    Defendants were at all times relevant to this action, acting under color of law and within the scope of their employment.

413.    Even though Defendants were on notice that Pfannenstiel was being treated differently than male employees based on her gender, they failed to protect her.

414.    Adverse action was taken against Pfannenstiel based on the above-referenced characteristics not taken against similarly situated employees who did not share Pfannenstiel's gender.

415.    The Defendants treated male and female employees differently in the workplace.

416.    Defendants' actions violated Pfannenstiel's constitutional right to equal protection under the law.

417.    As a direct and proximate result of Defendants' unlawful actions against Pfannenstiel as described, Pfannenstiel has suffered injuries and damages, including, but not limited to, lost earnings, lost job benefits, lost value of retirement benefits, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, embarrassment, injuries to her reputation, and other pecuniary losses.

**COUNT 2: Pfannenstiel**
**42 U.S.C. § 1983**
**FOURTEENTH AMENDMENT**
**EQUAL PROTECTION VIOLATION**
**HOSTILE WORK ENVIRONMENT**
**(Alleged against Defendants Jones, De Vore, Murphy, and Knowlton)**

418.   Plaintiffs reallege and incorporate by reference each and every paragraph of this Complaint as though fully set forth herein.

419.   Defendants were at all times relevant to this action, acting under color of law and within the scope of their employment.

420.   Even though Defendants were on notice that Pfannenstiel was being treated differently than male employees based on her gender, they failed to protect her.

421.   Adverse actions were taken against Pfannenstiel based on the above-referenced characteristics not taken against similarly situated employees who did not share Pfannenstiel's gender.

422.   The Defendants treated male and female employees differently in the workplace and created a hostile work environment based on gender.

423.   Defendants' actions violated Pfannenstiel's constitutional right to equal protection under the law.

424.   As a direct and proximate result of Defendants' unlawful actions against Pfannenstiel as described, Pfannenstiel has suffered injuries and damages, including, but not limited to, lost earnings, lost job benefits, lost value of retirement benefits, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, embarrassment, injuries to her reputation, and other pecuniary losses.

**COUNT 3: Pfannenstiel**
**42 U.S.C. § 1983**
**FIRST AMENDMENT VIOLATION FOR SPEECH**
**(Alleged against Defendants Jones and De Vore)**

425.   Plaintiff realleges and incorporates by reference each and every paragraph of this Complaint as though fully set forth herein.

426.   The First Amendment of the United States Constitution guarantees Pfannenstiel the right to freedom of speech. Pfannenstiel's right to free speech is further protected by 42 U.S.C. § 1983, which imposes liability on any person acting under color of state law who deprives her of her right of free speech.

427.   Pfannenstiel exercised her right of free speech by speaking out on matters of public concern. Specifically, Pfannenstiel disclosed information to others outside of KHP regarding the seemingly illegal actions by State of Kansas employees.

428.   Defendants knew, or at least suspected, that Pfannenstiel exercised her civil rights by discussing the illegal activities of KHP employees with others outside of KHP.

429.   Pfannenstiel was acting as a member of the public speaking on a matter of public concern outside the scope of her official job duties.

430.   Defendants, acting under color of state law, violated Pfannenstiel's First Amendment right to free speech by intimidating her and threatened termination of her employment for exercising her right.

431.   Defendants' interests in promoting the efficiency of the public service do not outweigh Pfannenstiel's interests in free speech.

432.   Pfannenstiel's free speech was a motivating factor in the Defendants' actions of intimidation of her.

433.   Defendants' actions against Pfannenstiel were done willfully or maliciously; intentionally and in gross disregard of her constitutional rights; and/or in reckless disregard of her constitutional rights.

434.   Pfannenstiel has suffered damages.


**COUNT 4: Pfannenstiel**
**42 U.S.C. § 1983**
**FIRST AMENDMENT VIOLATION FOR SUPPRESSION OF SPEECH**
**(Alleged against Defendants Jones and De Vore)**

435.   Plaintiff realleges and incorporates by reference each and every paragraph of this Complaint as though fully set forth herein.

436.   The First Amendment of the United States Constitution guarantees Pfannenstiel the right to freedom of speech. Pfannenstiel's right to free speech is further protected by 42 U.S.C. § 1983, which imposes liability on any person acting under color of state law who deprives her of her right of free speech.

437.   Pfannenstiel was deterred from exercising her right of free speech to speak out on matters of public concern. Specifically, Pfannenstiel was deterred from speaking to others outside of KHP regarding the seemingly illegal actions by State of Kansas employees.

438.   Defendants knew, or at least suspected, that employees wanted to exercise their civil rights by discussing the illegal activities of KHP employees with others outside of KHP.

439.   Defendants, acting under color of state law, violated Pfannenstiel's First Amendment right to free speech by intimidating her and threatened termination of her employment if she exercised her right.

440.    Defendants, acting under color of state law, violated Pfannenstiel's First Amendment right to free speech by placing her in fear of employment retaliation if she exercised her right.

441.    Defendants' interests in promoting the efficiency of the public service do not outweigh Pfannenstiel's interests in free speech.

