## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

SUSAN PFANNENSTIEL, et al.,

        Plaintiffs,

        v.                        Case No. 5:21-cv-04006-HLT-ADM

STATE OF KANSAS, et al.,

        Defendants.

## MEMORANDUM AND ORDER

Plaintiffs Susan Pfannenstiel, Amber Harrington, Natasha McCurdy, Rebecca Corazzin-McMahan, Kimberly Meader, and Jarah Cooper bring claims under 42 U.S.C. § 1983 and Title VII. Defendants are the State of Kansas, Herman Jones, Jason De Vore, Michael Murphy, Andrew Dean, Eric Sauer, Wesley Ludolph, and Thomas Catania. Plaintiffs assert thirty counts in the second amended complaint. Doc. 65. The claims arise out of Plaintiffs' employment with the Kansas Highway Patrol ("KHP"). At issue are five motions to dismiss. Docs. 67, 69, 71, 73, and 75. The Court addresses each motion. The surviving claims are summarized in the conclusion.

## I.      BACKGROUND[1]

### A.      Defendants

Jones is the KHP Superintendent. Doc. 65 at ¶ 15. De Vore is the Assistant Superintendent. *Id.* ¶ 16. Murphy, Dean, and Sauer are KHP Majors. *Id.* ¶¶ 17-19. Ludolph is a KHP Captain, and Catania was a KHP Lieutenant. *Id.* ¶¶ 20-21. These defendants are sued individually. The State of Kansas is also named as a defendant.

---

[1]   The following facts have been drawn from Plaintiffs' second amended complaint and are accepted as true for purposes of resolving the motions to dismiss.

The governor appointed Jones in April 2019. *Id.* ¶ 32. Jones selected De Vore as Assistant Superintendent in May 2019. *Id.* ¶ 34. De Vore oversees the KHP Executive Commanders, as well as daily operations and departmental policy. *Id.* ¶ 36. Murphy, Dean, Sauer, Ludolph, and Catania were all under the chain of command of Jones and De Vore. *Id.* ¶ 44. Only Jones can fire KHP employees, but KHP employees can be reprimanded through their chain of command. *Id.* ¶¶ 45-46.

### B.    Plaintiff Pfannenstiel

Pfannenstiel started working for the State of Kansas in 1999. *Id.* ¶ 26. She served as KHP's Human Resources Director until September 2020. *Id.* ¶ 2. Although Pfannenstiel had supervisors within KHP, she also reported to the Office of Personnel Services ("OPS") under the Kansas Department of Administration ("KDA"), which was headed by Kraig Knowlton. *Id.* ¶¶ 54-55. OPS provides human resources policies and procedures for the State of Kansas. *Id.* ¶ 56.

On October 10-11, 2019, Pfannenstiel received instant messages from Jones. The complaint does not detail the substance of the messages other than to describe them as "of a sexual nature and . . . offensive." *Id.* ¶¶ 59-60. Defendants attached the messages to one of the motions to dismiss. Doc. 68-1.[2] The messages, which include labels for the emojis used in parenthesis, read:

> [10/10/2019 4:13 PM] Herman Jones [KHP]:
> Getting our money's worth from you this week huh!
>
> [10/10/2019 4:13 PM]
> what an understatement(facepalm)
> It's all good(thumbs up)

---

[2]  Pfannenstiel acknowledges that the Court may consider documents referenced in the second amended complaint. Doc. 81 at 2; *see also GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997) ("[I]f a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss."). She does not challenge the Court's consideration of these messages or challenge the authenticity of them.

Well at least I know you're not sleeping on the company's couch.
(smiley with tongue hanging out)[3]

WE have a couch? Wait...no one told me

[10/10/2019 4:17 PM] Herman Jones [KHP]:
See, you've been soooooo busy, you didn't even notice the beige
couch in the corner. Since you're not using it I'm going to have it
removed and place elsewhere. (mmm emoji)

[10/10/2019 4:18 PM]
I see, ok fine (sleep emoji)

*Id.* The next day the following exchange occurred:

[10/11/2019 8:25 AM] Herman Jones:
And you came back?!

[10/11/2019 8:25 AM]
Yes sir

[10/11/2019 8:27 AM] Herman Jones:
I guess you don't need that couch after all huh!

[10/11/2019 8:27 AM]
I guess not

[10/11/2019 8:39 AM] Herman Jones:
Have a great day and thank you for all that you do to advance the
agency and Kansas. (y)(thumbs up emoji)

[10/11/2019 8:40 AM]
I am dedicated to the KHP and OPS as well. Have a nice day.

[10/11/2019 8:40 AM] Herman Jones:
Yelp ma'am!

*Id.* Pfannenstiel reported the messages to her supervisor, KHP Major Scott Harrington,[4] and said

they were sexual harassment. Doc. 65 at ¶ 61. She also reported them to her KDA supervisor, and

---

3   Defendants suggest this line was sent by Jones. Doc. 68 at 3. Pfannenstiel does not dispute this suggestion.

4   Major Scott Harrington, who is not a party to this case, is related to Plaintiff Amber Harrington. For clarity, the
    Court refers to him by his full name and refers to Plaintiff Amber Harrington as "Harrington."

she also relayed complaints of harassment and discrimination she was receiving from other female KHP employees. *Id.* ¶¶ 62, 257.

On December 3, 2019, Murphy entered Pfannenstiel's office and shut the door. *Id.* ¶ 63. Murphy said he wanted to demonstrate inappropriate workplace behavior and then attempted to grab Pfannenstiel's hands while she was seated with her hands in her lap. *Id.* ¶¶ 64-65. Pfannenstiel told Murphy he was in her personal space and told him to leave, which he did after laughing at her. *Id.* ¶ 66. Pfannenstiel was intimidated and tried to keep her distance from him. *Id.* ¶ 67.

In February 2020, Pfannenstiel emailed Knowlton, the director of OPS, and gave him documentation of Harrington's harassment complaints. *Id.* ¶ 259. In March 2020, Knowlton reported the allegations to the governor's chief of staff and deputy chief of staff. *Id.* ¶ 262. Knowlton specifically named Pfannenstiel as the initiator of the complaint because the other staff were too worried about retaliation to come forward. *Id.* ¶ 263. This placed a target on Pfannenstiel for retaliation. *Id.* ¶ 265. Pfannenstiel subsequently provided information to attorneys for the State of Kansas who were investigating the allegations. *Id.* ¶ 266. KHP supervisors were notified of which KHP employees were reporting discrimination and harassment. *Id.* ¶ 267.

Following Pfannenstiel's reports, Jones and De Vore began taking retaliatory actions against her, including reducing her decision-making authority and making policy changes that directly impacted her staff's ability to execute their duties. *Id.* ¶¶ 268-270. Jones and De Vore treated Pfannenstiel differently by ignoring her policy recommendations but then accepting the same recommendations when they were presented by her male counterparts. *Id.* ¶¶ 68-69. Pfannenstiel subsequently retired on September 1, 2020, due to discrimination, retaliation, and the hostile work environment at KHP. *Id.* ¶ 70. She retired earlier than she would have, which resulted

in her earning less retirement funds. *Id.* ¶ 71. Pfannenstiel claims her early retirement was a constructive discharge by the State of Kansas. *Id.* ¶ 73.

### C.   Plaintiff Harrington

Harrington started working for the State of Kansas in 2000. *Id.* ¶ 27. Harrington is a KHP Captain. *Id.* ¶ 4. On August 1, 2019, Jones physically touched Harrington on the back during a meeting. *Id.* ¶ 75. Harrington told him that touching her was inappropriate, and he laughed and touched her again and said, "there, I take it back." *Id.* ¶ 76. Harrington reported this incident to Scott Harrington and KHP Major Josh Kellerman, who told her to report the incident to human resources, which she did. *Id.* ¶ 78. On November 7, 2019, Harrington again reported being touched during a meeting and that she felt singled out because of her gender by Jones. *Id.* ¶ 79. Harrington told Jones to stop touching her, but he continued to do so. *Id.* ¶ 80. She was again encouraged to report it to human resources. *Id.* ¶ 81. On December 27, 2019, Harrington reported a third touching incident. *Id.* ¶ 82. Harrington reported the incidents to Pfannenstiel, stating "this makes the third time he has placed his hands on me after I have specifically told him not to touch me again." *Id.* ¶ 85. Pfannenstiel forwarded Harrington's message to her KDA supervisor. *Id.* ¶ 86.

Harrington alleges she was treated differently by Dean, who was her supervisor. *Id.* ¶¶ 87-88. She was not informed of changes impacting her work, which undermined her authority and prevented her from effectively preforming her duties. *Id.* ¶ 89. Dean made employment demands on Harrington that made it impossible for her to perform her duties, which he did not do to male captains under his authority. *Id.* ¶ 90.

On February 21, 2020, Harrington met with Knowlton, the director of OPS, and reported her concerns about harassment and discrimination. *Id.* ¶¶ 274-275. Harrington met with an investigator from KDA on February 28, 2020, and reported the same concerns. *Id.* ¶ 277. Knowlton

subsequently relayed the allegations to the governor's staff, specifically naming Harrington. *Id.* ¶¶ 278-279. This made Harrington a target of retaliation by KHP supervisors. *Id.* ¶ 281. KDA investigators also identified Harrington. *Id.* ¶ 283.

On September 9, 2020, Harrington filed a formal complaint with the EEOC, which notified both the State of Kansas and the KHP. *Id.* ¶¶ 284-285. Following Harrington's reports of harassment Dean began retaliating against her. *Id.* ¶ 286. Harrington has been shut out of information that undermines her ability to command her Troop. *Id.* ¶ 287. Dean placed duty demands on Harrington that made it impossible for her to perform her duties. *Id.* ¶ 289. Harrington informed Dean in a September 16, 2020 email that she was being treated differently than the male captains under his authority and stated that "you are intentionally setting me up for failure in an attempt to create the perception that I am incapable of performing my duties as a Captain" and that it was "directly connected to the fact you are well aware that I filed a formal EEOC complaint against certain members of the KHP for retaliation and sexual discrimination." *Id.* ¶¶ 291-292. Dean's actions have made Harrington fear losing her employment, and Harrington believes that Jones and De Vore authorized or knew of Dean's actions. *Id.* ¶ 293.