442.    Pfannenstiel's free speech was a motivating factor in the Defendants' actions of intimidation of her.

443.    Defendants' actions against Pfannenstiel were done willfully or maliciously; intentionally and in gross disregard of her constitutional rights; and/or in reckless disregard of her constitutional rights.

444.    Pfannenstiel has suffered damages.


**COUNT 5: Pfannenstiel**
**VIOLATION OF TITLE VII**
**SEX DISCRIMINATION**
**(Alleged against Defendant State of Kansas)**

445.    Plaintiffs reallege and incorporate by reference each and every paragraph of this Complaint as though fully set forth herein.

446.    At all times relevant, Defendant State of Kansas was an employer within the meaning of Title VII of the Civil Rights Act of 1964.

447.    Pfannenstiel is a female and is a member of a protected class under Title VII.

448.    Pfannenstiel's gender was a motivating factor in the Defendant's decision to subject her to the wrongful and discriminatory treatment described herein.

449.    Defendant, by its agents, representatives, and employees was predisposed to discriminate based on gender and acted in accordance with that predisposition.

450. Defendant's actions were intentional and were made with reckless indifference to Pfannenstiel's rights and sensibilities.

451. If Pfannenstiel were a male, she would not have been treated in the manner described herein.

452. As a result of Defendant's unlawful discrimination, Pfannenstiel has suffered damages.


**COUNT 6: Pfannenstiel**
**VIOLATION OF TITLE VII**
**HOSTILE WORK ENVIRONMENT**
**(Alleged against Defendant State of Kansas)**

453. Plaintiffs reallege and incorporate by reference each and every paragraph of this Complaint as though fully set forth herein.

454. At all times relevant, Defendant State of Kansas was an employer within the meaning of Title VII of the Civil Rights Act of 1964.

455. Pfannenstiel is a female and is a member of a protected class under Title VII.

456. Pfannenstiel was subjected to a hostile work environment in the form of degrading, demeaning, humiliating and offensive treatment, statements, conduct, and physical contact, and unwanted sexual harassment that was directed toward female employees, including Pfannenstiel, by Defendant and its employees, agents, or servants.

457. The hostile work environment was based on Pfannenstiel's gender.

458. The hostile work environment had the effect of unreasonably interfering with the work environment.

459. Defendant had notice of Pfannenstiel's hostile work environment and is liable for its employees' actions and harassment under Respondeat Superior.

460. As a result of Defendant's unlawful actions, Pfannenstiel has suffered damages.

**COUNT 7: Pfannenstiel**
**VIOLATION OF TITLE VII**
**RETALIATION**
**(Alleged against Defendant State of Kansas)**

461.   Plaintiffs reallege and incorporate by reference each and every paragraph of this Complaint as though fully set forth herein.

462.   At all times relevant, Defendant was an employer within the meaning of Title VII of the Civil Rights Act of 1964.

463.   By opposing unlawful discrimination or harassment against her by the Defendant, its employees or agents, Pfannenstiel was engaged in protected activity under Title VII.

464.   Defendant knew Pfannenstiel exercised her civil rights because Pfannenstiel had made complaints objecting to Defendant's harassment and discrimination against female employees to KHP supervisors, the State of Kansas Department of Administration, and agents hired by the State of Kansas to investigate the discrimination complaints.

465.   Defendant took adverse employment actions against Pfannenstiel, including retaliation, denial of opportunities, intimidation, and constructive discharge.

466.   Pfannenstiel's exercise of her civil rights, as alleged in this Complaint, was a direct and proximate cause of Defendant's adverse employment actions.

467.   As a result of Defendant's unlawful actions, Pfannenstiel has suffered damages.

**COUNT 8: Harrington**
**42 U.S.C. § 1983**
**FOURTEENTH AMENDMENT**
**EQUAL PROTECTION VIOLATION**
**GENDER DISCRIMINATION**
**(Alleged against Defendants Jones, De Vore, Knowlton, and Dean)**

468.   Plaintiffs reallege and incorporate by reference each and every paragraph of this Complaint as though fully set forth herein.

469.   Defendants were at all times relevant to this action, acting under color of law and within the scope of their employment.

470.   Even though Defendants were on notice that Harrington was being treated differently than male employees based on her gender, they failed to protect her.

471.   Adverse action was taken against Harrington based on the above-referenced characteristics not taken against similarly situated employees who did not share Harrington's gender.

472.   The Defendants treated male and female employees differently in the workplace.

473.   Defendants' actions violated Harrington's constitutional right to equal protection under the law.

474.   As a direct and proximate result of Defendants' unlawful actions against Harrington as described, Harrington has suffered injuries and damages, including, but not limited to, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, embarrassment, injuries to her reputation, and other pecuniary losses.

**COUNT 9: Harrington
42 U.S.C. § 1983
FOURTEENTH AMENDMENT
EQUAL PROTECTION VIOLATION
HOSTILE WORK ENVIRONMENT
(Alleged against Defendants Jones, De Vore, Knowlton, and Dean)**

475.   Plaintiffs reallege and incorporate by reference each and every paragraph of this Complaint as though fully set forth herein.

476.   Defendants were at all times relevant to this action, acting under color of law and within the scope of their employment.

477.   Even though Defendants were on notice that Harrington was being treated differently than male employees based on her gender, they failed to protect her.