On March 9, 2021, following the filing of this lawsuit, Jones placed Harrington on administrative leave pending an "administrative investigation." *Id.* ¶ 297. Harrington submitted a written request for information that same day, but no response was given. *Id.* ¶¶ 298-299. Harrington's patrol car and office keys were taken from her, her filing cabinets were removed from her office, and her email access was cut off, none of which is a common practice for KHP employees on administrative leave. *Id.* ¶¶ 300-302.

On May 8, 2021, Harrington was informed that allegations that she was insubordinate were substantiated but that allegations of harassment toward another employee were not substantiated.

*Id.* ¶ 304. On June 8, 2021, Harrington was informed her duties would be reinstated. *Id.* ¶ 305. On June 14, 2021, Dean gave Harrington a formal reprimand for insubordination, unethical behavior, and misconduct. *Id.* ¶ 306. Her yearly employment review given that same day also stated she was insubordinate and uncooperative, and her overall rating was unsatisfactory. *Id.* ¶ 307. The unsatisfactory rating triggered a 150-day special review period. *Id.* ¶ 308.

Harrington was entitled to a copy of the allegations or complaints made against her under KHP policy, but she has never received them despite repeated requests. *Id.* ¶¶ 309-310. Dean did state that there were no written complaints filed, even though unwritten complaints are generally not investigated. *Id.* ¶¶ 313-314. Harrington believes the administrative leave, investigation, reprimand, unsatisfactory rating, and special review period are retaliatory actions. *Id.* ¶ 317.

### D.      Plaintiff McCurdy

McCurdy started working for the State of Kansas in 2016. *Id.* ¶ 28. McCurdy is a KHP Trooper. *Id.* ¶ 6. Each time McCurdy encountered Jones, he singled her out by gender. *Id.* ¶ 96. On April 19, 2019, McCurdy was training with other KHP Troopers. *Id.* ¶ 97. Jones attended the training and started introducing himself and shaking hands with the Troopers. *Id.* ¶¶ 98-99. When McCurdy extended her hand, Jones grabbed her hand and pulled her in for a tight, uncomfortable, chest-to-chest hug. *Id.* ¶ 100. McCurdy didn't know Jones and had no past relationship with him. *Id.* ¶ 101.

On September 7, 2019, McCurdy was providing security at a football game and was the only female Trooper present. *Id.* ¶¶ 102-103. Jones shook the hands of the male Troopers but again pulled McCurdy in for a tight hug. *Id.* ¶ 104. In February 2020, McCurdy was walking past Jones in the hallway at headquarters, and he again pulled her into a full hug. *Id.* ¶¶ 105-107.

On June 19, 2020, McCurdy was serving as a coach at the KHP recruit academy. *Id.* ¶ 108. McCurdy was eating her lunch when Jones yelled from the end of the table, "Woman! Woman! Hey Woman!" *Id.* ¶ 110. He asked if she was eating her own food, and when McCurdy said she was, Jones replied, "That's my girl!" *Id.* ¶¶ 110-113. McCurdy was uncomfortable and humiliated, and her coworkers said Jones's behavior was demeaning. *Id.* ¶¶ 114-115. McCurdy reported these incidents to the KHP Human Resources Director in June 2020 and also encouraged another female KHP employee to formally report gender discrimination. *Id.* ¶¶ 116-117.

### E.   Plaintiff Corazzin-McMahan

Corazzin-McMahan started working for the State of Kansas in 2017. *Id.* ¶ 29. Corazzin-McMahan was a KHP Public Service Administrator I from September 2017 until December 2019. *Id.* ¶ 8. On August 19, 2019, Corazzin-McMahan and KHP Lieutenant John McMahan informed McMahan's supervisor, Ludolph, that they were in a relationship. *Id.* ¶ 172. At the same time, Corazzin-McMahan expressed concern that Catania, who was her supervisor, would retaliate against her. *Id.* ¶ 173. The next day, McMahan's ex-wife reported that McMahan and Corazzin-McMahan had engaged in inappropriate romantic activity while on duty. *Id.* ¶ 174. The allegations were later deemed to be false. *Id.* ¶ 175. But as part of the investigation, Corazzin-McMahan admitted she had begun a relationship with McMahan after his ex-wife filed for divorce but before the divorce was final. *Id.* ¶ 178. Corazzin-McMahan and McMahan married on September 20, 2019. *Id.* ¶ 182.

Corazzin-McMahan was due a routine employment performance evaluation in September 2019. *Id.* ¶ 179. But on September 10, 2019, Corazzin-McMahan was relieved of most of her job duties via an email from Samantha Juarez. *Id.* ¶ 180. Catania sent out an email on

September 12, 2019, that notified others of the staffing change. *Id.* ¶ 181. Catania included two employees under Corazzin-McMahan's supervision but excluded her from the email. *Id.*

On October 12, 2019, Ludolph spoke to McMahan about Corazzin-McMahan's unspecified employment issues. *Id.* ¶¶ 183-184. On November 15, 2019, Ludolph temporarily took over as Corazzin-McMahan's supervisor. *Id.* ¶ 185. Ludolph consulted with Catania, Murphy, and De Vore about his supervision of Corazzin-McMahan and followed his chain-of-command's orders. *Id.* ¶¶ 186-187. Jones was aware of the actions taken against Corazzin-McMahan but did nothing to prevent or cease the actions. *Id.* ¶ 189.

On November 18, 2019, Ludolph issued a letter reprimanding both McMahan and Corazzin-McMahan for engaging in a romantic relationship before McMahan's divorce was final. *Id.* ¶ 190. The reprimand letter cited the dictionary definition of "infidelity" and a criminal statute for "adultery." *Id.* ¶¶ 191-192. McMahan suffered no further actions as a result of his relationship with Corazzin-McMahan, despite them being in the same chain of command. *Id.* ¶ 194. But from September through December 2019, Corazzin-McMahan alleges she suffered adverse employment actions and a hostile work environment by being intentionally isolated, given menial tasks, verbally ridiculed and harassed by co-workers because of the relationship, removed from decision-making meetings, and excluded from communications with her subordinates. *Id.* ¶¶ 196-200. She complained to her supervisors about these actions and notified Ludolph in person and via email about her concerns, but her employment duties were never reinstated. *Id.* ¶¶ 201-202. On November 21, 2019, Corazzin-McMahan requested that human resources complete her past-due performance evaluation, but it was never completed. *Id.* ¶¶ 203-204. She applied for a paralegal position at KHP headquarters, which she was qualified for. *Id.* ¶ 205. But she never got an interview. *Id.* ¶ 206. She subsequently resigned on December 13, 2019, because of the hostile work

environment and the loss of her employment duties. *Id.* ¶ 207. Corazzin-McMahan alleges she was constructively discharged. *Id.* ¶ 208.

### F.    Plaintiff Meader

Meader started working for the State of Kansas in 2017. *Id.* ¶ 30. Meader was a KHP Senior Administrative Specialist until October 2020. *Id.* ¶ 10. Meader was treated differently than her male co-workers and was singled out by Jones because she is female. *Id.* ¶¶ 120-121. On October 24, 2019, a KHP Major noticed Meader was upset and asked why. *Id.* ¶ 122. Meader explained that Jones had walked over to Meader, picked up both of her hands, stated, "my hands are so cold," and tried to warm his hands with hers before Meader pulled away. *Id.* ¶ 124. Meader was encouraged to report the harassment to the KHP Director of Human Resources. *Id.* ¶ 126. Scott Harrington also reported the incident to both Meader's direct supervisor, Kellerman, and to human resources. *Id.* ¶¶ 127-128.

On October 31, 2019, Meader reported another incident involving Jones. *Id.* ¶ 129. Meader stated that she was scared of Jones, that she didn't want him to put his hands on her, and that he made unwelcome sexual comments nearly every time he saw her. *Id.* ¶ 130. Meader stated that Jones stood behind her while she was eating and put his hands on her shoulders and began shaking her and asking why she always "shakes it" for him when he is around. *Id.* ¶¶ 131-133. He walked away loudly singing "shake it for me!" *Id.* ¶ 134. Meader met with the KHP Human Resources Director in November 2019 about the two incidents in October. *Id.* ¶ 136. She stated she was uncomfortable, fearful, and did not want to lose her job. *Id.* ¶ 137.

Meader reported another incident on February 21, 2020. *Id.* ¶ 138. Jones came to Meader from behind, stood very close to her, put his hands on her back, and said "does this make you feel uncomfortable?" *Id.* ¶¶ 140-141. He was so close that Meader could feel Jones's breath on her

neck. *Id.* ¶ 143. Meader responded affirmatively that she was uncomfortable. *Id.* ¶ 142. Jones laughed and walked away, saying he was "a funny man." *Id.* ¶ 144. Meader again reported this incident to Scott Harrington, who reported it to Kellerman and human resources. *Id.* ¶ 145.

On March 3, 2020, Meader detailed these incidents to an investigator from KDA. *Id.* ¶¶ 146-147. After a period of remote work due to the COVID-19 pandemic, Meader returned to the office on May 27, 2020. *Id.* ¶ 148. Jones immediately began touching her upon her return, including sliding his hand down her arm, touching her across her legs, grabbing her hand, and rubbing her shoulders. *Id.* ¶ 149-150. She again reported it to both Scott Harrington and human resources. *Id.* ¶ 152. Scott Harrington also informed Kellerman. *Id.* ¶ 153. Kellerman told Meader she could work continue to work remotely to avoid Jones. *Id.* ¶ 155.

Scott Harrington and Kellerman were both terminated from the KHP on July 23, 2020. *Id.* ¶ 156. As a result, Meader believed she had no one left to protect her from sexual harassment, discrimination, and a hostile work environment. *Id.* ¶ 157.