478.   Adverse actions were taken against Harrington based on the above-referenced characteristics not taken against similarly situated employees who did not share Harrington's gender.

479.   The Defendants treated male and female employees differently in the workplace and created a hostile work environment based on gender.

480.   Defendants' actions violated Harrington's constitutional right to equal protection under the law.

481.   As a direct and proximate result of Defendants' unlawful actions against Harrington as described, Harrington has suffered injuries and damages, including, but not limited to, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, embarrassment, injuries to her reputation, and other pecuniary losses.

**COUNT 10: Harrington**
**42 U.S.C. § 1983**
**FIRST AMENDMENT VIOLATIONS FOR SPEECH**
**(Alleged against Defendants Jones and De Vore)**

482.   Plaintiff realleges and incorporates by reference each and every paragraph of this Complaint as though fully set forth herein.

483.   The First Amendment of the United States Constitution guarantees Harrington the right to freedom of speech. Harrington's right to free speech is further protected by 42 U.S.C. § 1983, which imposes liability on any person acting under color of state law who deprives her of her right of free speech.

484.   Harrington exercised her right of free speech by speaking out on matters of public concern. Specifically, Harrington disclosed information to others outside of KHP regarding the seemingly illegal actions by State of Kansas employees.

485.   Defendants knew, or at least suspected, that Harrington exercised her civil rights by discussing the illegal activities of KHP employees with others outside of KHP.

486.   Harrington was acting as a member of the public speaking on a matter of public concern outside the scope of her official job duties.

487.   Defendants, acting under color of state law, violated Harrington's First Amendment right to free speech by intimidating her and placed her in fear of termination of her employment for exercising her right.

488.   Defendants' interests in promoting the efficiency of the public service do not outweigh Harrington's interests in free speech.

489.   Harrington's free speech was a motivating factor in the Defendants' actions of intimidation of her.

490.   Defendants' actions against Harrington were done willfully or maliciously; intentionally and in gross disregard of her constitutional rights; and/or in reckless disregard of her constitutional rights.

491.   Harrington has suffered damages.

**COUNT 11: Harrington**
**42 U.S.C. § 1983**
**FIRST AMENDMENT VIOLATION FOR SUPPRESSION OF SPEECH**
**(Alleged against Defendants Jones and De Vore)**

492.   Plaintiff realleges and incorporates by reference each and every paragraph of this Complaint as though fully set forth herein.

493. The First Amendment of the United States Constitution guarantees Harrington the right to freedom of speech. Harrington's right to free speech is further protected by 42 U.S.C. § 1983, which imposes liability on any person acting under color of state law who deprives her of her right of free speech.

494. Harrington was deterred from exercising her right of free speech to speak out on matters of public concern. Specifically, Harrington was deterred from speaking to others outside of KHP regarding the seemingly illegal actions by State of Kansas employees.

495. Defendants knew, or at least suspected, that employees wanted to exercise their civil rights by discussing the illegal activities of KHP employees with others outside of KHP.

496. Defendants, acting under color of state law, violated Harrington's First Amendment right to free speech by intimidating her and threatened termination of her employment if she exercised her right.

497. Defendants, acting under color of state law, violated Harrington's First Amendment right to free speech by placing her in fear of employment retaliation if she exercised her right.

498. Defendants' interests in promoting the efficiency of the public service do not outweigh Harrington's interests in free speech.

499. Harrington's free speech was a motivating factor in the Defendants' actions of intimidation of her.

500. Defendants' actions against Harrington were done willfully or maliciously; intentionally and in gross disregard of her constitutional rights; and/or in reckless disregard of her constitutional rights.

501. Harrington has suffered damages.

**COUNT 12: Harrington**
**VIOLATION OF TITLE VII**
**SEX DISCRIMINATION**
**(Alleged against Defendant State of Kansas)**

502.　Plaintiffs reallege and incorporate by reference each and every paragraph of this Complaint as though fully set forth herein.

503.　At all times relevant, Defendant State of Kansas was an employer within the meaning of Title VII of the Civil Rights Act of 1964.

504.　Harrington is a female and is a member of a protected class under Title VII.

505.　Harrington's gender was a motivating factor in the Defendant's decision to subject her to the wrongful and discriminatory treatment described herein.

506.　Defendant, by its agents, representatives, and employees was predisposed to discriminate based on gender and acted in accordance with that predisposition.

507.　Defendant's actions were intentional and were made with reckless indifference to Harrington's rights and sensibilities.

508.　If Harrington were a male, she would not have been treated in the manner described herein.

509.　As a result of Defendant's unlawful discrimination, Harrington has suffered damages.


**COUNT 13: Harrington**
**VIOLATION OF TITLE VII**
**HOSTILE WORK ENVIRONMENT**
**(Alleged against Defendant State of Kansas)**

510.　Plaintiffs reallege and incorporate by reference each and every paragraph of this Complaint as though fully set forth herein.

511.　At all times relevant, Defendant State of Kansas was an employer within the meaning of Title VII of the Civil Rights Act of 1964.