On July 27, 2020, Meader's new supervisor, Sauer, said he was surprised Meader had the nerve to return to work given that Scott Harrington and Kellerman were no longer employed. *Id.* ¶ 158. Meader tried to confide in a female co-worker, but Sauer informed her in September 2020 that she could not take breaks or lunches with that co-worker or with anyone else. *Id.* ¶¶ 160-161. Meader was thus alienated from her peers at work. *Id.* ¶ 162. Sauer's actions perpetuated the harassment by Jones. *Id.* ¶ 164. Sauer knew that Meader had complained about Jones but took no action to stop it, as authorized by De Vore, who through his participation in and supervision of the Executive Commanders also took no action to stop Jones. *Id.* ¶¶ 165-168.

Meader subsequently resigned on October 9, 2020, because she could no longer tolerate working at the KHP. *Id.* ¶ 169. Meader claims she was constructively discharged. *Id.* ¶ 170.

### G.     Plaintiff Cooper

Cooper started working for the State of Kansas in 2017. *Id.* ¶ 31. Cooper was a KHP Trooper from July 2017 through December 2020. *Id.* ¶ 12. Cooper was assigned to Troop C on October 18, 2020. *Id.* ¶ 210. Cooper was engaged to another Trooper, Lucas Byron, who was also on Troop C. *Id.* ¶ 211. On October 21, 2020, Cooper was assigned to the KHP office in Manhattan, and Byron was assigned to a construction zone in Junction City. *Id.* ¶ 212. Byron stopped in Manhattan to give Cooper a water bottle. *Id.* ¶ 213. A lieutenant counseled both Cooper and Byron and stated that it was not acceptable for Byron to run errands for Cooper on company time, even though it was otherwise acceptable for zone members to run errands for each other. *Id.* ¶¶ 214-215. Cooper stated she believed it was discrimination because of her relationship with Byron. *Id.* ¶ 216. The lieutenant said she should expect to be noticed and treated differently because of her relationship with Byron, though Byron was not treated differently. *Id.* ¶¶ 217-218.

After Byron and Cooper were married on November 7, 2020, the lieutenant who supervised them continued treating Cooper differently than Bryon. *Id.* ¶¶ 219-221. Cooper's duty performance was questioned and she was micromanaged, including with regard to the timing of her lunch breaks. *Id.* ¶ 222.

Cooper's supervisor would surveil her to determine her whereabouts—something that did not happen to male subordinates. *Id.* ¶¶ 224-225. Specifically, on November 4, 2020, Cooper's supervisor drove to a KHP office to see if Cooper was present, and upon not seeing her car, drove to her apartment complex. *Id.* ¶¶ 226-227. On November 16, 2020, the supervisor again drove to the office to see if Cooper was present. *Id.* ¶ 228. On November 19, 2020, Byron discovered the supervisor sitting and watching Cooper's apartment. *Id.* ¶ 229. The supervisor told Byron that Cooper was likely not enjoying the job and that he was attempting to make her leave. *Id.* ¶ 230.

During this time, Cooper was pregnant. *Id.* ¶ 232. She was on medical restrictions and was given limited duty assignments. *Id.* ¶¶ 234-235. On October 21, 2020, Cooper's supervisor discussed "command staff's" limited duty plans for her. *Id.* ¶ 238. Although they initially discussed that she would check VINs, another captain set a restriction that Cooper was to have no personal contact with the public, which was not a restriction from her doctor. *Id.* ¶¶ 239-240.

Cooper also sought to attend some training in November 2020. *Id.* ¶ 241. Her request was initially approved, but after she transferred to Troop C, approval was refused due to her medical restrictions limiting the amount of time she could drive during a shift. *Id.* ¶¶ 242-243. Cooper subsequently obtained documentation from her doctor stating that she could drive to the training. *Id.* ¶ 248. But she was still denied permission to attend the training. *Id.* ¶ 252.

Cooper resigned on December 31, 2020, due to discrimination, hostile work environment, and the adverse employment actions taken against her, including increased restrictions. *Id.* ¶ 253. Cooper claims she was constructively discharged. *Id.* ¶ 254.

### H.    Hostile Work Environment

Plaintiffs allege that Jones, De Vore, Murphy, Dean, and Sauer have allowed a hostile work environment against women to exist at the KHP. *Id.* ¶ 319. Female employees have stated during exit interviews that they left because of the hostile work environment and discrimination towards women within the KHP and that they could not endure it. *Id.* ¶ 322.

De Vore specifically is known within the KHP to have the opinion that women should not be in law enforcement. *Id.* ¶ 320. De Vore has made statements to the effect of "a woman belongs in the kitchen." *Id.* ¶ 321. De Vore has stated openly that women belong in the home. *Id.* ¶ 366. He has also told new recruits that "there are two things that will keep you from being successful: your mouth and your zipper." *Id.* ¶ 367. Jones has made offensive sexual jokes in the presence of

13

female KHP employees. *Id.* ¶ 323. Once, on seeing a hotel advertisement depicting women in bikinis, Jones stated that hotel had the best view. *Id.* ¶ 324. Another KHP employee told Scott Harrington in October 2019 that Jones made inappropriate sexual comments about female KHP employees at the KHP training academy, stating that he needed to check his "flow" while making sexual body gestures. *Id.* ¶ 325. Another female KHP employee stated that she tried to "tune out" a lot of what Jones says because it is inappropriate. *Id.* ¶ 327. On December 5, 2019, a female KHP employee told Scott Harrington that Jones again told female employees that he needed to check his "flow" while making sexual body gestures. *Id.* ¶ 328. She said it was offensive but that she was used to Jones's inappropriate behavior, which was the "norm." *Id.* ¶ 329. Jones also told a female KHP employee that her voice sounded like a phone sex operator. *Id.* ¶ 330.

From October 2019 through February 2020, KDA received information about the hostile work environment at the KHP. *Id.* ¶ 331. But despite investigating and knowing that Scott Harrington and Kellerman had personal knowledge of the allegations, KDA never interviewed them. *Id.* ¶ 333. Attorneys for KDA did interview Harrington, Meader, and McCurdy. *Id.* ¶¶ 398, 403. Meader felt like the attorneys made fun of her and blamed her for Jones's conduct. *Id.* ¶ 399. Meader did not believe the investigation was taken seriously. *Id.* ¶ 401. The investigators told McCurdy that they may talk to Jones and mention names. *Id.* ¶ 404. McCurdy told this to other employees involved in the investigation and they panicked. *Id.* ¶ 405. Pfannenstiel contacted the investigators and expressed concerns about retaliation if the names of the complaining employees were provided to Jones. *Id.* ¶¶ 406-408. Plaintiffs believe that the investigators did identify the complaining employees to Jones. *Id.* ¶ 412.

On February 24, 2020, Pfannenstiel told Knowlton that Scott Harrington and Kellerman were ready to take Meader to Jones's office and tell him to stop harassing her. *Id.* ¶ 334. Knowlton

responded that the investigation would take time. *Id.* ¶ 335. Pfannenstiel told Knowlton that Meader had not made a gesture or statement that Jones's actions were unwanted because she freezes when it happens. *Id.* ¶ 336. Pfannenstiel also told Knowlton about Jones's comment regarding a phone sex operator. *Id.* ¶ 338. Pfannenstiel told Knowlton that employees were resigning or transferring because of the discrimination and harassment. *Id.* ¶¶ 339-340.

Knowlton subsequently prepared a draft report and gave it to the governor's staff. *Id.* ¶ 342. Plaintiffs believe Jones was informed of the contents of the draft report. *Id.* ¶ 396. The draft report included statements from Harrington and Meader about Jones's unwanted touching. *Id.* ¶ 368-371. It also included allegations about statements made by Jones and De Vore and their bias against women. *Id.* at ¶¶ 372-373. The draft report concluded that the female KHP employees' reports were not credible and that they were biased against Jones. *Id.* ¶ 344. Knowlton concluded that any actions by Jones could be explained and that his physical contact with Meader was not harassment because "the exact nature of the physical contact cannot be ascertained, nor can it be clearly documented that Meader informed Col. Jones that the contact was unwelcome." *Id.* ¶ 345. The draft report ultimately concluded that there was insufficient evidence to show that Meader told Jones that the physical contact was unwelcome, and that Jones's "double entendres or questionable statements" could not be clearly defined as sexual harassment because Jones was possibly just trying to be funny. *Id.* ¶¶ 378-379.

KHP employees who participated in the investigation were not provided a copy of the report or the findings, despite requests. *Id.* ¶¶ 346-353. Plaintiffs contend that Knowlton improperly called into question some statements made by former female KHP employees about why they left the KHP. *Id.* ¶¶ 374-377.

During this time, Pfannenstiel continued reporting concerns to Knowlton. *Id.* ¶¶ 357-367. Despite being put on notice of the allegations of sexual harassment and discrimination, the State of Kansas took no action. *Id.* ¶¶ 381-382. Instead, the State of Kansas was supportive of Jones's rebuttal to the allegations, which had a chilling effect on others reporting discrimination or harassment. *Id.* ¶¶ 383-384, 388-389. Further, the termination of Scott Harrington and Kellerman removed protective supervisors and dissuaded other male KHP employees from taking action to support and assist female KHP employees. *Id.* ¶¶ 386-387.

## I.      Protected Speech

In November 2019, Harrington met with a Kansas state senator and provided documentation of the sexual harassment and discrimination complaints. *Id.* ¶ 417. The state senator said they would discuss the issue with the governor. *Id.* ¶ 418. Harrington also spoke with a Kansas state representative about issues at the KHP. *Id.* ¶ 421. Harrington alleges that she spoke with these legislators in her personal capacity outside the scope of her employment. *Id.* ¶¶ 420, 423.

In May 2020, Pfannenstiel told the president of the Kansas State Troopers Association about the allegations of discrimination and sexual harassment. *Id.* ¶ 424. Pfannenstiel alleges this was done as a matter of public concern and outside the scope of her employment. *Id.* ¶ 426.

On August 17, 2020, Pfannenstiel, Harrington, McCurdy, and Meader did an interview with a journalist. *Id.* ¶ 428. During the interview, their faces and voices were concealed and altered. *Id.* ¶ 429. They spoke about the discrimination and harassment at the KHP and their fear of retaliation. *Id.* ¶ 431. The interview was done in their personal capacity and outside the scope of their employment. *Id.* ¶ 433. It aired on October 15, 2020, November 12, 2020, and December 5, 2020. *Id.* ¶ 434. It has also been shared on social media. *Id.* ¶ 435.