512.   Harrington is a female and is a member of a protected class under Title VII.

513.   Harrington was subjected to a hostile work environment in the form of degrading, demeaning, humiliating and offensive treatment, statements, conduct, and physical contact, and unwanted sexual harassment that was directed toward female employees, including Harrington, by Defendant and its employees, agents, or servants.

514.   The hostile work environment was based on Harrington's gender.

515.   The hostile work environment had the effect of unreasonably interfering with the work environment.

516.   Defendant had notice of Harrington's hostile work environment and is liable for its employees' actions and harassment under Respondeat Superior.

517.   As a result of Defendant's unlawful actions, Harrington has suffered damages.


**COUNT 14: Harrington**
**VIOLATION OF TITLE VII**
**RETALIATION**
**(Alleged against Defendant State of Kansas)**

518.   Plaintiffs reallege and incorporate by reference each and every paragraph of this Complaint as though fully set forth herein.

519.   At all times relevant, Defendant was an employer within the meaning of Title VII of the Civil Rights Act of 1964.

520.   By opposing unlawful discrimination or harassment against her by the Defendant, its employees or agents, Harrington was engaged in protected activity under Title VII.

521.   Defendant knew Harrington exercised her civil rights because Harrington had made complaints objecting to Defendant's harassment and discrimination against female

employees to KHP supervisors, the State of Kansas Department of Administration, and agents hired by the State of Kansas to investigate the discrimination complaints.

522.     Defendant took adverse employment actions against Harrington, including retaliation, denial of opportunities, and intimidation.

523.     Harrington's exercise of her civil rights, as alleged in this Complaint, was a direct and proximate cause of Defendant's adverse employment actions.

524.     As a result of Defendant's unlawful retaliation, Harrington has suffered damages.

**COUNT 15: McCurdy**
**42 U.S.C. § 1983**
**FOURTEENTH AMENDMENT**
**EQUAL PROTECTION VIOLATION**
**GENDER DISCRIMINATION**
**(Alleged against Defendants Jones, De Vore, and Knowlton)**

525.     Plaintiffs reallege and incorporate by reference each and every paragraph of this Complaint as though fully set forth herein.

526.     Defendants were at all times relevant to this action, acting under color of law and within the scope of their employment.

527.     Even though Defendants were on notice that McCurdy was being treated differently than male employees based on her gender, they failed to protect her.

528.     Adverse action was taken against McCurdy based on the above-referenced characteristics not taken against similarly situated employees who did not share McCurdy's gender.

529.     The Defendants treated male and female employees differently in the workplace.

530.     Defendants' actions violated McCurdy's constitutional right to equal protection under the law.

531.   As a direct and proximate result of Defendants' unlawful actions against McCurdy as described, McCurdy has suffered injuries and damages, including, but not limited to, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, embarrassment, injuries to her reputation, and other pecuniary losses.

**COUNT 16: McCurdy**
**42 U.S.C. § 1983**
**FOURTEENTH AMENDMENT**
**EQUAL PROTECTION VIOLATION**
**HOSTILE WORK ENVIRONMENT**
**(Alleged against Defendants Jones, De Vore, and Knowlton)**

532.   Plaintiffs reallege and incorporate by reference each and every paragraph of this Complaint as though fully set forth herein.

533.   Defendants were at all times relevant to this action, acting under color of law and within the scope of their employment.

534.   Even though Defendants were on notice that McCurdy was being treated differently than male employees based on her gender, they failed to protect her.

535.   Adverse actions were taken against McCurdy based on the above-referenced characteristics not taken against similarly situated employees who did not share McCurdy's gender.

536.   The Defendants treated male and female employees differently in the workplace and created a hostile work environment based on gender.

537.   Defendants' actions violated McCurdy's constitutional right to equal protection under the law.

538.   As a direct and proximate result of Defendants' unlawful actions against McCurdy as described, McCurdy has suffered injuries and damages, including, but not limited to,

emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, embarrassment, injuries to her reputation, and other pecuniary losses.

## COUNT 17: McCurdy
## 42 U.S.C. § 1983
## FIRST AMENDMENT VIOLATION FOR SUPPRESSION OF SPEECH
## (Alleged against Defendants Jones and De Vore)

539.   Plaintiff realleges and incorporates by reference each and every paragraph of this Complaint as though fully set forth herein.

540.   The First Amendment of the United States Constitution guarantees McCurdy the right to freedom of speech. McCurdy's right to free speech is further protected by 42 U.S.C. § 1983, which imposes liability on any person acting under color of state law who deprives her of her right of free speech.

541.   McCurdy was deterred from exercising her right of free speech to speak out on matters of public concern. Specifically, McCurdy was deterred from speaking to others outside of KHP regarding the seemingly illegal actions by State of Kansas employees.

542.   Defendants knew, or at least suspected, that employees wanted to exercise their civil rights by discussing the illegal activities of KHP employees with others outside of KHP.

543.   Defendants, acting under color of state law, violated McCurdy's First Amendment right to free speech by intimidating her and threatened termination of her employment if she exercised her right.

544.   Defendants, acting under color of state law, violated McCurdy's First Amendment right to free speech by placing her in fear of employment retaliation if she exercised her right.

545.    Defendants' interests in promoting the efficiency of the public service do not outweigh McCurdy's interests in free speech.