In December 2020, female KHP employees were directly questioned about whether they were one of the individuals who appeared in the interview. *Id.* ¶ 454. The questioning was done in a hostile manner. *Id.* ¶ 455. A male KHP employee warned McCurdy that supervisors were interrogating female KHP employees. *Id.* ¶ 456. Although McCurdy herself was not questioned, she was placed in fear of speaking out. *Id.* ¶ 457. Harrington was likewise afraid. *Id.* ¶ 458.

Jones and De Vore became aware of anonymous letters sent to the governor's office and to state legislators. *Id.* ¶ 438. Jones made it clear he did not tolerate KHP employees speaking out against him, his subordinates, or the KHP. *Id.* ¶ 437. On February 11, 2020, Jones and De Vore accused Pfannenstiel of sending an anonymous letter to the governor. *Id.* ¶¶ 439-440. The letter had accused Jones of being inappropriate towards women and of committing ethical violations or illegal actions. *Id.* ¶ 441. Pfannenstiel denied sending the letter, and Jones said that if he found out who did, he would "see that they have a parting of the ways with this agency." *Id.* ¶¶ 442-443. De Vore said "we are warning you to watch what you say and to whom." *Id.* ¶ 444. Pfannenstiel felt attacked and threatened. *Id.* ¶ 445. The comments made Pfannenstiel afraid to speak out. *Id.* ¶ 446.

Jones and De Vore had a reputation of warning employees against any speech that would make KHP "look bad." *Id.* ¶¶ 449-450. Jones sent out many agency-wide emails that "caution[ed]" KHP employees from making statements that could reflect on the KHP in a negative light. *Id.* ¶ 452. Jones's statements had a chilling effect on Pfannenstiel, Harrington, McCurdy, Meader, and Cooper. *Id.* ¶ 459.

### J.    Claims

Each Plaintiff asserts several claims against various Defendants. The following tables summarize the claims. The shaded claims are at issue in the motions to dismiss.

| Pfannenstiel | | |
|---|---|---|
| Count | Claims | Defendants |
| 1 | Gender Discrimination - § 1983 | Jones, De Vore, Murphy |
| 2 | Hostile Work Environment - § 1983 | Jones, De Vore, Murphy |
| 3 | Speech - § 1983 | Jones, De Vore |
| 4 | Suppression of Speech - § 1983[5] | Jones, De Vore |
| 5 | Sex Discrimination - Title VII | State of Kansas |
| 6 | Hostile Work Environment - Title VII | State of Kansas |
| 7 | Retaliation - Title VII | State of Kansas |

| Harrington | | |
|---|---|---|
| Count | Claims | Defendants |
| 8 | Gender Discrimination - § 1983 | Jones, De Vore[6] |
| 9 | Hostile Work Environment - § 1983 | Jones, De Vore, Dean |
| 10 | Speech - § 1983 | Jones, De Vore |
| 11 | Suppression of Speech - § 1983 | Jones, De Vore |
| 12 | Sex Discrimination - Title VII | State of Kansas |
| 13 | Hostile Work Environment - Title VII | State of Kansas |
| 14 | Retaliation - Title VII | State of Kansas |
| 15 | Retaliation (Second Count) - Title VII | State of Kansas |

| McCurdy | | |
|---|---|---|
| Count | Claims | Defendants |
| 16 | Gender Discrimination - § 1983 | Jones, De Vore |
| 17 | Hostile Work Environment - § 1983 | Jones, De Vore |
| 18 | Suppression of Speech - § 1983 | Jones, De Vore |
| 19 | Sex Discrimination - Title VII | State of Kansas |
| 20 | Hostile Work Environment - Title VII | State of Kansas |

| Corazzin-McMahan | | |
|---|---|---|
| Count | Claims | Defendants |
| 21 | Gender Discrimination - § 1983 | Jones, De Vore, Murphy, Ludolph, Catania |
| 22 | Hostile Work Environment - § 1983 | Jones, De Vore, Murphy, Ludolph, Catania |

[5]   The distinction between the First Amendment claims appears to be that the "Speech" claims allege First Amendment retaliation, and the "Suppression of Speech" claims are prior-restraint claims.

[6]   Harrington's claim against Dean on Count 8 was dismissed by stipulation after the second amended complaint was filed. Doc. 95.

| Meader | | |
|---|---|---|
| Count | Claims | Defendants |
| 23 | Gender Discrimination - § 1983 | Jones, De Vore, Sauer |
| 24 | Hostile Work Environment - § 1983 | Jones, De Vore, Sauer[7] |
| 25 | Suppression of Speech - § 1983 | Jones, De Vore |
| 26 | Sex Discrimination - Title VII | State of Kansas |
| 27 | Hostile Work Environment - Title VII | State of Kansas |

| Cooper | | |
|---|---|---|
| Count | Claims | Defendants |
| 28 | Suppression of Speech - § 1983 | Jones, De Vore |
| 29 | Sex Discrimination - Title VII | State of Kansas |
| 30 | Hostile Work Environment - Title VII | State of Kansas |

*Id.* ¶¶ 460-700.

## II.    STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible if it is accompanied by sufficient factual content to allow a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a 'probability requirement.'" *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (quoting *Twombly*, 550 U.S. at 557) (internal quotations omitted). In undertaking this analysis, the Court accepts as true all well-pleaded allegations in the complaint, though it need not accept legal conclusions. *Id.* Likewise, conclusory statements are not entitled to the presumption of truth. *Id.* at 678-79.

---

[7]    Defendants move on Count 24 only as to De Vore and Sauer.

### III.    ANALYSIS

Defendants have filed five motions to dismiss, each of which separately addresses various claims by Pfannenstiel (Doc. 67), Harrington (Doc. 75), McCurdy (Doc. 71), Corazzin-McMahan (Doc. 69), and Meader (Doc. 73). None of Cooper's claims are at issue. The motions generally challenge the various claims under § 1983 and Title VII for gender/sex discrimination, claims under § 1983 and Title VII for hostile work environment, claims under § 1983 for First Amendment retaliation, and Harrington's second claim for Title VII retaliation.

### A.    Gender/Sex Discrimination

#### 1.    Counts 1, 5, 8, 12, 16, 19, 23, and 26 – Gender/Sex Discrimination Under § 1983 and Title VII by Pfannenstiel, Harrington, McCurdy, and Meader

Pfannenstiel, Harrington, McCurdy, and Meader all assert gender/sex discrimination claims under § 1983 against various individual defendants (Counts 1, 8, 16, and 23) for violation of the Equal Protection Clause, and gender/sex discrimination claims under Title VII against the State of Kansas (Counts 5, 12, 19, and 26). For each of these claims, Plaintiffs argue that they do not need to prove a distinct adverse employment action because the claims are based on a hostile work environment. Doc. 81 at 5-6 (Pfannenstiel); Doc. 82 at 5-6 (Harrington); Doc. 79 at 7-8 (McCurdy); Doc. 80 at 8-9 (Meader); *see also, e.g.*, Doc. 79 at 7 ("[G]ender discrimination based on sexual harassment allegations can be presented under one of two theories: quid pro quo discrimination or hostile work environment."); Doc. 80 at 6 (stating that, in a hostile-work-environment claim, the hostile environment is the adverse action).[8] But they also assert claims of hostile work environment under both § 1983 and Title VII based on the same conduct. *See* Doc.

---

[8]    By comparison, Corazzin-McMahan specifically asserts that her gender/sex discrimination claims are disparate-treatment claims. Doc. 83 at 5. Her gender/sex discrimination claims are addressed separately below.

65 (Counts 2 and 6 (Pfannenstiel); 9 and 13 (Harrington); 17 and 20 (McCurdy); and 24 and 27 (Meader)).

There are various claims actionable under Title VII and, by extension, the Equal Protection Clause: disparate treatment, hostile work environment, and quid pro quo sexual harassment. *See Throupe v. Univ. of Denver*, 988 F.3d 1243, 1251 (10th Cir. 2021); *Desouza v. Off. of Child. & Fam. Servs.*, 2019 WL 2477796, at *3-4 (E.D.N.Y. 2019). But these are all distinct claims. *Desouza*, 2019 WL 2477796, at 4; *see also Thiongo v. Airtex Mfg., LLLP*, 2021 WL 147981, at *4 (D. Kan. 2021); *Garang v. Smithfield Farmland Corp.*, 439 F. Supp. 3d 1073, 1089 (N.D. Iowa 2020) ("[C]ourts must be careful not to conflate the elements of a disparate-treatment claim with those of a hostile work environment harassment claim."). They have distinct elements. For example, a disparate treatment claim requires an adverse employment action. *Desouza*, 2019 WL 2477796, at *4. But a hostile-work-environment claim requires allegations of a workplace so saturated with severe or pervasive harassment that it alters the conditions of the working environment. *Mitchell v. City & Cnty. of Denver*, 112 F. App'x 662, 668 (10th Cir. 2004); *see also Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) ("A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'"). The differing analytical standards necessarily mean that allegations that might establish one claim do not necessarily establish the other. *Desouza*, 2019 WL 2477796, at *4; *Benedetto v. New York State Off. of Child. & Fam. Servs.*, 2020 WL 4049945, at *3 n.4 (N.D.N.Y. 2020) ("The Court thus will not find that there was an adverse employment action based simply on Plaintiff's allegations supporting harassment or retaliation claims.").

Plaintiffs base their so-called gender/sex discrimination claims on the existence of a hostile work environment. But as pleaded, these claims are redundant. Accordingly, the Court dismisses Counts 1, 5, 8, 12, 16, 19, 23, and 26.

### 2. Count 21 – Gender Discrimination Under § 1983 by Corazzin-McMahan

Corazzin-McMahan asserts a § 1983 gender/sex discrimination claim against Jones, De Vore, Murphy, Ludolph, and Catania. Unlike the gender/sex discrimination claims discussed above that are based on a hostile work environment, Corazzin-McMahan argues that her claim is based on disparate treatment. Doc. 83 at 5. Defendants move to dismiss, however, arguing that Corazzin-McMahan has not pleaded facts that plausibly show an adverse employment action taken by each named defendant, and they also seek qualified immunity. Doc. 70 at 11-15.