546.    McCurdy's free speech was a motivating factor in the Defendants' actions of intimidation of her.

547.    Defendants' actions against McCurdy were done willfully or maliciously; intentionally and in gross disregard of her constitutional rights; and/or in reckless disregard of her constitutional rights.

548.    McCurdy has suffered damages.


**COUNT 18: McCurdy**
**VIOLATION OF TITLE VII**
**SEX DISCRIMINATION**
**(Alleged against Defendant State of Kansas)**

549.    Plaintiffs reallege and incorporate by reference each and every paragraph of this Complaint as though fully set forth herein.

550.    At all times relevant, Defendant State of Kansas was an employer within the meaning of Title VII of the Civil Rights Act of 1964.

551.    McCurdy is a female and is a member of a protected class under Title VII.

552.    McCurdy's gender was a motivating factor in the Defendant's decision to subject her to the wrongful and discriminatory treatment described herein.

553.    Defendant, by its agents, representatives, and employees was predisposed to discriminate based on gender and acted in accordance with that predisposition.

554.    Defendant's actions were intentional and were made with reckless indifference to McCurdy's rights and sensibilities.

555.    If McCurdy were a male, she would not have been treated in the manner described herein.

556.    As a result of Defendant's unlawful discrimination, McCurdy has suffered damages.


**COUNT 19: McCurdy**
**VIOLATION OF TITLE VII**
**HOSTILE WORK ENVIRONMENT**
**(Alleged against Defendant State of Kansas)**

557.    Plaintiffs reallege and incorporate by reference each and every paragraph of this Complaint as though fully set forth herein.

558.    At all times relevant, Defendant State of Kansas was an employer within the meaning of Title VII of the Civil Rights Act of 1964.

559.    McCurdy is a female and is a member of a protected class under Title VII.

560.    McCurdy was subjected to a hostile work environment in the form of degrading, demeaning, humiliating and offensive treatment, statements, conduct, and physical contact, and unwanted sexual harassment that was directed toward female employees, including McCurdy, by Defendant and its employees, agents, or servants.

561.    The hostile work environment was based on McCurdy's gender.

562.    The hostile work environment had the effect of unreasonably interfering with the work environment.

563.    Defendant had notice of McCurdy's hostile work environment and is liable for its employees' actions and harassment under Respondeat Superior.

564.    As a result of Defendant's unlawful actions, McCurdy has suffered damages.

**COUNT 20: Corazzin-McMahan**
**42 U.S.C. § 1983**
**FOURTEENTH AMENDMENT**
**EQUAL PROTECTION VIOLATION**
**GENDER DISCRIMINATION**
**(Alleged against Defendants Jones, De Vore, Knowlton, Murphy, Ludolph, and Catania)**

565.    Plaintiffs reallege and incorporate by reference each and every paragraph of this Complaint as though fully set forth herein.

566.    Defendants were at all times relevant to this action, acting under color of law and within the scope of their employment.

567.    Even though Defendants were on notice that Corazzin-McMahan was being treated differently than male employees based on her gender, they failed to protect her.

568.    Adverse action was taken against Corazzin-McMahan based on the above-referenced characteristics not taken against similarly situated employees who did not share Corazzin-McMahan's gender.

569.    The Defendants treated male and female employees differently in the workplace.

570.    Defendants' actions violated Corazzin-McMahan's constitutional right to equal protection under the law.

571.    As a direct and proximate result of Defendants' unlawful actions against Corazzin-McMahan as described, Corazzin-McMahan has suffered injuries and damages, including, but not limited to, lost earnings, lost job benefits, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, embarrassment, injuries to her reputation, and other pecuniary losses.

## COUNT 21: Corazzin-McMahan
## 42 U.S.C. § 1983
## FOURTEENTH AMENDMENT
## EQUAL PROTECTION VIOLATION
## HOSTILE WORK ENVIRONMENT
**(Alleged against Defendants Jones, De Vore, Knowlton, Murphy, Ludolph, and Catania)**

572.    Plaintiffs reallege and incorporate by reference each and every paragraph of this Complaint as though fully set forth herein.

573.    Defendants were at all times relevant to this action, acting under color of law and within the scope of their employment.

574.    Even though Defendants were on notice that Corazzin-McMahan was being treated differently than male employees based on her gender, they failed to protect her.

575.    Adverse actions were taken against Corazzin-McMahan based on the above-referenced characteristics not taken against similarly situated employees who did not share Corazzin-McMahan's gender.

576.    The Defendants treated male and female employees differently in the workplace and created a hostile work environment based on gender.

577.    Defendants' actions violated Corazzin-McMahan's constitutional right to equal protection under the law.

578.    As a direct and proximate result of Defendants' unlawful actions against Corazzin-McMahan as described, Corazzin-McMahan has suffered injuries and damages, including, but not limited to, lost earnings, lost job benefits, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, embarrassment, injuries to her reputation, and other pecuniary losses.

**Count 22: Corazzin-McMahan**
**42 U.S.C. § 1983**
**FIRST AMENDMENT VIOLATION FOR SUPPRESSION OF SPEECH**
**(Alleged against Defendants Jones and De Vore)**

579.    Plaintiff realleges and incorporates by reference each and every paragraph of this Complaint as though fully set forth herein.