As indicated above, a disparate-treatment claim requires an adverse employment action. *Throupe*, 988 F.3d at 1253. An adverse employment action is a "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* (internal quotation and citation omitted). Inconveniences or alterations in job duties are not enough. *Id.*

In response, Corazzin-McMahan identifies seven ostensible adverse employment actions:

- she expressed concern that Catania would take retaliatory actions against her after she disclosed her relationship;
- she was relieved of the majority of her employment duties;
- Ludolph told McMahan (Corazzin-McMahan's husband) that she had employment issues;
- she was intentionally isolated and given menial tasks;
- she was removed from decision-making meetings, which interfered with her employment responsibilities regarding grant payments;
- she was excluded from communications to her subordinates and was removed from decision-making and leadership meetings; and
- she was constructively discharged due to a hostile work environment.

22

Doc. 83 at 6. As a preliminary matter, Corazzin-McMahan expressing concern about possible retaliation is not an adverse employment action. It's not an employment action at all. Her allegations that she was relieved of most of her employment duties and that she was isolated and given menial tasks are not tied to any specific individual defendants.[9] But a § 1983 claim must be based on conduct of the named defendant. *See Henry v. Storey*, 658 F.3d 1235, 1241 (10th Cir. 2011) ("But § 1983 imposes liability for a defendant's own actions—personal participation in the specific constitutional violation complained of is essential.").

The only two specific instances of conduct by Defendants are that Ludolph told Corazzin-McMahan's husband that she had unspecified employment issues, and that Catania did not include her on one email that included two of her subordinates. Doc. 65 at ¶ 181, 183-184. Neither of these events are of the type that would plausibly plead an adverse employment action.[10] The only allegation about actions taken by Jones, De Vore, or Murphy is that they consulted with Ludolph about his supervisory duties. But this vague and conclusory statement doesn't plausibly allege that Jones, De Vore, or Murphy individually took any unlawful employment action toward Corazzin-McMahan, even assuming that Ludolph's action was adverse.

Finally is Corazzin-McMahan's claim that she was constructively discharged. Constructive discharge can be an adverse employment action. *Rivero v. Bd. of Regents of Univ. of N.M.*, 950 F.3d 754, 761 (10th Cir. 2020). But such a claim requires that a plaintiff "allege facts sufficient to show both that a hostile work environment existed and that this environment was so intolerable

---

[9] Corazzin-McMahan does identify the person who told her she was relieved of most of her employment duties as Samantha Juarez. Doc. 65 at ¶ 180. But Juarez is not a party, and Corazzin-McMahan has not tied Juarez's actions to any Defendant.

[10] Corazzin-McMahan also alleged that Ludolph issued a letter of reprimand to her and her husband because they started their relationship before his former marriage was dissolved. Doc. 65 at ¶ 190. It doesn't appear that Corazzin-McMahan relies on this as an adverse employment action underlying her gender/sex discrimination claim because both she and her husband received identical letters, which would not be disparate treatment. *See* Doc. 83 at 7.

that a reasonable person would have felt compelled to resign." *Brown v. LaFerry's LP Gas Co.*, 708 F. App'x 518, 523 (10th Cir. 2017) (internal quotation and citation omitted). As discussed below, Corazzin-McMahan has not pleaded sufficient facts to plausibly suggest that Defendants created a hostile work environment. And as discussed above, the only specific actions she does allege (those of Ludolph and Catania) do not plausibly allege facts that a reasonable person in Corazzin-McMahan's position would have felt compelled to resign as a result. Based on this, Corazzin-McMahan has failed to state a plausible claim for gender/sex discrimination under § 1983.

Alternatively, to the extent any of these events did plausibly allege an adverse employment action, Corazzin-McMahan has not come forward with any authorities suggesting that such actions could support a § 1983 gender/sex discrimination claim involving a violation of a clearly established constitutional right, which is her burden. *Lincoln v. Maketa*, 880 F.3d 533, 544 (10th Cir. 2018) ("The assertion of qualified immunity imposes a heavy burden on the plaintiffs, requiring them to point to existing precedent or the clear weight of authority establishing the existence of a constitutional violation."); *Hoke v. Swender*, 421 F. Supp. 3d 1164, 1170 (D. Kan. 2019) ("Once a defendant asserts qualified immunity, the plaintiff must show that: (1) the defendant's actions violate a constitutional right and (2) the constitutional issue was clearly established at the time of the defendant's actions."). This alternatively entitles Jones, De Vore, Murphy, Ludolph, and Catania to qualified immunity on Count 21. *See Hoke*, 421 F. Supp. 3d at 1170 (granting qualified immunity where plaintiffs failed to come forward with caselaw supporting their claim that the actions complained of were adverse employment actions that could support a First Amendment retaliation claim).

### B.      Hostile Work Environment

Pfannenstiel, Harrington, McCurdy, Corazzin-McMahan, and Meader all assert § 1983 hostile-work-environment claims against various defendants. Pfannenstiel, Harrington, and McCurdy also assert Title VII hostile-work-environment claims against the State of Kansas that are at issue.

A series of separate acts can collectively constitute a hostile work environment. *Throupe*, 988 F.3d at 1251. A hostile work environment exists where a plaintiff (1) was discriminated against because of her sex, and (2) the discrimination was sufficiently severe or pervasive that it altered the terms or conditions of employment. *Id.*

To sufficiently plead a hostile-work-environment claim, a plaintiff must "plead facts sufficient to show that the work environment 'is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Brown*, 708 F. App'x at 520 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). There must be facts pleaded showing that the work environment is both subjectively and objectively hostile. *Id.* "[Run-of-the-mill] boorish, juvenile, or annoying behavior" is not sufficient, nor are a few isolated incidents. *Throupe*, 988 F.3d at 1252 (internal quotation and citation omitted). Where "none of the acts [a plaintiff] complains of, either considered alone or in combination, can be said to have altered the conditions of employment such that the atmosphere was abusive. . . . dismissal for failure to state claim is proper." *Chand v. Braithwaite*, 2020 WL 9209284, at *2 (D.S.C. 2020).

Sexual harassment is also actionable under § 1983. *Mitchell*, 112 F. App'x at 671 n.11; *Notari v. Denver Water Dep't*, 971 F.2d 585, 587 (10th Cir. 1992) (noting that a § 1983 claim is independent of a Title VII claim based on the same conduct where it has a substantive basis other

than Title VII, such as Equal Protection). "But § 1983 imposes liability for a defendant's own actions—personal participation in the specific constitutional violation complained of is essential." *Henry*, 658 F.3d at 1241. Liability under § 1983 therefore requires a deliberate deprivation of constitutional rights. *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1250 (10th Cir. 1999). Negligence is not enough. *Id.* Thus, if a plaintiff seeks liability against a supervisor under § 1983 who did not actually do the harassing, there must be "a showing of deliberate indifference to known sexual harassment" by a supervisor or that the supervisor "consciously acquiesce[d] in sexual harassment by an outside third party or by co-workers." *Id.* (quoting *Woodward v. City of Worland*, 977 F.2d 1392, 1401 (10th Cir. 1992)). Additionally, "[m]ore is required to state a claim for a constitutional violation . . . than for a statutory claim under Title VII." *See Miller v. Regents of Univ. of Colo.*, 1999 WL 506520, at *10-11 (10th Cir. 1999) (internal quotation and citation omitted).

Typically, in evaluating whether the conduct was sufficiently severe or pervasive for purposes of a hostile-work-environment claim, courts consider the totality of the circumstances, including "such factors as the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Throupe*, 988 F.3d at 1252 (internal quotation and citation omitted). This includes consideration of the environment overall. *See Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1415-16 (10th Cir. 1987) ("Evidence of a general work atmosphere therefore—as well as evidence of specific hostility directed toward the plaintiff—is an important factor in evaluating the claim."). However, in the context of a § 1983 claim, the analysis is necessarily somewhat different. *See Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014) ("This case demonstrates how hostile work environment claims that may readily be brought against

employers under Title VII do not always fit easily within the context of individual liability under § 1983."). Claims under Title VII seek to hold an <u>employer</u> liable, and thus it makes sense to consider the conduct of multiple employees or supervisors in determining whether the working environment was hostile overall. *See id.* But § 1983 focuses on <u>individual</u> liability. *Id.* at 115; *see also Henry*, 658 F.3d at 1241. Accordingly, "when a plaintiff alleges that multiple individual defendants have engaged in uncoordinated and unplanned acts of harassment, each defendant is only liable under § 1983 when his own actions are independently sufficient to create a hostile work environment." *Raspardo*, 770 F.3d at 115 (addressing issue in context of a qualified-immunity analysis).

Here, there are no allegations that the individual defendants coordinated or planned acts of harassment. Rather, the individual defendants are alleged to have engaged in uncoordinated acts of harassment, or else acquiesced to or were deliberately indifferent to acts of harassment by others. Accordingly, the Court will first consider whether Plaintiffs have alleged facts against each individual defendant that plausibly allege a hostile work environment for purposes of the § 1983 claims. Second, the Court will consider whether, under the totality of the circumstances, Plaintiffs have plausibly stated a claim for a hostile work environment against the State of Kansas under Title VII.