580.    The First Amendment of the United States Constitution guarantees Corazzin-McMahan the right to freedom of speech. Corazzin-McMahan's right to free speech is further protected by 42 U.S.C. § 1983, which imposes liability on any person acting under color of state law who deprives her of her right of free speech.

581.    Corazzin-McMahan was deterred from exercising her right of free speech to speak out on matters of public concern. Specifically, Corazzin-McMahan was deterred from speaking to others outside of KHP regarding the seemingly illegal actions by State of Kansas employees.

582.    Defendants knew, or at least suspected, that employees wanted to exercise their civil rights by discussing the illegal activities of KHP employees with others outside of KHP.

583.    Defendants, acting under color of state law, violated Corazzin-McMahan's First Amendment right to free speech by intimidating her and threatened termination of her employment if she exercised her right.

584.    Defendants, acting under color of state law, violated Corazzin-McMahan's First Amendment right to free speech by placing her in fear of employment retaliation if she exercised her right.

585.    Defendants' interests in promoting the efficiency of the public service do not outweigh Corazzin-McMahan's interests in free speech.

586.   Corazzin-McMahan's free speech was a motivating factor in the Defendants' actions of intimidation of her.

587.   Defendants' actions against Corazzin-McMahan were done willfully or maliciously; intentionally and in gross disregard of her constitutional rights; and/or in reckless disregard of her constitutional rights.

588.   Corazzin-McMahan has suffered damages.


**COUNT 23: Meader**
**42 U.S.C. § 1983**
**FOURTEENTH AMENDMENT**
**EQUAL PROTECTION VIOLATION**
**GENDER DISCRIMINATION**
**(Alleged against Defendants Jones, De Vore, Knowlton, and Sauer)**

589.   Plaintiffs reallege and incorporate by reference each and every paragraph of this Complaint as though fully set forth herein.

590.   Defendants were at all times relevant to this action, acting under color of law and within the scope of their employment.

591.   Even though Defendants were on notice that Meader was being treated differently than male employees based on her gender, they failed to protect her.

592.   Adverse action was taken against Meader based on the above-referenced characteristics not taken against similarly situated employees who did not share Meader's gender.

593.   The Defendants treated male and female employees differently in the workplace.

594.   Defendants' actions violated Meader's constitutional right to equal protection under the law.

595.   As a direct and proximate result of Defendants' unlawful actions against Meader as described, Meader has suffered injuries and damages, including, but not limited to, lost

earnings, lost job benefits, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, embarrassment, injuries to her reputation, and other pecuniary losses.

## COUNT 24: Meader
## 42 U.S.C. § 1983
## FOURTEENTH AMENDMENT
## EQUAL PROTECTION VIOLATION
## HOSTILE WORK ENVIRONMENT
### (Alleged against Defendants Jones, De Vore, Knowlton, and Sauer)

596.   Plaintiffs reallege and incorporate by reference each and every paragraph of this Complaint as though fully set forth herein.

597.   Defendants were at all times relevant to this action, acting under color of law and within the scope of their employment.

598.   Even though Defendants were on notice that Meader was being treated differently than male employees based on her gender, they failed to protect her.

599.   Adverse actions were taken against Meader based on the above-referenced characteristics not taken against similarly situated employees who did not share Meader's gender.

600.   The Defendants treated male and female employees differently in the workplace and created a hostile work environment based on gender.

601.   Defendants' actions violated Meader's constitutional right to equal protection under the law.

602.   As a direct and proximate result of Defendants' unlawful actions against Meader as described, Meader has suffered injuries and damages, including, but not limited to, lost earnings, lost job benefits, future pecuniary losses, emotional pain, suffering,

inconvenience, mental anguish, loss of enjoyment of life, humiliation, embarrassment, injuries to her reputation, and other pecuniary losses.

**Count 25: Meader**
**42 U.S.C. § 1983**
**FIRST AMENDMENT VIOLATION FOR SUPPRESSION OF SPEECH**
**(Alleged against Defendants Jones and De Vore)**

603. Plaintiff realleges and incorporates by reference each and every paragraph of this Complaint as though fully set forth herein.

604. The First Amendment of the United States Constitution guarantees Meader the right to freedom of speech. Meader's right to free speech is further protected by 42 U.S.C. § 1983, which imposes liability on any person acting under color of state law who deprives her of her right of free speech.

605. Meader was deterred from exercising her right of free speech to speak out on matters of public concern. Specifically, Meader was deterred from speaking to others outside of KHP regarding the seemingly illegal actions by State of Kansas employees.

606. Defendants knew, or at least suspected, that employees wanted to exercise their civil rights by discussing the illegal activities of KHP employees with others outside of KHP.

607. Defendants, acting under color of state law, violated Meader's First Amendment right to free speech by intimidating her and threatened termination of her employment if she exercised her right.

608. Defendants, acting under color of state law, violated Meader's First Amendment right to free speech by placing her in fear of employment retaliation if she exercised her right.

609.   Defendants' interests in promoting the efficiency of the public service do not outweigh Meader's interests in free speech.