### 1.     Counts 2, 9, 17, 22, and 24 – § 1983 Hostile-Work-Environment Claims by Pfannenstiel, Harrington, McCurdy, Corazzin-McMahan, and Meader

The Court first considers the § 1983 hostile-work-environment claims, isolating the acts that each Plaintiff alleges each Defendant committed. The following summaries are drawn from a careful review of the second amended complaint and the response briefs of each Plaintiff. The Court has endeavored to include all allegations highlighted by Plaintiffs. But conclusory

statements are not given a presumption of truth. As discussed, the Court finds that the non-conclusory allegations are generally insufficient to plausibly allege that any of the individual defendants are individually liable for creating a hostile work environment, with one exception discussed below.

| Pfannenstiel | |
| --- | --- |
| Jones | sent the instant messages quoted above; treated Pfannenstiel differently by ignoring her policy recommendations in favor of recommendations by male employees; created a "general atmosphere" of discrimination and harassment |
| De Vore | known to have the opinion that women do not belong in law enforcement; known to have said a woman "belongs in the kitchen"; treated Pfannenstiel differently by ignoring her policy recommendations in favor of recommendations by male employees; knew of Jones's actions but took no action to prevent them and was deliberately indifferent; allowed a hostile work environment at the KHP |
| Murphy | entered Pfannenstiel's office on one occasion, said he wanted to demonstrate inappropriate behavior, tried to grab Pfannenstiel's hands, was told to stop, laughed, and left |

| Harrington | |
| --- | --- |
| Jones | touched Harrington three times; created a "general atmosphere" of discrimination and harassment; knew of or authorized Dean's actions |
| De Vore | was present on one occasion that Jones touched Harrington; known to have the opinion that women do not belong in law enforcement; known to have said a woman "belongs in the kitchen"; knew of Jones's actions but took no action to prevent them and was deliberately indifferent; allowed a hostile work environment at the KHP; knew of or authorized Dean's actions |
| Dean | failed to inform Harrington of changes impacting her work, which undermined her authority; made impossible employment demands, which he did not do to male captains[11] |

---

[11] Harrington's allegations against Dean are identical in both alleging a gender-based hostile work environment and retaliation. See Doc. 65 at ¶¶ 88-92, 287-292. The only distinction is that the first time the allegations are made, Harrington alleges the treatment was distinct from how male KHP employees were treated, and the second time the allegations are made, she asserts Dean was motivated by retaliation.

| McCurdy | |
|---|---|
| Jones | pulled McCurdy in for three hugs between April 2019 and February 2020, described as a "tight, uncomfortable, chest-to-chest hug," a "tight hug," and a "full hug"; in June 2020, called out to McCurdy while she was eating lunch, "Woman! Woman! Hey Woman!" and then said "That's my girl" when she said she was eating her own food; created a "general atmosphere" of discrimination and harassment |
| De Vore | known to have the opinion that women do not belong in law enforcement; known to have said a woman "belongs in the kitchen"; knew of Jones's actions but took no action to prevent them and was deliberately indifferent; allowed a hostile work environment at the KHP |

| Corazzin-McMahan[12] | |
|---|---|
| Jones | knew of actions taken against Corazzin-McMahan but did nothing to stop it; was in a leadership role and was informed of daily operations |
| De Vore | gave instructions and orders to Ludolph; consulted with Ludolph about supervision duties; oversaw the KHP Executive Commanders and was informed of daily operations; known to have the opinion that women do not belong in law enforcement; known to have said a woman "belongs in the kitchen" |
| Murphy | gave instructions and orders to Ludolph; consulted with Ludolph about supervision duties |
| Ludolph | spoke to Corazzin-McMahan's husband about her unspecified employment issues; issued letter of reprimand to Corazzin-McMahan and her husband about their relationship |
| Catania | sent an email notifying employees about a staffing change that included two of Corazzin-McMahan's subordinates but not Corazzin-McMahan; consulted with Ludolph about supervision duties |

---

[12] Corazzin-McMahan also alleges she was told she was being relieved of most of her employment duties by Samantha Juarez, who is not a party to this case. She also claims she was intentionally isolated, verbally ridiculed and harassed by co-workers, removed from supervisory or leadership meetings, was not given a performance evaluation, and did not receive an interview for a job she applied for internally. But she does not link any of these actions to any Defendant.

| Meader[13] | |
|---|---|
| De Vore | known to have the opinion that women do not belong in law enforcement; known to have said a woman "belongs in the kitchen"; knew of Jones's actions but took no action to prevent them and was deliberately indifferent; authorized Sauer's actions via his KHP leadership role; allowed Sauer's actions to continue |
| Sauer | told Meader he was surprised she returned to work given that Scott Harrington and Kellerman were no longer employed at the KHP; told Meader she could not take lunch or breaks with a specific co-worker or anyone else, which alienated her; knew Meader had complained about Jones but took no action to prevent or cease Jones's actions |

As to De Vore, who is named by all Plaintiffs, the allegations are generally limited to conclusory statements that De Vore knew of and was deliberately indifferent to actions of others. But conclusory statements are not entitled to the presumption of truth. *Iqbal*, 556 U.S. at 678-79. Similarly, statements that De Vore supervised or authorized the actions of his subordinates are not enough to show that he personally is liable for a hostile work environment. Finally, all Plaintiffs rely on the allegations that De Vore didn't believe that women belonged in law enforcement and had said on at least one occasion that women "belong in the kitchen." There are no allegations that he communicated these beliefs to any particular Plaintiff, and even if he did, these statements or opinions of De Vore, while perhaps "boorish," *Throupe*, 988 F.3d at 1252, fall well shy of severe or pervasive harassment that would alter the terms of anyone's employment.[14] Accordingly, Plaintiffs have failed to state a plausible § 1983 hostile-work-environment claim against De Vore in Counts 2, 9, 17, 22, and 24, and those claims are dismissed.

---

[13]   Meader also asserts a § 1983 hostile-work-environment claim against Jones. But Defendants do not seek dismissal of that claim, nor do they seek dismissal of her Title VII hostile-work-environment claim.

[14]   The second amended complaint contains other statements made by De Vore. Doc. 65 at ¶¶ 366-367. Plaintiffs do not seem to rely on these statements in their briefs. But even considering them, Plaintiffs still fail to assert a § 1983 hostile-work-environment claim against De Vore.

Murphy is alleged to have attempted to grab Pfannenstiel's hands on one occasion. But there are no allegations that he actually made physical contact, nor is one isolated incident such as this sufficient to create a hostile work environment. *See Morris v. City of Colo. Springs*, 666 F.3d 654, 658-59, 668 (10th Cir. 2012) (holding harassment was not severe despite three separate tortious incidents); *see also Turnbull v. Topeka State Hosp.*, 255 F.3d 1238, 1242-44 (10th Cir. 2001) (finding a sexually hostile work environment because, "[w]hile there was only one incident, it was objectively abusive, dangerous, and humiliating," where a doctor was attacked, undressed, digitally penetrated, bit, choked, and threatened with death by a patient); *see also Paul v. Northrop Grumman Ship Sys.*, 309 F. App'x 825, 828 (5th Cir. 2009) (stating that an isolated incident must be "extremely serious" to create a hostile work environment); *Rivers v. Time Warner Cable, Inc.*, 2012 WL 2342930, at *5 (W.D.N.C. 2012) (finding that one isolated incident of a defendant trying to pull a plaintiff's shirt away from her back to see a tattoo was not serious enough to create a hostile work environment). Corazzin-McMahan also alleges Murphy gave instructions and orders to Ludolph and consulted with Ludolph about supervision duties. But such vague and conclusory allegations do little to connect Murphy to any severe or pervasive harassment. Pfannenstiel's and Corazzin-McMahan's § 1983 claims against Murphy in Counts 2 and 22 are therefore dismissed.

Harrington alleges that Dean failed to inform her of changes impacting her work, which undermined her authority and made impossible employment demands. As noted above, the Court questions whether Harrington has plausibly alleged that Dean took these actions because of her gender or sex as opposed to retaliation, as Harrington relies on these facts to support both claims. But even to the extent Harrington has plausibly alleged these actions were taken because of her gender or sex, these unspecified complaints do rise to the level of severe or pervasive harassment. *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008) ("Workplaces are not always

harmonious locales, and even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard. Some rolling with the punches is a fact of workplace life."). Harrington's § 1983 claim against Dean in Count 9 is dismissed.

Corazzin-McMahan alleges that Ludolph spoke to her husband about her employment issues and issued both Corazzin-McMahan and her husband a letter of reprimand. Catania sent an email without copying Corazzin-McMahan. None of these are sufficient to plausibly allege severe or pervasive harassment. The § 1983 claims against Ludolph and Catania in Count 22 are dismissed.

Meader alleges that Sauer told her that he was surprised she had the nerve to return to work given that Scott Harrington and Kellerman were no longer employed at KHP. Meader also alleges that Sauer told her that she could not take her breaks or lunches with a female co-worker Meader had confided in, or with anyone else, on the floor of her building. Meader claims this action intentionally alienated her from her peers and left her with no other employees to support her in the context of the sexual harassment she was suffering. Meader also alleges that Sauer knew that Meader had complained about Jones but took no action to prevent or cease Jones's actions. But Meader offers no allegations suggesting that Sauer had the ability to stop the actions of Jones, who was Sauer's superior. None of these actions are sufficient to plead a hostile work environment under the well-established standards discussed above. *See id.*; *see also Gasperini v. Dominion Energy New England*, 2012 WL 2402804, at *7 n.13 (D. Mass. 2012) (noting in dicta that the plaintiff's hostile work environment claim, which included an allegation that she had to eat lunch alone, would not have survived summary judgment); *Paul*, 309 F. App'x at 828 (stating that an isolated incident must be "extremely serious" to create a hostile work environment); *Young v.*

*Giant Food Stores, LLC*, 108 F. Supp. 3d 301, 312 (D. Md. 2015) ("Though hardly pleasant, the disrespectful conduct alleged by Young is not sufficient to give rise to a hostile work environment claim."). Therefore Meader's § 1983 claim against Sauer in Count 24 is dismissed.

Finally, the Court considers the allegations against Jones, which are somewhat more detailed and varied. Corazzin-McMahan's allegations against Jones are just that he was in a leadership position at KHP, which is not enough to hold him individually liable for a hostile work environment created by others, *Henry*, 658 F.3d at 1241; *Murrell*, 186 F.3d at 1250, and the allegation that he knew of actions taken against Corazzin-McMahan but did nothing to stop it is conclusory and not entitled to a presumption of truth, *Iqbal*, 556 U.S. at 678-79. Corazzin-McMahan's § 1983 claim against Jones in Count 22 is dismissed.