610.   Meader's free speech was a motivating factor in the Defendants' actions of intimidation of her.

611.   Defendants' actions against Meader were done willfully or maliciously; intentionally and in gross disregard of her constitutional rights; and/or in reckless disregard of her constitutional rights.

612.   Meader has suffered damages.


### COUNT 26: Meader
### VIOLATION OF TITLE VII
### SEX DISCRIMINATION
### (Alleged against Defendant State of Kansas)

613.   Plaintiffs reallege and incorporate by reference each and every paragraph of this Complaint as though fully set forth herein.

614.   At all times relevant, Defendant State of Kansas was an employer within the meaning of Title VII of the Civil Rights Act of 1964.

615.   Meader is a female and is a member of a protected class under Title VII.

616.   Meader's gender was a motivating factor in the Defendant's decision to subject her to the wrongful and discriminatory treatment described herein.

617.   Defendant, by its agents, representatives, and employees was predisposed to discriminate based on gender and acted in accordance with that predisposition.

618.   Defendant's actions were intentional and were made with reckless indifference to Meader's rights and sensibilities.

619.   If Meader were a male, she would not have been treated in the manner described herein.

620.   As a result of Defendant's unlawful discrimination, Meader has suffered damages.


**COUNT 27: Meader**
**VIOLATION OF TITLE VII**
**HOSTILE WORK ENVIRONMENT**
**(Alleged against Defendant State of Kansas)**

621.   Plaintiffs reallege and incorporate by reference each and every paragraph of this Complaint as though fully set forth herein.

622.   At all times relevant, Defendant State of Kansas was an employer within the meaning of Title VII of the Civil Rights Act of 1964.

623.   Meader is a female and is a member of a protected class under Title VII.

624.   Meader was subjected to a hostile work environment in the form of degrading, demeaning, humiliating and offensive treatment, statements, conduct, and physical contact, and unwanted sexual harassment that was directed toward female employees, including Meader, by Defendant and its employees, agents, or servants.

625.   The hostile work environment was based on Meader's gender.

626.   The hostile work environment had the effect of unreasonably interfering with the work environment.

627.   Defendant had notice of Meader's hostile work environment and is liable for its employees' actions and harassment under Respondeat Superior.

628.   As a result of Defendant's unlawful actions, Meader has suffered damages.

**COUNT 28: Cooper**
**42 U.S.C. § 1983**
**FOURTEENTH AMENDMENT**
**EQUAL PROTECTION VIOLATION**
**GENDER DISCRIMINATION**
**(Alleged against Defendants Jones, De Vore, Knowlton, Proffitt, Cordner, and Hyman)**

629. Plaintiffs reallege and incorporate by reference each and every paragraph of this Complaint as though fully set forth herein.

630. Defendants were at all times relevant to this action, acting under color of law and within the scope of their employment.

631. Even though Defendants were on notice that Cooper was being treated differently than male employees based on her gender, they failed to protect her.

632. Adverse action was taken against Cooper based on the above-referenced characteristics not taken against similarly situated employees who did not share Cooper's gender.

633. Adverse action was also taken against Cooper, on the basis of her gender, because of her pregnancy.

634. The Defendants treated male and female employees differently in the workplace.

635. Defendants' actions violated Cooper's constitutional right to equal protection under the law.

636. As a direct and proximate result of Defendants' unlawful actions against Cooper as described, Cooper has suffered injuries and damages, including, but not limited to, lost earnings, lost job benefits, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, embarrassment, injuries to her reputation, and other pecuniary losses.

**COUNT 29: Cooper**
**42 U.S.C. § 1983**
**FOURTEENTH AMENDMENT**
**EQUAL PROTECTION VIOLATION**
**HOSTILE WORK ENVIRONMENT**
**(Alleged against Defendants Jones, De Vore, Knowlton, Proffitt, Cordner, and Hyman)**

637.  Plaintiffs reallege and incorporate by reference each and every paragraph of this Complaint as though fully set forth herein.

638.  Defendants were at all times relevant to this action, acting under color of law and within the scope of their employment.

639.  Even though Defendants were on notice that Cooper was being treated differently than male employees based on her gender, they failed to protect her.

640.  Adverse actions were taken against Cooper based on the above-referenced characteristics not taken against similarly situated employees who did not share Cooper's gender.

641.  Adverse action was also taken against Cooper, on the basis of her gender, because of her pregnancy.

642.  The Defendants treated male and female employees differently in the workplace and created a hostile work environment based on gender.

643.  Defendants' actions violated Cooper's constitutional right to equal protection under the law.

644.  As a direct and proximate result of Defendants' unlawful actions against Cooper as described, Cooper has suffered injuries and damages, including, but not limited to, lost earnings, lost job benefits, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, embarrassment, injuries to her reputation, and other pecuniary losses.

**COUNT 30: Cooper**
**42 U.S.C. § 1983**
**FIRST AMENDMENT VIOLATION FOR SUPPRESSION OF SPEECH**
**(Alleged against Defendants Jones and De Vore)**

645.   Plaintiff realleges and incorporates by reference each and every paragraph of this Complaint as though fully set forth herein.

646.   The First Amendment of the United States Constitution guarantees Cooper the right to freedom of speech. Cooper's right to free speech is further protected by 42 U.S.C. § 1983, which imposes liability on any person acting under color of state law who deprives her of her right of free speech.