Pfannenstiel alleges that Jones sent her instant messages that were offensive and of a sexual nature. But even accepting Pfannenstiel's characterization of the instant messages as sexual and offensive, that isolated event, even when coupled with Pfannenstiel's unspecified contentions that Jones disregarded her policy recommendations and created a "general atmosphere" of harassment do not plausibly state a claim against Jones for hostile work environment. The Court further notes that it has reviewed the actual messages, which Pfannenstiel acknowledges it can do. *See* Doc. 81 at 2. The conversation included some brief banter about sleeping on an office couch due to long working hours. Both Pfannenstiel and Jones appeared to be joking and both used emojis that reflect that tone.[15] And the second interaction was mostly just Jones thanking Pfannenstiel for her work. These messages are not severe harassment and in fact can hardly be reasonably characterized as harassment at all. *E.E.O.C. v. Tuscarora Yarns, Inc.*, 2010 WL 785376, at *3 (M.D.N.C. 2010)

---

[15]   The emojis themselves are not included. Just the parenthetical descriptions are listed. None appear to be sexual in nature. Jones did use a "smiley with tongue hanging out" emoji once and referenced a couch. Doc. 68-1. Even to the extent this could be considered sexual in nature, this isolated event would not be sufficient to create a hostile work environment.

("However, EEOC's complaint, while flush with innuendo, lacks sufficient facts upon which to reach such a conclusion."). Pfannenstiel's § 1983 claim against Jones in Count 2 is dismissed.

Harrington alleges that Jones touched her three times and created a "general atmosphere" of harassment. Putting aside the latter contention, which is vague and conclusory, *see Young*, 108 F. Supp. 3d at 312 ("Simply stating that the conduct occurred 'often,' . . . is insufficient to show that it was pervasive without more context[.]"), three incidents of touching, without some showing that the context was severe or offensive or sexual,[16] is not sufficient to state a claim for hostile work environment. *See Morris*, 666 F.3d at 658-59, 668; *Turnbull*, 255 F.3d at 1242-44; *see also Penry v. Fed. Home Loan Bank of Topeka*, 155 F.3d 1257, 1260-61 (10th Cir. 1998) (affirming summary judgment on a hostile-work-environment claim where plaintiff alleged numerous inappropriate comments and actions, including that the defendant "needlessly touched [the plaintiffs] on many occasions"); *Sowash v. Marshalls of MA, Inc.*, 2021 WL 2115359, at *5 (W.D. Va. 2021) ("While Hughes's hugs, touching of Sowash's arm, kiss on the cheek, and occasional compliments about her appearance are inappropriate work behaviors, they do not cross the threshold of severe or pervasive conduct under Title VII."); *Paul*, 309 F. App'x at 826, 829 (finding no hostile work environment based on one incident where a man walked up to a woman until his chest was touching hers, stood there for 30 seconds during a confrontation, and then placed his hand on her stomach and around her waist before passing her in the hallway while "rubb[ing] his pelvic region across [her] hips and buttocks"); *Rivers*, 2012 WL 2342930, at *5 ("The occasional

---

[16] The only details provided are that the three touches occurred between August and December 2019, and on the first occasion, Jones touched Harrington on the back, and when she said that touching her was inappropriate, he touched her again and said "there, I take it back." This fails to plausibly state a claim. *See Tuscarora Yarns, Inc.*, 2010 WL 785376, at *3 ("The allegation that Martinez was 'inappropriately touched' does not indicate how she was touched so that a determination can be made that the touching was plausibly unwelcome and based on gender."). It is also well established that "[run-of-the-mill] boorish, juvenile, or annoying behavior" is not sufficient to show a hostile work environment, nor are a few isolated incidents. *Throupe*, 988 F.3d at 1252 (internal quotation and citation omitted). The Court further discerns distinctions, albeit fine ones, between the conduct complained of by Harrington and the conduct complained of by McCurdy, as discussed below.

non-sexual touching Plaintiff complains of is not remotely close to establishing the severe and pervasive harassment required for a hostile environment claim."); *cf. Mitchem v. Sleepcair, Inc.*, 2021 WL 4439406, at *6-7 (D. Kan. 2021) (finding a plausible claim of hostile work environment where the plaintiff alleged multiple incidents of touching, including rubbing the plaintiff's shoulders, back, and neck, coupled with an unwanted sexual advance involving a kiss on the lips and "sexual grinding"). Harrington's § 1983 claim against Jones in Count 9 is dismissed.[17]

Lastly, McCurdy alleges that Jones created a hostile work environment when he pulled her in for three hugs between April 2019 and February 2020, which were described as a "tight, uncomfortable, chest-to-chest hug," a "tight hug," and a "full hug." Additionally, in June 2020, Jones called out to McCurdy while she was eating lunch, "Woman! Woman! Hey Woman!" and then said "That's my girl" when she said she was eating her own food.

McCurdy's allegations against Jones present somewhat of a closer call than the other § 1983 claims asserted. The Court agrees that Defendants attempt to put somewhat of a gloss on Jones's conduct that characterizes the allegations in a more favorable light to Jones, *see* Doc. 72 at 8, which is not proper at this stage. Although the Court thinks it is close, the Court finds that the three hugs as described and other facts suggesting that McCurdy was singled out because she is a

---

[17] The Court finds most Plaintiffs have failed to plausibly state a claim for hostile work environment against the individual defendants, except as discussed below. It seems that most Defendants also would be shielded by qualified immunity had this argument been raised in the opening briefs for the § 1983 hostile-work-environment claims. But it was not. For example, as to Meader's claims, Defendants' motion only appears to assert qualified immunity as to the § 1983 claim for gender/sex discrimination, but not the § 1983 hostile-work-environment claim. Doc. 74 at 6-14; *see also* Doc. 70 at 11-20 (similar argument for Corazzin-McMahan); Doc. 68 at 12-14, 22-25 (similar argument for Pfannenstiel); Doc. 76 at 7-17 (similar argument for Harrington). As discussed above, Plaintiffs' theories on these claims are redundant. However, although Defendants argue that it is not clearly established that Sauer's actions amount to an adverse employment action against Meader, Doc. 74 at 9; *see also* Doc. 70 at 9-13 (Corazzin-McMahan); Doc. 68 at 12-14 (Pfannenstiel); Doc. 76 at 14-17 (Harrington), they don't specifically argue that those same actions also fail to meet the standard for a clearly established hostile work environment. Nevertheless, Plaintiffs respond as if they do. Doc. 80 at 19-20; *see also* Doc. 83 at 12-14 (Corazzin-McMahan); Doc. 81 at 13-15 (Pfannenstiel); Doc. 82 at 16-18 (Harrington). But in doing so, Plaintiffs uniformly fail to cite to clearly established caselaw with the requisite specificity. *See Pauly v. White*, 874 F.3d 1197, 1222 (10th Cir. 2017).

woman is sufficient at this stage to plausibly state a claim that Jones created a hostile work environment. Defendants' motion on this point is therefore denied, and McCurdy's § 1983 claim in Count 17 against Jones survives.[18]

### 2.    Counts 6, 13, and 20 – Title VII Hostile-Work-Environment Claims by Pfannenstiel, Harrington, and McCurdy

In addition to the § 1983 claims for hostile work environment, Pfannenstiel, Harrington, and McCurdy all assert Title VII hostile-work-environment claims against the State of Kansas that are at issue in the motions to dismiss. As explained above, Title VII claims for hostile work environment asserted against an employer consider a wider range of conduct compared to a § 1983 claim. *See Raspardo*, 770 F.3d at 114. Accordingly, whether these Plaintiffs have stated a claim for Title VII hostile work environment is not necessarily limited to the actions of any one defendant or KHP employee. The Court must consider all the alleged transgressions, including allegations not otherwise specifically discussed by Plaintiffs in the context of their § 1983 claims. *See, e.g.*, Doc. 65 at ¶¶ 319-333; *see also Hicks*, 833 F.2d at 1415-16.

The Court recently considered what is required to show a severe or pervasive hostile work environment, albeit in the context of summary judgment. *Frank v. Heartland Rehab. Hosp., LLC*,

---

[18]  The Court questions whether McCurdy will be able to defeat a claim of qualified immunity by Jones as to this claim. *See supra* note 17. As just explained, Defendants asserted qualified immunity as to McCurdy's Counts 16 and 19 for gender/sex discrimination based on the lack of an adverse action. Doc. 72 at 4-5. But as to McCurdy's hostile-work-environment claim in Count 17, Defendants only argue that the conduct alleged is not severe or pervasive as a matter of law, without mention of qualified immunity. *Id.* at 6-8. Nevertheless, McCurdy argued in response that Jones was not entitled to qualified immunity on the claim of a hostile work environment. Doc. 79 at 17. But McCurdy relies on general statements that it is clearly established that hostile work environments violate the Fourteenth Amendment. *Id.* at 18. The clearly-established prong considers whether the contours of the right are sufficiently clear such that a reasonable defendant would have known that his actions violate the right at issue. *See Pauly*, 874 F.3d at 1222. There need not be a case that is factually identical. *Id.* But "existing precedent must have placed the statutory or constitutional question beyond debate" *Id.* (internal quotation and citation omitted). In this context, it seems McCurdy would have to point to caselaw supportive of the conclusion that <u>conduct akin to what Jones is accused of</u> is sufficiently severe or pervasive to create a hostile work environment, not simply that harassment is constitutionally impermissible. This may ultimately prove a high hurdle. Although Defendants eventually do make this argument in their reply brief, Doc. 90 at 11-12, the Court does not consider arguments raised for the first time in a reply brief. Accordingly, whether Jones is entitled to qualified immunity on McCurdy's § 1983 hostile-work-environment will have to wait until another day.

2022 WL 486793, at *2-5 (D. Kan. 2022). While it remains to be seen whether Plaintiffs will be able to marshal sufficient evidence to create a triable issue on these claims, the Court finds that Plaintiffs have passed the hurdle of plausibility at this stage. Accordingly, the Court denies Defendants' motions to the extent they seek dismissal of Plaintiffs' Title VII hostile-work-environment claims.[19]

### C.   Counts 3 and 10 – First Amendment Retaliation by Pfannenstiel and Harrington

In Count 3, Pfannenstiel sues Jones and De Vore under § 1983 for First Amendment retaliation. In Count 10, Harrington also sues Jones and De Vore under § 1983 for First Amendment retaliation.