647.   Cooper was deterred from exercising her right of free speech to speak out on matters of public concern. Specifically, Cooper was deterred from speaking to others outside of KHP regarding the seemingly illegal actions by State of Kansas employees.

648.   Defendants knew, or at least suspected, that employees wanted to exercise their civil rights by discussing the illegal activities of KHP employees with others outside of KHP.

649.   Defendants, acting under color of state law, violated Cooper's First Amendment right to free speech by intimidating her and threatened termination of her employment if she exercised her right.

650.   Defendants, acting under color of state law, violated Cooper's First Amendment right to free speech by placing her in fear of employment retaliation if she exercised her right.

651.   Defendants' interests in promoting the efficiency of the public service do not outweigh Cooper's interests in free speech.

652.   Cooper's free speech was a motivating factor in the Defendants' actions of intimidation of her.

653. Defendants' actions against Cooper were done willfully or maliciously; intentionally and in gross disregard of her constitutional rights; and/or in reckless disregard of her constitutional rights.

654. Cooper has suffered damages.

## COUNT 31: Cooper
## VIOLATION OF TITLE VII
## SEX DISCRIMINATION
### (Alleged against Defendant State of Kansas)

655. Plaintiffs reallege and incorporate by reference each and every paragraph of this Complaint as though fully set forth herein.

656. At all times relevant, Defendant State of Kansas was an employer within the meaning of Title VII of the Civil Rights Act of 1964.

657. Cooper is a female and is a member of a protected class under Title VII.

658. Cooper's gender was a motivating factor in the Defendant's decision to subject her to the wrongful and discriminatory treatment described herein.

659. Defendant, by its agents, representatives, and employees was predisposed to discriminate based on gender and acted in accordance with that predisposition.

660. Defendant's actions were intentional and were made with reckless indifference to Cooper's rights and sensibilities.

661. If Cooper were a male, she would not have been treated in the manner described herein.

662. As a result of Defendant's unlawful discrimination, Cooper has suffered damages.

**COUNT 32: Cooper**
**VIOLATION OF TITLE VII**
**HOSTILE WORK ENVIRONMENT**
**(Alleged against Defendant State of Kansas)**

663.    Plaintiffs reallege and incorporate by reference each and every paragraph of this Complaint as though fully set forth herein.

664.    At all times relevant, Defendant State of Kansas was an employer within the meaning of Title VII of the Civil Rights Act of 1964.

665.    Cooper is a female and is a member of a protected class under Title VII.

666.    Cooper was subjected to a hostile work environment in the form of degrading, demeaning, humiliating and offensive treatment, statements, conduct, and physical contact, and unwanted sexual harassment that was directed toward female employees, including Cooper, by Defendant and its employees, agents, or servants.

667.    The hostile work environment was based on Cooper's gender.

668.    The hostile work environment had the effect of unreasonably interfering with the work environment.

669.    Defendant had notice of Cooper's hostile work environment and is liable for its employees' actions and harassment under Respondeat Superior.

670.    As a result of Defendant's unlawful actions, Cooper has suffered damages.


        WHEREFORE, Plaintiffs request that the Court enter judgment in their favor on all claims asserted against the Defendants and award Plaintiffs all of their damages available under 42 U.S.C. § 1983 and Title VII including lost compensation, back pay, front pay, economic damages, compensatory damages, punitive damages, reasonable attorney's fees and costs incurred, for pre

and post-judgment interest as allowed by law, and for such other and further legal and equitable

relief as this Court deems just and proper.

Respectfully submitted,

/s/ Kelly J. Trussell
Kelly J. Trussell, #23161
SLOAN, EISENBARTH, GLASSMAN,
  McENTIRE & JARBOE, L.L.C.
534 S. Kansas Avenue, Suite 1000
Topeka, KS  66603-3456
Phone: (785) 357-6311
Fax:(785) 357-0152
ktrussell@sloanlawfirm.com
*ATTORNEYS FOR PLAINTIFFS*

## DEMAND FOR JURY TRIAL

Plaintiffs request a trial by jury on all triable claims.

Respectfully submitted,

/s/ Kelly J. Trussell
Kelly J. Trussell, #23161
SLOAN, EISENBARTH, GLASSMAN,
  McENTIRE & JARBOE, L.L.C.
534 S. Kansas Avenue, Suite 1000
Topeka, KS  66603-3456
Phone: (785) 357-6311
Fax:(785) 357-0152
ktrussell@sloanlawfirm.com
*ATTORNEYS FOR PLAINTIFFS*

## <u>DESIGNATION OF PLACE OF TRIAL</u>

Plaintiffs designate and request that trial take place in Topeka, Kansas.

Respectfully submitted,

/s/ Kelly J. Trussell
Kelly J. Trussell, #23161
SLOAN, EISENBARTH, GLASSMAN,
  McENTIRE & JARBOE, L.L.C.
534 S. Kansas Avenue, Suite 1000
Topeka, KS  66603-3456
Phone: (785) 357-6311
Fax:(785) 357-0152
ktrussell@sloanlawfirm.com
*ATTORNEYS FOR PLAINTIFFS*