First Amendment retaliation claims are governed by the five-part *Garcetti*/*Pickering* test:

1.   The protected speech was not made pursuant to an employee's official duties.

2.   The protected speech addressed a matter of public concern.

3.   The government's interests as an employer did not outweigh the employee's free-speech interests.

4.   The protected speech was a motivating factor in the adverse employment action.

5.   The defendant would not have made the same employment decision in the absence of the protected speech.

*Lincoln*, 880 F.3d at 538. The standard for evaluating a First Amendment retaliation claim "is analogous" to the standard used in a Title VII case. *Id.* at 540. The fourth factor requires the

---

[19] Pfannenstiel alleges she was constructively discharged, which Defendants challenge in their motion. Doc. 68 at 28-30. Although the Court has dismissed Pfannenstiel's claims under § 1983 for gender/sex discrimination and hostile work environment, her Title VII hostile-work environment claim remains at issue. Because a constructive-discharge claim is effectively an extension of a hostile-work-environment claim, *see Brown*, 708 F. App'x at 523, the Court denies Defendants' request to dismiss Pfannenstiel's claim for constructive discharge to the extent she asserts that as part of her Title VII hostile-work-environment claim.

employer to take some adverse employment action against the employee. *Id.* at 539-40. The question is whether the action would dissuade a reasonable person from exercising First Amendment rights. *Id.* at 540.

Defendants argue in the opening briefs that neither Pfannenstiel nor Harrington have pleaded adverse actions that are clearly established and that Jones and De Vore are entitled to qualified immunity. Qualified immunity is meant to protect public servants—"all but the plainly incompetent or those who knowingly violate the law"—from the burdens of lawsuits. *Lewis v. Tripp*, 604 F.3d 1221, 1225 (10th Cir. 2010) (internal quotation and citation omitted). Once a defendant asserts qualified immunity, the plaintiff must show that: (1) the defendant's actions violate a constitutional right and (2) the constitutional issue was clearly established at the time of the defendant's actions. *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001).

Defendants argue that the actions Pfannenstiel complains of as retaliatory are not clearly established adverse employment actions in the First Amendment context. Doc. 68 at 12-14. Specifically, they argue that "Pfannenstiel's vague allegations that she was frightened she would lose her job, her professional advice was ignored, and policy changes were made that impacted her ability to do her job, cannot state a claim" for First Amendment retaliation because these are not adverse employment actions. *Id.* at 12. In response, Pfannenstiel states only that the second amended complaint "contains numerous allegations regarding the different types of retaliation Pfannenstiel suffered." Doc. 81 at 18.

Defendants likewise argue, among other things, that Harrington has not alleged facts suggesting that any protected speech by Harrington led to an adverse employment action by Jones or De Vore. Doc. 76 at 21. Harrington responds, in an identical fashion to Pfannenstiel, stating that

the second amended complaint "contains numerous allegations regarding the different types of retaliation Harrington suffered."[20] Doc. 82 at 21.

Neither Pfannenstiel nor Harrington have specifically identified what adverse employment action occurred, nor have they identified any caselaw that clearly establishes that such actions would support a First Amendment retaliation claim. Because Pfannenstiel and Harrington have not alleged an adverse employment action, they have failed to state a claim for First Amendment retaliation. Alternatively, neither Pfannenstiel nor Harrington have shown that Jones and De Vore's actions violate clearly established law, and they are entitled to quality immunity on Counts 3 and 10.[21]

### D.     Count 15 – Title VII Retaliation by Harrington

Harrington asserts a Title VII retaliation claim against the State of Kansas for actions taken against her after she filed this lawsuit. Defendants very briefly argue this fails to state a claim because Harrington has only alleged that she was put on paid administrative leave that took away access and equipment, subjected to an internal investigation for insubordination and harassment, given a formal reprimand, given an unsatisfactory rating, and had a temporary special review placement, and that none of these are adverse employment actions. Doc. 76 at 14. Harrington

---

[20] Although the Court is disinclined to sort through the second amended complaint, which is 81 pages and 700 paragraphs, to attempt to identify what retaliatory adverse employment actions Pfannenstiel and Harrington complain of, the Court notes that the second amended complaint includes allegations that Defendants reduced Pfannenstiel's decision-making authority, made policy changes that directly impacted her staff's ability to execute their duties, and treated her differently by ignoring her policy recommendations. Doc. 65 at ¶¶ 68-69, 268-270. Pfannenstiel also alleges Defendants intimidated her and threatened termination. *Id.* ¶ 479. It is less clear what adverse actions, if any, Harrington alleges Jones and De Vore took in retaliation for her allegedly protected speech. Putting aside Pfannenstiel's and Harrington's failure under the second prong of the qualified immunity claim, as discussed above, the Court questions whether either Pfannenstiel or Harrington have plausibly asserted any adverse employment action at all. *See, e.g.*, *Lincoln*, 880 F.3d at 543 ("Thus, an allegation of humiliation alone is not enough to clearly establish an adverse employment action."); *Throupe*, 988 F.3d at 1252.

[21] Pfannenstiel and Harrington argue that the law is clearly established that speaking out about widespread discrimination in a public agency is protected conduct. Doc. 81 at 18; Doc. 82 at 21. But neither address whether it is clearly established that the actions allegedly taken by Jones and De Vore are sufficient to support a First Amendment retaliation claim.

argues in response that she also alleged that many of these actions were taken in contravention of KHP policy. Doc. 82 at 18; *see also* Doc. 65 at ¶¶ 297-317. Given this, Harrington argues she has plausibly alleged sufficient facts to suggest that the actions taken against her would dissuade a reasonable worker from making a charge of discrimination.

The Court agrees with Harrington. A prima facie case of retaliation requires (1) protected opposition to discrimination, (2) actions a reasonable employee would have found materially adverse, and (3) a causal connection. *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 638 (10th Cir. 2012). A materially adverse action is one that would dissuade a reasonable employee from making a charge of discrimination. *Id.* An adverse employment action is typically a significant change in employment status or benefits. *Id.* at 635. But what is considered materially adverse depends on the totality of the circumstances of the case. *Id.*

Whether Harrington will ultimately meet this standard remains to be seen. But at this stage, she has plausibly alleged retaliation based on conduct that occurred after this lawsuit was filed, and that actions taken against her could dissuade a reasonable worker from making a charge of discrimination. Defendants' motion as to Count 15 is denied.

## IV.  CONCLUSION

Based on the rulings above, the Court dismisses Counts 1, 2, 3, 5, 8, 9, 10, 12, 16, 17 (as to De Vore), 19, 21, 22, 23, 24 (as to De Vore and Sauer), and 26. The remaining claims are:

| Pfannenstiel | | |
|---|---|---|
| Count | Claims | Defendants |
| 4 | Suppression of Speech - § 1983 | Jones, De Vore |
| 6 | Hostile Work Environment - Title VII | State of Kansas |
| 7 | Retaliation - Title VII | State of Kansas |

| Harrington | | |
|---|---|---|
| Count | Claims | Defendants |
| 11 | Suppression of Speech - § 1983 | Jones, De Vore |
| 13 | Hostile Work Environment - Title VII | State of Kansas |
| 14 | Retaliation - Title VII | State of Kansas |
| 15 | Retaliation (Second Count) - Title VII | State of Kansas |

| McCurdy | | |
|---|---|---|
| Count | Claims | Defendants |
| 17 | Hostile Work Environment - § 1983 | Jones |
| 18 | Suppression of Speech - § 1983 | Jones, De Vore |
| 20 | Hostile Work Environment - Title VII | State of Kansas |

| Meader | | |
|---|---|---|
| Count | Claims | Defendants |
| 24 | Hostile Work Environment - § 1983 | Jones |
| 25 | Suppression of Speech - § 1983 | Jones, De Vore |
| 27 | Hostile Work Environment - Title VII | State of Kansas |

| Cooper | | |
|---|---|---|
| Count | Claims | Defendants |
| 28 | Suppression of Speech - § 1983 | Jones, De Vore |
| 29 | Sex Discrimination - Title VII | State of Kansas |
| 30 | Hostile Work Environment - Title VII | State of Kansas |

All claims by Plaintiff Corazzin-McMahan are dismissed. Defendants Murphy, Dean, Ludolph, Catania, and Sauer are dismissed from the case.

THE COURT THEREFORE ORDERS that Defendants' Motion to Dismiss Counts 1, 2, 3, 5, and 6 of Plaintiff Pfannenstiel's Claims and her Claims for Constructive Discharge (Doc. 67) is GRANTED IN PART AND DENIED IN PART. Pfannenstiel's claims in Counts 1, 2, 3, and 5 are dismissed.

THE COURT FURTHER ORDERS that Defendants' Motion to Dismiss Claims of Rebecca Corazzin-McMahan (Counts 21-22) for Failure to State a Claim and Qualified Immunity (Doc. 69) is GRANTED. Corazzin-McMahan's claims in Counts 21-22 are dismissed.

THE COURT FURTHER ORDERS that Defendants' Motion to Dismiss Counts 16, 17, 19, and 20 of Plaintiff Natasha McCurdy (Doc. 71) is GRANTED IN PART AND DENIED IN PART. McCurdy's claims in Counts 16, 17 (as to De Vore), and 19 are dismissed.

THE COURT FURTHER ORDERS that Defendants' Motion to Dismiss Claims of Plaintiff Kimberly Meader In Counts 23, 24 (as to De Vore and Sauer), and 26 (Doc. 73)[22] is GRANTED. Meader's claims in Counts 23, 24 (as to De Vore and Sauer), and 26 are dismissed.

THE COURT FURTHER ORDERS that Defendants' Motion to Dismiss Counts 8, 9, 10, 12, 13, and 15 of Plaintiff Amber Harrington's Claims (Doc. 75) is GRANTED IN PART AND DENIED IN PART. Harrington's claims in Counts 8, 9, 10, and 12 are dismissed.

IT IS SO ORDERED.

Dated: March 24, 2022                          /s/ *Holly L. Teeter*
                                                HOLLY L. TEETER
                                                UNITED STATES DISTRICT JUDGE

---

[22]  This motion incorrectly states that it is challenging Counts 24, 25, and 27, when it is actually challenging Counts 23, 24, and 26. Doc. 94 at 1.