## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| SUSAN PFANNENSTIEL: | ) | |
| AMBER HARRINGTON; | ) | |
| NATASHA MCCURDY; | ) | |
| KIMBERLY MEADER; | ) | |
| and | ) | |
| JARAH COOPER; | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 2021-CV- 04006-HLT-ADM |
| | ) | |
| STATE OF KANSAS; | ) | |
| HERMAN JONES, in his individual capacity; | ) | |
| JASON DE VORE, in his individual capacity; | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM IN SUPPORT OF STATE OF KANSAS AND JONES AND DE VORE'S MOTIONS FOR SUMMARY JUDGMENT</u>

HITE, FANNING & HONEYMAN L.L.P.

/s/ Gaye B. Tibbets

Gaye B. Tibbets, #13240
Jon E. Newman, #16612
Pam Saenz, #28948
100 N. Broadway, Ste. 950
Wichita, KS 67202-2209
Telephone: (316) 265-7741
Facsimile: (316) 267-7803
*Attorneys for Defendants*

# TABLE OF CONTENTS

I.   Summary of Case .................................................................................1

II.  Questions Presented ...........................................................................1

III. Facts ....................................................................................................2

IV.  Arguments and Authorities ...............................................................34

    A.   Jones and De Vore Should Be Granted Summary Judgment on Plaintiffs' First Amendment Prior Restraint Claims (Counts 4, 11, 18, 25, and 28). .....................34

        1.   Plaintiffs do not present a fact question about whether they suffered an injury in fact for standing...........................................................34

            a.   Pfannenstiel does not have standing because she cannot establish an injury in fact....................................................................35

            b.   Harrington has not suffered an injury in fact. ..............................37

            c.   McCurdy does not have standing because she has not demonstrated an injury in fact and cannot meet her burden to establish redressability...........................................................38

            d.   Meader has not suffered an injury in fact. ....................................39

            e.   Cooper cannot establish standing because she has not suffered an injury in fact...................................................................40

        2.   There is no evidence that either Jones or De Vore personally violated any Plaintiff's First Amendment Rights or that if they did, they should have known they were committing constitutional violations. ...........................40

            a.   Neither Jones nor De Vore can be liable for the acts of others......40

            b.   Jones and De Vore are entitled to qualified immunity. ................41

            c.   The speech Jones and De Vore allegedly suppressed is not constitutionally protected speech...................................................41

            d.   The speech allegedly suppressed was pursuant to Pfannenstiel, Harrington and Cooper's official duties, not their speech as citizens. ...................................................................................43

e.    Speech about internal department management disputes or personal reputation is not constitutionally protected because it is not a matter of public concern............................................................................44

f.    KHP has an interest in promoting the efficiency and sound operations of its office. .................................................................46

g.    If it allows claims to proceed, the Court should grant summary judgment on compensatory and punitive damages. ......................46

(1)    Harrington and McCurdy have no compensatory damages for First Amendment violation, and Pfannenstiel, Meader and Cooper do not if constructive discharge fails.............46

(2)    There is no evidence of behavior by Jones and De Vore that would justify punitive damages. .........................................47

B.    The State is Entitled to Summary Judgment on Pfannenstiel (Counts 6-7), Harrington (Counts 13, 14, 15) and Cooper's (Counts 29-30) Title VII Claims because they failed to timely exhaust their administrative remedies....................47

1.    Harrington did not timely exhaust her administrative remedies for incidents that occurred more than 300 days before September 10, 2020, for events that took place prior to her September 10, 2020 EEOC filing but were not included in that filing, for retaliation and for unrelated events that occurred after she filed her EEOC complaint. ..........................................48

2.    Cooper did not exhaust her administrative remedies because she did not allege hostile work environment or constructive discharge.....................48

C.    The state should be granted summary judgment on all plaintiffs' hostile work environment claims (Counts 6, 13, 20, 27, 30) because there is not evidence of severe and pervasive harassment based on gender and there are not fact questions about the Faragher defense. ...................................................................49

1.    No severe or pervasive harassment.............................................49

D.    There are no questions of material fact about whether KHP exercised reasonable care to prevent harassment and that Plaintiffs failed to take advantage of corrective or preventative opportunities. ..............................................................53

E.    Jones should be granted summary judgment on Meader's claim for violation of her constitutional rights (Count 24) because there were only four incidents over more than a year and he is qualifiedly immune and there is no evidence to justify the award of compensatory or punitive damages.......................................................54

F.     Summary Judgement is required regarding Cooper's Title VII Sex Discrimination versus the State (Count 29).  There is no genuine issue of material fact that the State discriminated against Cooper.....................................................................55

    1.    Cooper cannot prove a prima facie case of discrimination or pretext. ......55

        a.    Nothing she complains about is adverse employment action. .......55

        b.    There is no evidence Cooper was treated differently because of her gender.............................................................................................55

        c.    Decisions about Cooper's employment were made for legitimate non-discriminatory reasons...........................................................57

G.    The State and Jones and De Vore should be granted summary judgment on Pfannenstiel, Meader and Cooper's claims for constructive discharge. ...............57

    1.    The pretrial order does not allege constructive discharge claims. .............57

    2.    Plaintiffs cannot present genuine issues of fact about whether their working conditions were intolerable or whether a reasonable person would have felt compelled to resign. .....................................................................................57

        a.    There is not a genuine issue of fact about whether Pfannenstiel was constructively discharged.................................................................58

        b.    Meader was not constructively discharged. ....................................59

        c.    Cooper was not constructively discharged. .....................................59

H.    The State should be granted summary judgement on Pfannenstiel and Harrington's Title VII claims for retaliation (Counts 7, 14, 15) because they did not establish their prima facia case. ...................................................................................................60

    1.    Pfannenstiel did not engage in protected activity. ......................................61

        a.    Doing her job is not opposing illegal activity.................................61

        b.    Pfannenstiel could not have had a good faith belief that the IMs and a single encounter with Murphy created a hostile work environment. .........................................................................................................62

        c.    Pfannenstiel cannot create a fact question about whether she was subjected to materially adverse action. ...........................................62

d.    Pfannenstiel cannot create a fact question about a causal connection between her complaints and the decisions about which she complains. ....................................................................................63

e.    There is no evidence that her participation in meetings or her input on policies was ignored for anything but legitimate non-discriminatory reasons. ..................................................................63

2.    Harrington cannot create issues of material fact on whether she engaged in protected activity, whether she suffered materially adverse action, whether there is a causal connection or whether there were legitimate non-discriminatory reasons for decisions about which she complains. ............64

## I.   SUMMARY OF CASE

Three plaintiffs complained about Col. Jones touching them on the back or shoulder or brushing their arm when shaking hands or sending an IM with emojis. The State investigated the complaints in February 2020 and found no sexual harassment. In June 2020, the Governor ordered a second investigation. Plaintiffs interviewed then acknowledged that Jones's physical contact was not sexual. That concession and the infrequency, brevity and failure to tell Jones that his conduct was unwelcome, led the second investigators to conclude he did not violate KHP policy or the law. The State forbids harassment, investigates complaints, and stops harmful activity, which is what Title VII requires. These employees, who have not lost wages or promotions or who left State employ for family reasons should have their claims dismissed.

## II.   QUESTIONS PRESENTED

1.   Are Jones and De Vore entitled to summary judgment on Plaintiffs' First Amendment prior restraint claims when they never told any Plaintiff she could not talk and what Plaintiffs wished to talk about was not constitutionally protected and they are qualifiedly immune?

2.   Should the State be granted summary judgment on Pfannenstiel, Harrington's and Cooper's Title VII claims for failure to timely exhaust administrative remedies as some claims were not referenced or unrelated incidents happened after their EEOC complaints were filed?

3.   Should the State be granted summary judgment on the hostile work environment claims because none suffered from severe or pervasive harassment and Meader, McCurdy and Pfannenstiel never told Jones his conduct was unwelcome, and McCurdy and Cooper never reported the alleged harassment to HR?

4.      Should Jones be granted summary judgment on Meader's claim for violation of her constitutional right to equal protection when there were only four incidents over more than a year and he is qualifiedly immune?

5.      Should the State be granted summary judgment on Cooper's claims when she cannot establish she was treated differently because of her sex, she did not encounter severe or pervasive harassment because of her sex, she has not established adverse employment action and all decisions made about her were for legitimate and non-discriminatory reasons?

6.      Should the State be granted summary judgment on Pfannenstiel, Meader and Cooper's claims for constructive discharge when there is not evidence that their workplace was intolerable and that they had no option but to resign?

7.      Should the State be granted summary judgment on Pfannenstiel and Harrington's retaliation claims when neither engaged in protected activity and the incidents about which they complain were not materially adverse and there is no causal connection between any protected activity and any actions by their supervision, who all made decisions for legitimate non-discriminatory reasons?

III.    FACTS

**Facts Relevant to All Plaintiffs**

1.      Col. Herman Jones became Superintendent of the Kansas Highway Patrol ("KHP") in April 2019 and Jason De Vore became Lt. Col. in May 2019. (ECF 194, 3:iii-iv).

2.      De Vore never told any Plaintiff not to speak about sexual harassment/hostile work environment/gender discrimination, and he did not threaten any Plaintiff with job consequences for any complaint about Jones or De Vore. (Ex A, De Vore Aff. ¶ 1.)

2. De Vore never told Susan Pfannenstiel that if the Human Resources sexual harassment complaints against Jones did not disappear, then all complainants' employment would be terminated. (Ex. A, ¶ 2.)

3. Jones has never threatened anyone with consequences for speaking about harassment, discrimination or hostile work environment. (Ex. B, Jones Aff. ¶ 1.) He never said that "those who do not get in the canoe" will be terminated. (Ex. C, Jones Dep. 66:14-17.) Jones has never spoken with any Plaintiff about her allegations. (Ex. B, ¶ 3.)

4. Neither Jones nor De Vore asked Capt. Witham to monitor anyone's social media. (Ex. B, Jones Aff. ¶ 3; Ex. C, Witham Decl. ¶ 2; Ex A, De Vore Aff. ¶ 6.)

5. Neither Jones nor De Vore questioned any female employee about interviews aired by KMBC-TV. Neither of them never told anyone to question employees about being featured in those videos or being interviewed by reporters. (Ex B, Jones Aff. ¶ 5; Ex A, ¶ 4.)

6. Jones drafted and sent Week in Review emails between May 4, 2019 and July 30, 2022 to the entire staff on an almost weekly basis. (Ex. E, Meader Dep. 100:22 - 101:16; Ex. B, ¶ 6.)

7. All of the Week in Review emails have been produced to Plaintiffs' counsel and none threaten consequences for saying anything negative. None mention canoes, "being out of the loop", "picking the right people to hang out with" or "being in the right group." (Ex. B, ¶ 6; Ex. D, Tibbets Aff. ¶2.)

8. The KHP follows two social media policies and a social media directive. ADM 31A applies to social media KHP official accounts. Created on 11/25/19 and modified 11/19/20, its purpose is "to address issues associated with employee use of social networking sites for the Kansas Highway Patrol and establish guidelines and procedures related to the use and maintenance

of social media accounts for the agency." It does not apply to personal accounts of KHP personnel. (Ex. G, Dean Aff. ¶ 1.)

9.  The social media accounts directive also applies to KHP social media accounts, and it "establish[es] guidelines and procedures related to the use and maintenance of the agency-wide Twitter, Facebook, YouTube."  It does not apply to personal accounts of KHP personnel. (Ex. G, ¶ 2.)

10.  ADM 31 deals with employees' personal social media accounts. (Ex. H, Ex. 120[1].) It exempts statements made as citizens on matters of public concern.  "If an employee is speaking solely in their role as a private citizen and the communication touches on matters of public concern, then their speech may be protected." (Ex. H, Ex.120 3:VI,H.) It was implemented in 2013 and only modified to correct a typo since Jones became superintendent. (Ex. G, Dean Aff. ¶ 3.)

11.  KHP has a sexual harassment policy and each KHP employee is required to receive training on the sexual harassment policy annually. (Ex. G, ¶ 4.)

**First investigation: Department of Administration**

12.  Susan Pfannenstiel was the Director of Human Resources ("HR") for KHP from 2017 until September 2020. (ECF 194 3:vi; and 4:ix4.)  She reported to Major Scott Harrington at the KHP and Craig Kibbe, a Deputy Director in the Department of Administration ("D of A"). (Ex. I, Kibbe Dep. 50:1-9.) Kraig Knowlton was the Director of the Office of Personnel Services and Kibbe's boss. (Ex. J, Pfannenstiel Dep. 18:25-19:4.)

13.  As Director of HR, Pfannenstiel was responsible for EEOC matters, (Ex. J, 10:23-11:4.) and she took complaints of discrimination and investigated them. (Ex. J, 19:23-20:15.) She

---

[1] The parties numbered deposition exhibits sequentially, they are not referenced by witness. The only exhibits are deposition exhibits. The parties have stipulated that deposition exhibits, with a couple of exceptions, are admissible in the summary judgment pleadings. (ECF 194, 2. 6. B.)

would have reported sexual harassment complaints she received up chain of command unless against an agency head, which instead were forwarded to her supervision at the D of A. (Ex. J, 71:10-25.)

14.     The HR director advises an agency, and the agency management is the decisionmaker. Knowlton advises HR Managers that "all we can do is advise and abide by the decisions of those who are authorized to make the decisions." It is not unusual that decisionmakers in an agency make decisions that are not exactly in line with HR recommendations. This does not reflect on the HR manager. Knowlton reviewed Exhibits 108 and 115 and found nothing out of the ordinary in them. (Ex O, Knowlton Decl. ¶ 1; Ex. F2, Ex. 108; Ex. X, Ex. 115.)

15.     During the Fall of 2019, Pfannenstiel documented that some KHP employees complained about Jones making comments or touching them on the back or shoulder. None were willing to go on record. (Ex. J, Pfannenstiel Dep. 69:11-70:25; Ex. L, Ex. 103.) For confidentiality, she documented complaints in a note or email, printed them, blacked out the names of the complainants, and forwarded them to Kibbe. (Ex. J, 30:1-31:11, 34:7-35:4.)

16.     Meader told Pfannenstiel on November 5, 2019, that Jones touched her hands to show her how cold his hands were and, a week later, held her shoulders and shook them while singing a "shake it" song. Meader did not want to make a formal complaint to D of A. (Ex. J, 56:1-14; 70:15-25; 71:3-9; Ex. M; Ex. 102.)

17.     On November 7, 2019, Pfannenstiel told Major Harrington that she stopped forwarding information about complaints from KHP employees to D of A because she thought there "was no resolution available" unless an employee filed a formal complaint with the D of A. (Ex. J, Pfannenstiel Dep. 71:6-9; 72:9-24; and Ex. L, Ex. 103.)

18.    The D of A would initiate an investigation without the employee's cooperation if the allegations were clearly a violation of policy or law. (Ex. I, Kibbe Dep. 57:6-24.)

19.    Amber Harrington was the first to agree to file a formal complaint with the D of A. Pfannenstiel arranged Harrington to have an hour-long meeting with Kraig Knowlton on February 21, 2020. Afterward, Knowlton ordered D of A to perform an investigation. (Ex. K, Knowlton Dep. 16:4-8.)

20.    Harrington told Knowlton in that meeting she was a part of a "coup" to get rid of Jones and De Vore. He concluded that she and others had a goal of removing Jones and De Vore from leadership. (Ex. K, 16:18-25.)

21.    Knowlton assigned two D of A investigators to interview Harrington and others. (Ex. K, Knowlton Dep. 19:11-16.) The investigators only wanted to interview people directly involved in the incidents. (Ex. K, 23:3-6, 19-22.)

22.    When asked what she hoped would result from the investigation, Harrington said "the solution is to get rid of Col. Jones, Lt. Col. De Vore, and Majors Keener, Murphy and Sauer." "They need to go." (Ex N, Harrington Dep. 163:23-25; 164:1-5.)

23.    Knowlton and the investigators prepared a draft report concluding that the allegations that Jones committed sexual misconduct or harassment were unsubstantiated. (Ex. K, Knowlton Dep. 24:19-25, 31:13-25.)

24.    Knowlton and the investigators suspected bias against Jones because of Harrington's statement about a coup and because Harrington's brother Scott Harrington and her boss, Josh Kellerman, were strong supporters of the former KHP superintendent Mark Bruce, who had been replaced by Jones and was suing KHP. (Ex. K, 28:14-25, 29:1-10.) They also noted that some of the accounts of incidents were inconsistent or did not reflect that Jones had been told that

what could have been perceived as friendly touching was unwelcome. (Ex. O, Knowlton Decl. ¶ 2.)

**Jones, De Vore and Dean's knowledge of complaints**

25.    By February 2020, Jones and De Vore knew that some unidentified people were critical of Col. Jones and the staff he had assembled. They suspected the trooper's association, or maybe former superintendent Bruce. (Ex. P, De Vore Dep. 20-CV-04081[2], 18:18-25; 19:1-4.)

26.    Pfannenstiel claims to have reported the harassment allegations to the Kansas State Troopers Association ("KSTA") in May 2020 (ECF 26:44, ¶ 390), but neither Jones nor De Vore ever knew about that until she filed her lawsuit. (Ex A, De Vore Aff. ¶ 15; Ex. B, Jones Aff. ¶ 21.)

27.    On June 10, 2020, Knowlton told Jones for the first time that KHP employees accused him of sexual harassment and that the D of A had investigated and found those complaints unsubstantiated. (Ex. Q, Jones Dep., 20-CV-04081, 39:19-25, 40:1-11.) Knowlton did not tell Jones who complained or the specific allegations. (Ex. Q, 43:18-25, 44:1; Ex. K, Knowlton Dep. 33:6-25, 36:5-9.)

28.    Jones did not see the D of A report until his deposition in 2022. (Ex. Q, 28:17-19, 25; 29:1-4, 32:15-23, 40:1-17, 103:19-23.) Knowlton did not give Jones a copy of the D of A report. (Ex. K, 32:9-19.)

29.    In July, De Vore overheard either Clay Britton or Will Lawrence tell Col. Jones that the D of A had investigated complaints of sexual harassment. De Vore did not see the D of A report or know its details until his deposition. (Ex. P, De Vore Dep., 20-CV-04081, 68:4-21.)

30.    Majors Harrington and Kellerman received female employees' complaints about Jones and had encouraged them to report their concerns. Scott Harrington never told Jones about

---

[2] Some witnesses were deposed in a companion case. If a deposition is cited without a case number, it was taken in this case, if not, the case number is noted in the facts and on the cover sheet of the exhibit.

the complaints. (Ex. Q, Jones Dep., 20-CV-04081, 36:3-10; 37:15-22; 105:2-8; Ex. R, Scott Harrington Dep. 62:13-17.) De Vore never knew Majors Harrington and Kellerman received those complaints nor that they encouraged reporting concerns. (Ex. P, De Vore Dep., 20-CV-04081, 72:5-15.)

31.    Even after they learned of the D of A investigation, Jones and De Vore were unaware that Pfannenstiel had complained to D of A about Jones and Murphy. (Ex. C, Jones Dep. 53:16-54:1-2; Ex. A, De Vore Aff. ¶ 16.)

**Law firm investigation**

32.    The Governor told Jones that though the D of A investigation had found the complaints to be unsubstantiated, she had ordered an independent investigation. (Ex. Q, Jones Dep. 20-CV-04081, 87:3-17, 90:6-14.)

33.    During June-July 2020, attorneys David Cooper and Terrelle Mock investigated complaints of sexual harassment made against Col. Jones. They interviewed Amber Harrington, Kimberly Meader, and Susan Pfannenstiel. Mock interviewed Natasha McCurdy and shared her findings with Cooper. (Ex. S, Cooper Decl. ¶ 1-2.)

34.    Jones first learned that Harrington had complained about him and what her specific complaints were during his interview with David Cooper on June 23, 2020. (Ex. Q, 20-cv-04081, 94:5-96:1-2; 97:11-20.) Jones told them he perceived his contacts with Harrington, Meader and McCurdy as friendly. He had not been told that his conduct was unwelcome. Cooper and Mock told Jones that the women did not want any physical contact with him. (Ex. S, ¶4.)

35.    In the independent investigation the complainants denied that the physical contact they had with Jones was "of a sexual nature." The contact described was infrequent and brief and primarily was handshakes, hugs, or touches to the shoulder and back. (Ex. S, ¶ 3.)

36.     The independent investigators concluded that the described conduct was not sexual harassment as defined by KHP policy or under Title VII. That conclusion was reported to the Governor's office in July 2020. (Ex. S, ¶ 3.)

37.     Though Pfannenstiel was interviewed in the independent investigation, she did not complain about the IMs from Jones or about Murphy. Instead, she criticized Jones's leadership and said he was unprofessional, and she did not approve of his selection of De Vore as Lt. Col. nor of the appointments of his majors. (Ex. S, ¶ 5.)

38.     Jones never saw the investigation report done by Cooper and Mock. (Ex. Q, Jones Dep., 20-CV-04081, 93:1-6.)

**EEOC Complaints**

39.     Harrington and Pfannenstiel filed the first two EEOC complaints on September 10, 2020. (ECF 194, 4:x and xxi.) At that point, Pfannenstiel had already retired. (ECF 194, 4:ix.)(Ex. T, EEOC complaints).

40.     The next EEOC complaints were filed by McCurdy on September 28, 2020, and then Meader and Cooper on December 2, 2020. By then, Meader had quit. (ECF 194, 4:xiv; 5:xxxii., and xxxiv; and 5:xli.)(Ex. T.)

**Media interviews and dates of release**

41.     On August 17, 2020, Pfannenstiel, Harrington, McCurdy, and Meader interviewed with a television news journalist. The interviews were televised with their faces shadowed and their voices digitally disguised. The interviews aired on three occasions: October 15, 2020; November 12, 2020; and December 5, 2020. (ECF 194, 6:xliv.)

42.    When asked what she would have said if her speech had not been suppressed, Pfannenstiel said that she would have talked to Jones about the allegations against him and served the other complainants better. (Ex. C1, Pfannenstiel's Response to Interrog 3.)

**Pfannenstiel**

43.    On October 10, 2019, Jones sent an instant message ("IM") to Pfannenstiel about how the KHP "was getting their money out of her this week." The two exchanged IMs and emojis for 5 minutes and then for 15 minutes the next day. She was offended because he had inferred "that their money's worth was not gotten from [her] on a regular basis." (Ex. J, Pfannenstiel Dep. 44:4-8; ECF 194 3:b. viii.) The IM string, which the court has said "can hardly be characterized as harassment at all" (ECF 98, p. 33) is spelled out in the Pretrial Order[3]. Pfannenstiel never told Jones she found the emoji IMs offensive. (Ex. J, 46:11-25.) Pfannenstiel felt harassed. (Ex. J, 53:17-22.)

44.    In December 2019, Major Murphy went to Pfannenstiel's office and "demonstrate[d] the way a female [employee] approached him the first time they met." He got close to her face and grabbed her hands, which had been in her lap. She pushed him back and he moved back. She felt harassed. (Ex. J,. 74:8-14; Ex. E1; Ex. 104.)

45.    When asked to describe incidents of hostile work environment, Pfannenstiel only listed having to listen to other employees' complaints about Jones as HR Director. (Ex V, Pfannenstiel's Reps. to Def.'s Interrogs. No. 9.)

46.    When asked to describe each act of retaliation, she cited only to Ex 115 and an email about interview panels being changed in March, 2020 without consulting her. (Ex. W, Pfannenstiel. Resp. to Def.'s Interrog. No. 10; and Ex. X, Ex 115 and Ex. Y, PLT 659-61.)

---

[3] Despite the court's characterization and the messages' innocuousness, the pretrial order continues to characterize the IM/emojis as being of a "sexual and offensive nature" Pretrial Order 6, ECF No. 194.

47.     When asked how Jones or De Vore suppressed her First Amendment rights, Pfannenstiel said that De Vore said "she should watch what she says in the future" during a meeting on February 10, 2020. (Ex. Z, Pl. Pfannenstiel's Resp. to Def.'s Interrog. No. 2.)

48.     The subject was an anonymous letter allegedly sent to the Governor that accused Jones of misconduct. (Ex. A1; Ex. 106.)

49.     Pfannenstiel denies writing the letter. She claims Jones and De Vore told her that the letter "had her name all over it." (ECF 1, 45-46:398; Ex. J, Pfannenstiel Dep. 134:5-9; Ex. B1, excerpt of Ex. 95, at KHP000111.)

50.     The letter mentioned Pfannenstiel three times, accusing her at each mention of not doing her job. (p.2, first paragraph "Susan Pfannenstiel, HR Director, allowed this occur" and p. 2, second paragraph "Susan Pfannenstiel, HR Director, allowed this to occur and did not report this misconduct" and p. 2, third paragraph, "Susan Pfannenstiel, HR Director, allowed this to occur.") (Ex. A, De Vore Aff. ¶¶ 8, 11.)

51.     Jones and De Vore wanted her to know that the letter literally "had her name all over it" when it accused her of shirking her job duties. (Ex. B, Jones Aff. ¶ 7; Ex. A, De Vore Aff. ¶ 10; Ex. C, Jones Dep. 83:10-23.)

52.     De Vore told her to watch what she said in the future because people were being critical of her. He never told her not to criticize Jones or De Vore or not to communicate with the Governor. He did not threaten any consequences if she did not watch what she said. (Ex. A, ¶ 12.)

53.     When she emailed Kibbe and Knowlton about De Vore's statement, Knowlton said it was "good advice" because it was "clear that there are some people over there with some motives of their own." (Ex. J, Pfannenstiel Dep. 79:10-14; 82:12-21; Ex. A1; Ex. 106.)

54.     Unsolicited, Pfannenstiel recommended to Knowlton and Kibbe who the Governor should appoint to replace Jones. Her nominee was plaintiff Harrington's brother. (Ex. I2.)

55.     She said the KHP social media policy ADM-31 was not unconstitutional. (Ex. J, 131:21-24; and 132:9-12; Ex. H; Ex. 120.)

56.     Pfannenstiel sent an email about her retirement date June 23, 2020, the day Scott Harrington and Kellerman were fired, saying "There's been a major shake up here and I would like to change my retirement date." (Ex. D1; Ex. 119, p. 2.)

57.     She decided to retire and provided 2.5 weeks' notice. (Ex. J, Pfannenstiel Dep. 136:11-14; KHP000004) She retired on September 1, 2020. She was not asked to resign, nor was her employment terminated. (Ex. J, 130:7-10, 136:9-13.)

58.     Kibbe and Knowlton offered to transfer her to another department, but she refused. (Ex. O, Knowlton Decl. ¶ 3.) Pfannenstiel could have gone work at another state agency but decided not to. (Ex. J, 131:16-20.)

**Harrington**

59.     Amber Harrington is a KHP captain. She has not lost out on promotional opportunities or wages since Jones arrived. (Ex. N, Harrington Dep. 10:25-11:7, 149:2-8.)

60.     She offices at the Docking building and Col. Jones offices at General Headquarters or "GHQ." (Ex. N, 35:17-22.)

61.     She was supervised by Major Kellerman until he was fired on July 23, 2020. Then, Major Andy Dean became her supervisor in August 2020. (ECF 194, p.4, xviii.)

62.     De Vore never told Harrington anything verbally or in writing limiting what she could say or that violated her First Amendment rights. (Ex. N, Harrington Dep. 17:24-25; and 18:4-8.) De Vore said to the group during in-service training she attended *when talking about*

*social media* that they "need to quit talking outside of our troop or outside of the agency if we don't have anything good to say." (Ex. N, 18:9-17.) **This is the only statement he made to her that she felt limited her speech**. (Ex. N, 19:14-17.)

63.     Harrington does not use any social media. (Ex. N, 69:1-2.)

64.     Jones did not speak to her about not talking outside of KHP. (Ex. N, 19:20-22, 20:6-9.) The **only** written instruction by Col. Jones that she claims restricted her speech was in Ex. 65, a Week in Review dated December 5, 2020, in which he said KHP should be dignified and honorable and that some information on social media portrayed an untruthful image. It referred troopers to the social media policies, including ADM 31 and 31A. (Ex. N, 21:1-15; Ex. F; Ex. 65.)

65.     Harrington said of the statement above, "...if this was the only thing by itself that would be—wouldn't be much." (Ex. N, 21:16-18.)

66.     She testified "I found out they were pulling in females, the Col. And Lt. Col. had captains and lieutenants pulling in females across the state demanding to know if they were the ones doing—speaking to Lara Moritz [KCMB reporter]." (Ex. N, 23:6-15.)

67.     Harrington said she talked to Senator Elaine Bowers in November 2019 about Jones touching her twice. (Ex. N, 177:10-25, 178:1-18.) She talked to Rep. Richard Proehl in late 2019 briefly about her incidents and she heard a female left the patrol due to hostile work environment. She spoke with Proehl again in 2022 and he assured her that if Kelly were not re-elected, Jones would be gone. (Ex 71.) She also spoke in 2020 with pro tem Blaine Finch. (Ex. G2, Harrington Resp. to Interrog. No. 15.)

68.     Neither Jones nor De Vore knew Harrington spoke to legislators about her complaints about Jones. (Ex. B, Jones Aff. ¶ 19; and Ex. A, De Vore Aff. ¶ 19.)

69.    If her speech had not been "suppressed," Harrington says she would have spoken to legislators, but she admitted she **had** spoken to legislators and had told them "what had happened to me."  (Ex. N, Harrington Dep. 24:10-27:7.)

70.    Jones has never made a suggestive or offensive statement to Harrington or to anyone in her presence and she has never seen him touch another female. (Ex. 155:17-19, and 24-25; and 156:1-7.)

71.    She has never heard De Vore suggest women should not be in law enforcement or make an offensive joke, such as suggesting women belong in the kitchen. (Ex. N, 155:8-16, 20-23.)

72.    De Vore denies having ever said that women belong in the kitchen or do not belong in law enforcement. (Ex. A, De Vore Aff. ¶ 18; Ex. P, De Vore Dep., 20-CV-04081, 59:7-25.)

73.    When asked about each incident that she claimed created a hostile work environment and when each occurred, Harrington described[4]:

  a.    August 1, 2019—Being "smacked" on the back by Jones when her back was to him. He did not say anything, but he hit her left shoulder blade with his palm and she said, "that was highly inappropriate" and he touched her shoulder blade again and said "there, I take it back" and she said "that wasn't necessary." (Ex. N, Harrington Dep. 34:1-35:5.)

  b.    October 31, 2019—At a training in Salina with captains and majors Jones was going down the rows of chairs, shaking the hand of everyone present. The rows were not "like spread out where you have a whole lot of room to back your chair up or anything." Jones was "talking to the back row" and she felt his body "near the back of her chair" as he talked to and shook the hands of the people behind her. Then he "turns around directly behind [her] and placed his hand on [her] shoulders and starts patting them" and then "he brushes up against [her] arm to reach in and shake [her] hand." (Ex. N, 45:4-23.) She said nothing. (Ex. N, 47:17-25.) He shook hands with everyone in the room. (Ex. N, 48:6-14.) Though she has said this occurred on November 7, she is pretty sure it actually occurred on October 31, 2019. (Ex. N, 158:13-22.)

---

[4] She also complained about some work-related problems, like Jones asking where she was during a legislative hearing, but those were not referenced in the pretrial order and Defendants assume they were abandoned.

      c.  December 27, 2019—She was presenting plaques at a retirement ceremony. After the ceremony, Lt. Hatcher told her that he saw Jones put his hands on her shoulders while she was unwrapping the plaques. She testified that she was so focused **she had not noticed it.** (Ex. N, 49:22-51:16.)

74.    She said to Jones, "That was highly inappropriate" in August 2019. (Ex. N, 53:9-20.)

75.    When asked in an interrogatory for all incidents that caused a hostile work environment, Harrington did not mention Major Dean. (Ex. F, Tibbets Aff., ¶3.)

76.    Harrington's 9/10/20 EEOC charge alleged sex discrimination and retaliation from August 2019 to "the present." It states that she had been subjected to sexual harassment by "other employees" and Col. Jones. She listed "Example dates of specific acts of sexual harassment/gender discrimination are: 8/1/2019; 9/10/2019; 10/02/2019; 10/14/2019; 10/31/2019; and 12/27/2019. Examples of actions of discrimination range from unwanted and inappropriate physical touching to comments and actions that treat me differently than my male counterparts within the Agency[5]. I have also assisted other female employees with reporting their complaints of sexual harassment/gender discrimination occurring within the Agency and by Col. Herman Jones. As a result of reporting my own· allegations of sexual harassment/gender discrimination to both Agency personnel and State of Kansas personnel, *I have experienced multiple acts of employment retaliation.* [that sentence is then repeated.] (emphasis added) These acts of retaliation are ongoing." (ECF No. 194 4:xxi; Ex. N, Harrington Dep. 43:15-7; Ex. T, Harrington's EEOC complaint.)

77.    Jones and De Vore did not know that Harrington claimed she had assisted others in making complaints until she filed her EEOC complaint on September 10, 2020. (Ex. B, Jones Aff.

---

[5] Any claim of gender discrimination other than hostile work environment has been dismissed by the court. Mem. and Order on Def.'s Mot. To Dismiss 22, ECF No. 98.

¶ 12; and Ex. A, De Vore Aff. ¶ 13.) Major Dean did not know that Harrington had complained of gender discrimination or hostile work environment until he learned of the EEOC complaint she filed on September 10. 2020. (Ex. G1, Dean Dep. 28:1-6.)

78.    Harrington alleges in the pretrial order that "Major Dean did not treat Harrington as he treated male officers." (ECF 194:9) Nowhere in the pretrial order does she attribute Dean's supervision of her to retaliation.

79.    In September 2020, Dean instructed her to have her troops stay near the Capitol and Cedar Crest. She alleges that the Col. told Dean to tell her this in order to retaliate against her for her statement in August 2019 that Jones's touching her on the back was "highly inappropriate." (Ex. N, Harrington Dep. 99:17-100:16) Dean wanted to insure that "aggressive enforcement activities" in other part of the city did not take her troop's focus away from the areas they were to be guarding. He wanted her to schedule a uniformed supervisor and four uniformed officers when either of the legislative bodies or committees were in session. (Ex. H1; Ex. 78.) Dean knew that there had been an incident when the Senate was in session and protestors were chanting and singing and there were no Capitol police or Troop K supervisors in the building and another incident where there were protesters and Capitol police were slow to respond and there was no uniformed supervisor in the building. (Ex. G1, Dean Dep. 23:10-25, 24:1-10, 26:18-25, 27:1-10.)

80.    Harrington attributed Dean's insistence that she make a schedule for officers in the Capitol as retaliation against her for filing an EEOC complaint. (Ex. N, Harrington Dep. 110: 18-25; 111:9-18; Ex. G1, Ex. 82.) Dean asked for a schedule on September 16. The first one he received did not have evening or night shifts filled in. In November she gave him a schedule that had the potential for officers to be working 16-hour days. Then she gave him a schedule that was

only for one month rather than the entire schedule and it was not manned the way he asked for it to be. (Ex. G1, Dean Dep. 28:21-25 and 29:1-25 and 30:1-19.)

81.     On January 6, 2022, Major Dean sent an email to her and Captains Basore, Oehm, and Spencer and Directors May and Holley telling them that if they received a request or inquiry from media, the Legislature, the Governor's office or the public, they needed to vet the request through the chain of command. (Ex. N, Harrington Dep. 82:6-83:15; Ex. H2; Ex. 82.) The reason for the directive was that sometimes questions come up through multiple areas of the agency, like the Public and Governmental Affairs unit and the records department and they want to make sure they were working with all departments when they communicate with government officials. (Ex. G1, Dean Dep. 38:12-25, 39:1-4; 39:21-25, 40:1.) Harrington was upset at the new directive. (Ex. I1, Ex, 70, handwritten note.)

82.     In early 2021, Lt. Golightley sent a text message to Dean complaining of the way she was being treated by her commanding officer, Harrington. (Ex. J1, Golightley Decl. ¶ 1.)

83.     Harrington claims that Dean and her superiors convinced Golightley to complain. Harrington's only evidence is Dean and the Golightleys' go out to dinner and "do all whatever" and Golightley hates Harrington. (Ex. N, Harrington Dep. 80:7-81:8.)

84.     Major Dean and Golightley swear that Dean never suggested to Golightley that she complain, she decided to complain on her own without input from any command staff. (Ex. J1, Golightley Decl. ¶¶ 2, 3; Ex. G, Dean Aff. ¶ 5.)

85.     After receiving Golightley's text, Dean and counsel Ganieany met with her to go over her complaints. (Ex. G1, Dean Dep. 41:14-42:6, 44:3-8, 43:11-20; 44:13-25; 45:1-6.)

86.     Due to the sensitive nature of the allegations in the case, and the fear of retaliation held by the complainant and witnesses, PSU requested permission from Col. Jones to

suspend notifying Captain Harrington of the investigation per ADM-07 V. F. 2. Col. Jones agreed. (Ex. K1, Decl. of Diloreto, ¶¶ 2, 5, and Ex. 1 to Decl.)

87.    The PSU standard operating procedure is to issue formal correspondence to the employee for an administrative investigation and to complete an HP-161 for citizen conduct complaints. (Ex. K1, Decl. Diloreto ¶ 3.) Harrington was issued formal correspondence at the time of her interview. (Ex. K1, ¶¶ 4, 11, Ex. 2 to his declaration.)

88.    The harassment complaint of Golightly was found by PSU to be unsubstantiated. (Ex. N, Harrington Dep. 81:9-14.)

89.    Harrington's troop members and former members said they were told by Capt. Harrington not to record what was said in meetings, that Harrington said Jones was a snake in the grass and a dirty old man, that the Colonel's hated Capitol Policy and had forgotten about Capitol police and that Captain Harrington's attitude was derogatory and negative. (Ex. K1, ¶¶ 6-10.)

90.    Harrington's allegation that the PSU investigation was manipulated by her supervisors is based on "the fact [she has] never been provided a document of the actual complaint to know what the specifics are. **[She has] only been told**." (Ex. N, Harrington Dep. 81:15-82:1.) Harrington believes that there is a written complaint or "documentation in blue team" of what led to her PSU investigation and that is not being shared with her as a way to retaliate against her for the statement she made to the Col. in August 2019. (Ex. N, 130:1-131:2.)

91.    Jones, De Vore, Dean and the PSU investigators Diloreto and Clark deny that Harrington's supervision manipulated the PSU process. (Ex. B, Jones Aff. ¶ 20; Ex. A, De Vore Aff. ¶ 14; Ex. G, Dean Aff. ¶ 6.)

92.     When asked by investigators whether she said something to the effect that the "Colonel is a dirty old man," Captain Harrington responded: "Yeah, I may have made that when I heard Kimberly's thing come out."  (Ex. K1, Diloreto Decl. ¶13.)

93.     When asked "the [comments] you agree you probably said, do you believe those comments violate KHP policy involving insubordination, the exact term of that is an obvious lack of courtesy or respect towards supervisory personnel by any employee?" Captain Harrington: "Sure." (Ex. K1, ¶15.)

94.     When Harrington was told "The morale at Troop K seems to be at a very low point. It was described that it feels everyone is worried that the world is coming to an end because of the Colonels. Those interviewed state that seems to be the constant message coming down from you and your supervisors, and being spread across Troop K. As Troop Commander, do you feel your comments about the Major and Colonels is contributing to this perception held at Troop K?" Captain Harrington: "I mean I going to guess that it could." She also said, "I've been pretty open and honest about my disappointment." (Ex. K1, ¶16.)

95.     Jones put Harrington on administrative leave with pay on March 9, 2021, while the Professional Standards Unit ("PSU") conducted an investigation. (Ex. L1, Ex. 90, 1; Ex. M1, Ex. 91, 3.)

96.     The PSU investigation and paid administrative leave occurred 18 months after Harrington told Jones his touching her shoulder blade was "highly inappropriate" in August 2019 and six months after she filed her EEOC complaint in September 2020. (Ex. N, Harrington Dep. 157:4-18; Ex. T, Harrington's EEOC charge.; Ex. L1; Ex. 90, 1.)

97.     While she was placed on administrative leave, Harrington's patrol car and keys were also taken from her and her access to the KHP's network and email was suspended. Because

of the allegations that she was making derogatory comments about the Colonels and preventing subordinates from recording them, there was reasonable concern that she might be trying to organize a rebellious attitude or effort with her subordinates toward Major Dean or the Colonels. This was why she was locked out of her email and access to the office, to prevent her from causing disruption to her chain of command if she was organizing a "coup." Her car had access to a radio, weapons and computer dock. Those were also removed from her control as a precaution during the investigation. Had they discovered evidence of a "coup" or rebellion, she would have been terminated. No other captain had been accused of this type of insubordination or placed on administrative leave during Jones's tenure. (Ex. B, Jones Aff. ¶ 15-19.)

98.    PSU determined Harrington had been insubordinate because of comments she had made about supervision to her subordinates, as she was informed by letter on April 24, 2021. (Ex. N, 120:18-121:8, 122:1-4.)

99.    Harrington was returned to work on June 14, 2021. (Ex N, Harrington Dep. 128:21-129:1; Ex. L1, Ex. 90; Ex. M1; Ex. 91, 2.)

100.    June 14, 2021, Major Dean gave Harrington an unsatisfactory review, citing six instances of Failure to Follow Instruction, two instances of supervisory shortfall and failure to follow chain of command, and the PSU investigation findings (Ex. G, Dean's Aff., ¶ 7 and Ex. D to Dean's Aff.)

101.    An unsatisfactory review does not prevent an employee from applying for promotion. (Ex. G, at ¶ 8.)

102.    Dean reprimanded Harrington because of the PSU investigation. (Ex. G, ¶ 9 and Ex. E to his Affidavit.) Dean also placed her on a 150-day performance review. During that time, he offered her coaching and increased their opportunities for communication. Her performance

improved and she completed the performance review period successfully. (Ex. L1, Ex. 90 and Ex. N1, Ex. 93)

**McCurdy**

103.    McCurdy only spoke with De Vore once and it was about a non-injury crash report. (Ex. P1, McCurdy's Resp. to Defs.' Interrog. No. 4;Ex. O1, McCurdy Dep. 66:12-15.)

104.    Neither Jones nor De Vore ever spoke to McCurdy about the social media policy or what she should or should not say. (Ex. O1, 83:8-17.)

105.    When asked in discovery for the basis of her claim, McCurdy claims that her speech was "suppressed" by these two statements:

> a.) In 2021, Lieutenant Bryce Whelpley spoke to [McCurdy] stating that a Facebook post written by Justin Dobler about the allegations of sexual harassment was screenshotted by Captain Witham and sent to Jones to show that she had "liked" said post. Lieutenant Whelpley warned Plaintiff that Captain Witham was monitoring her social media for Jones. (Ex. Q1, McCurdy's Resp. to Def.'s Interrog. No. 2a and 3; and Ex. O1, McCurdy Dep. 81:8-22.)

> b.) At an unknown time and date, De Vore stated to Plaintiff Susan Pfannenstiel that if the Human Resources sexual harassment complaints (including Plaintiff's) against Jones did not disappear, then all complainants' jobs would be terminated. (Ex. Q1, No. 2b; and Ex. O1, 59:8-15.)

106.    McCurdy works out of the Troop B office in Topeka. (Ex. O1, 29:17-20.)

107.    McCurdy testified the first of four incidents was a very fast hug by Col. Jones on April 19, 2019. She is not sure if Col. Jones touched anyone else's arm, shoulders or back and did not see him hug anyone else. (Ex. O1, 22:3-18). She did not say anything to Jones. (Ex. O1, 17:12-17; 19:16-24; 21:22).

108.    A male KHP employee has told McCurdy that Jones hugged him on occasion.  (Ex. O1, 22:19-23:19).

109.    Jones testified if he hugged McCurdy he would have hugged others in the room, male and female. (Ex. C, Jones Dep. 46:8-9).

110.    McCurdy talked to multiple people about the April 2019 hug, but did not discuss it with Jones, HR or her chain of command. (Ex. O1, McCurdy Dep. 25:3-9; 26:13-20; 30:10-22; 31:1-6).

111.    McCurdy's mentor, Lt. Lewis, advised her to tell Jones if she was uncomfortable with his hugging. McCurdy agreed, but she never talked to Jones.  (Ex. O1, 32:9-21; 34:16-25).

112.    When asked if the hug was sexual, she denied it saying, "I just felt that it was unprofessional." (Ex. O1, 39:1-9).

113.    In September 2019 at a KU football game Jones gave McCurdy another hug.  (Ex. O1, 37:22-38:22). She did not tell Jones not to hug her and she did not report to her chain of command or HR. (Ex. O1, 43:21-44:1-8, 18-25.)

114.     Jones hugged her a final time in February 2020, but she does not remember the details of the hug. They were alone in a hallway at Troop A and Jones hugged her. McCurdy did not say anything to Jones, HR or her chain of command about the hug.  (Ex. O1, 47:16-18, 24-25; 50:3-22; 53:18-23; 55:10-24). This was four or five months after the September 2019 incident and almost a calendar year after the first hug.  (Ex. O1, 35:10-15, 45:9-12.)

115.    The fourth incident was not a hug. Four months later, in a June 2020 training, to try to get McCurdy's attention, Jones said "woman, woman, hey woman," from the other end of the table. (Ex. O1, 55:10-24; 57:13-20.) McCurdy had no other unpleasant interactions with Jones after this and she had no issues continuing to work. (Ex. O1, 63:11-15.)

116.    Jones called McCurdy "woman" because he did not recall her name. He would have addressed a man whose name he did not remember as "hey, man". (Ex. C, Jones Dep. 50:5-51:6; and 95:16-18.)

117.    McCurdy never contacted HR about her complaints. Pfannenstiel called her after hearing about the fourth incident from someone else. (Ex. O1, McCurdy Dep. 54:23-55:1-9.)

118.    Pfannenstiel told McCurdy other employees had complained about Jones but gave her no details. (Ex. O1, 62:13-19, 23-25.)

119.    After someone made a complaint to HR about her incidents with Jones in the summer of 2020, nothing bad happened. (Ex. O1, 78:17-20.)

120.    When asked what she wanted to say if her speech had not been suppressed, McCurdy said she wanted to share her four interactions with Jones so people could "hear her side" of the story and "hopefully be a little more understanding" of her. (Ex. O1, 84:1-85:7.) She wanted to "explain her feelings" so other troopers would "not think badly" of her. (Ex. O1, 85:12-21.)

121.    Lt. Whepley told her to be careful of her social media posts. (Ex. O1, 87:4-7.) Neither Jones nor De Vore ever instructed him to tell McCurdy to be careful of her social media posts nor discussed McCurdy's social media posts with Whepley. (Ex. B, Jones Aff.  ¶ 11; Ex. A, De Vore Aff. ¶ 7.)

**Meader**

122.    Meader was hired by KHP in 2017. (ECF 194, 5:xxvi.)  In May 2019, Meader was hired to work at KHP's GHQ as a Senior Administrative Specialist. (Ex. E, Meader Dep. 26:7-15, 27:10-11, 27:25–28:1, 30:22-25.) Major Kellerman was her supervisor until his termination in July 2020. (Ex. E, 27:17-19.)  Major Sauer became Meader's supervisor on August 9, 2020. (ECF 194,

5:xixx, xxx) Meader spoke to De Vore less than five times, and none were substantive or referred to her speech. (Ex. E, 75:18-76:1.)

123.    When asked what Jones or De Vore said or did to suppress her speech, Meader said no one threatened her, but "some of the emails and some of the stuff that was sent out by Colonel Jones in the weekly report emails said 'stuff about picking the right people to hang out with and 'making sure you're in the right group.'" Jones never said anything to her verbally that made her feel she could not speak out. (Ex. E, 100:1-101:25)

124.    Meader said if her speech were not suppressed, she "would have expressed support for the statements made by Scott Harrington and Josh Kellerman through social media about the illegal activities of Col. Jones and Lt. Col. De Vore." (Ex. R1, Meader's Resp. to Def.'s Interrog. No. 7.) Jones and De Vore know nothing about Kellerman or Harrington "speaking out about [their] illegal activities." (Ex. B, Jones Aff. ¶ 10; Ex. A, De Vore Aff. ¶ 6.)

125.    Meader has not identified in her Rule 26 disclosures or produced in discovery in this case any statements that were made by Harrington or Kellerman on social media about the alleged "illegal activities of Jones and DeVore." (Ex. F, Tibbets Aff. ¶ 4.) Meader did not mention the statements made by Harrington or Kellerman about illegal activities on social media in the pretrial order.

126.    Meader had reviewed KHP's polices on sexual harassment. (Ex. E, Meader Dep. 16:24 – 17:16.) She also understood that she had a right not to be retaliated against while employed by KHP. (Ex. E, 70:21-23.)

127.    Meader's sex-based hostile work environment claim is based on four incidents with Jones. (Ex. E, 103:11-14.) Jones grabbed Meader's hands October 2019 to show her how cold his

hand were, which she did not think was sexual, just "weird." (Ex. E, 33,12-21, 34:17-21; Ex. S1; Ex. 33.) She, McCollum and Jones were in McCollum's office. (Ex. E, 34:2-6.)

128.    In November 2019, Meader says Jones shook her by the shoulders and sang the words "shake it for me." (Ex. E, 61:25- 62:12; Ex. 3.)

129.    Meader did not tell Jones not to touch her during or after the first or second incident. (Ex. E, 63:6-11, 35:1-11.)

130.    In February 2020, Meader was standing just outside of McCollum's office when Jones stood close behind her for some period of time and then asked her if she was uncomfortable. (Ex. E, 35:16-23, 43:1-9, and Ex. T1, Ex. 3.) Meader responded with "yeah, kind of" and Col. Jones laughed and walked away while saying he was a funny man. (Ex. E, 35:25-36:9, 64:10-16.)

131.    Jones remembers standing behind her as she talked to McCollum and was so absorbed in conversation that she did not notice him. He was trying to demonstrate that she and McCollum were absorbed in talking rather than working. (Ex. C, Jones Dep. 41:8-25.)

132.    From March 2020 until the end of May 2020, Meader worked from home because of the COVID-19 pandemic.  (ECF 194, 5:xxviii.),

133.    In late May 2020, the day Meader returned to the office, Jones shook her hand, joking that he wanted to welcome "the new employee." (Ex. E, Meader Dep. 65:1-5, 66:9-16.) When he reached for her hand, it was in her lap, so Jones grazed her leg. (Ex. E, 65:5-7.) Meader found the contact "an uncomfortable touching" but did not say it was sexual. (Ex. E, 65:12-16.) As he walked out, Jones rubbed the back of Meader's right shoulder. (Ex. E, 65:17-24.)

134.    Jones did not touch her between the May 2020 incident and her resignation in October 2020. (Ex. E, 96:2-18.)

135.    Meader did not report her complaints against Jones to HR for weeks despite being told to do so when she told Major Kellerman of the incidents. (Ex. E, 41:8-15.)

136.    Pfannenstiel told her she needed make a statement or gesture to Col. Jones that clearly indicated his actions were unwelcome. (Ex. E, 46:8-16.) She also understood she needed to indicate her discomfort to Col. Jones per KHP policies. (Ex. E, 134:12-19.) Meader never expressly told or gestured to Col. Jones that his actions were unwelcome. (Ex. E, 46:17-19, 134:20-24.)

137.    Meader never saw Jones touch anyone else or treat any other females improperly. (Ex. E, 39:15-24, 115:3-7.)

138.    The Monday following Kellerman and Scott Harrington's termination, Major Sauer testified that he saw Meader was upset about the termination and tried to provide encouragement. (Ex. T1, Sauer Dep. 43:17-44:11.)

139.    On September 14, 2020, Major Sauer met with Meader and talked about arriving at work on time, notifying him when she took time off from work, and the number and duration of breaks she had been taking. (Ex. E, Meader Dep. 72:15-73:9; Ex. U1, Ex. 34.) Meader agreed that she had been spending an unreasonable amount of time in McCollum's office. (Ex. E, 73:14-19.)

140.    Sauer did not order Meader not to take breaks or lunch with McCollum, or anyone within the patrol or on her floor, but requested that Meader limit her conversation time with other employees during working hours. (Ex. E, 88:8-21; 97:1-9; Ex. V1, Ex. 36; Ex. T1, Sauer Dep. 52:3-25.) Meader assumed this general request limited her from taking breaks or lunch with McCollum and applied generally to anyone within the patrol or on her floor, and she did not ask Sauer for clarification. (Ex. E, 97:10-21, 98:2-99:14.)

141.    Neither Jones nor Sauer ever yelled at Meader or called her names, neither said anything derogatory about her, never asked her to do demeaning tasks. (Ex. E, 75:5-17; 76:8-15.)

142.    Meader was hired by Ag Partners Cooperative on September 10, 2020 (ECF 194 5:xxxi), before her September 14, 2020, discussion with Major Sauer. (Ex. E, 72:12-17.)

143.    In an October 5, 2020 letter, Meader resigned effective October 9, 2020. (ECF No. 194 5:xxxii.)

144.    No one ever retaliated against Meader. (Ex. E, Meader Dep. 81:4-6; 83:7-2; 89:13-16).

145.    Meader testified that the earliest incident of discrimination would have occurred in October 2019, and Col. Jones was the only actor. (Ex. E, Dep. 93:1-21.)

**Cooper**

146.    Jarah Cooper ("Cooper") began working for the KHP as a trooper in 2017 at Troop A in Kansas City. (ECF 194, 5:xxxvi.).

147.    Cooper began dating Trooper Lucas Byron in April of 2020. (Ex. U, Cooper Dep. 20:14.) She learned she was pregnant October 7, 2020. (Ex. U, 26:21-22.)

148.    She requested a hardship transfer to Troop C in Riley County which was granted October 16, 2020. (ECF 194 5:xxxix). Her October 20, 2020 limited duty assignment in Riley County due to pregnancy was approved. (ECF 194 6:xl). Cooper was only at Troop C from October 21 to December 21, 2020. (Ex. U, Cooper Dep. 87:6-25; 89:10-15.)

149.    Proffitt supervised both Cooper and her eventual husband Trooper Byron and told them that they both could expect others to look at them differently and watch them closely because of their relationship. (Ex. U, 31:21-22; 32:13-19.)

150.    Proffitt "corrected" Byron for bringing Cooper's water bottle to the office instead of going directly to Zone C where he was to work that day. (Ex. U, 35:20-36:8, 37:7-10, 37:17-22.)  He also talked to Cooper about the water bottle incident. (Ex. U, 94:13-18.)

151.    Proffitt questioned Byron about his spending time with Cooper at home when he should be on the road. (Ex. U, 38:17-25.)

152.    Proffitt counseled Byron about excessive texting, including once where Proffitt was at the scene of an arrest and once when he was at an accident scene. Both times Byron was texting in his vehicle. (Ex. W1, Proffitt Dep. 12:9-20, 13:15-14:1-13.)  Other coworkers told Proffitt they were concerned with Byron's texting. (Ex. W1, 15:12-16:5.) Cooper admits she and Byron texted back and forth during work hours. (Ex. U, Cooper Dep. 52:22-53:2.)

153.    Cooper was never disciplined while at Troop C, though Byron was. (Ex. W1, Proffitt Dep. 30:3-19.) Proffitt never suggested Cooper quit. (Ex. X1, Proffitt Aff.)

154.    Proffitt testified he goes to "all [his] people's residence hopefully once or twice a year" for emergency response purposes. He had been to Byron's residence before Cooper moved there. (Ex. W1, 32:23-33:5.)

155.    The first time Proffitt went to Byron and Cooper's residence was when she was supposed to be at work, and she was not. Proffitt drove by their residence because he could not find her. (Ex. W1, 32:1-15.)

156.    The second time, Proffitt was not at their apartment but a few blocks away, seeing if Byron was timely going where he was assigned to work because Proffitt had an issue with Byron not reporting his location. (Ex. W1, 33:9-13, 40:24, 41:1-43:1-4.)

157.    Proffitt went to a trooper's house other than Cooper and Byron's twice because the other trooper was also having issues with radio absences and was suspected of sitting at home during work. (Ex. W1, 24:10-18; 25:4-12.)

158.    Captain Hyman recalls another supervisor going by an employee's home to see if they were going to work. (Ex. Y1, Hyman Dep. 17:25-:14; 19:3-16.) Captain Hyman recalls another supervisor going by a different male employee's home to see if the trooper was going to work. (Ex. Y1, 17:25-:14; 19:3-16.)

159.    Cooper was limited to driving one hour per shift because she had a medical condition that made her uncomfortable while on the road when she was pregnant**.** She also had light duty restrictions. She assumed these restrictions would apply throughout her pregnancy. (Ex. U, Cooper Dep. 24:9-12; 26:21-22; 29:17-19.)

160.    Cooper's limited duty assignment required her to be at an office from 8:00 am to 5:00 pm, with an hour for lunch. (Ex. U, 50:19-21; 51:8-12.) KHP accommodated her restrictions. (Ex. U, 51:19-25.)

161.    Cooper's direct supervisor at Troop C was Lt. Proffitt and she received her limited duty work assignments primarily from Lt. Cordner. Captain Bruce Hyman was Lt. Proffitt's boss. (Ex. U, 25:15-25; Ex. Z1, Cordner Dep. 10:3-4.)

162.    Cooper says she was treated differently than Trooper Garcia, whom she said had a similar limited duty job due to a physical injury, because she was micromanaged. (Ex. U, 83:18-84:7.)

163.    Trooper Garcia was in a different Troop, worked in Kansas City and had different restrictions and reported to a different lieutenant than Cooper. (Ex. U, 82:8-12.)

164.    Lt. Cordner said both troopers had similar tasking as far as the virtual component, especially in the beginning, but Garcia had extremely different restrictions and military service, so his tasking was a little bit different. (Ex. Z1, Cordner Dep. 14:19-21.) Cordner provided the tasking and training for both Cooper and Garcia, as she does with all the light-duty troopers. (Ex. Z1, 13:17-22). Lt. Cordner had dealt with two other trooper pregnancies, in addition to her own and Cooper's, and their arrangements were the same as Cooper's—they had to report to a place that was set by the troop command. (Ex. Z1, 15:23-25, 16:4-9.)

165.    Cooper testified her claim of discrimination because of her pregnancy is that she was not allowed to go to an optional human trafficking class in November 2020. (Ex. U, Cooper Dep. 77:18-22.)

166.    Before she transferred to Troop C, Cooper had asked to attend the class. (Ex. U, 59:3-60:4.) The seminar was November 2-5, 2020, in Topeka, which would require Cooper to drive to and from Topeka for each of the four days. (Ex. U, 65:9-12; 67:3-5.)

167.    Proffitt and Hyman initially told Cooper she could not attend the class because driving to Topeka and returning would violate her one hour a day driving restriction. It was approximately an hour or slightly over one hour from Cooper's residence to Topeka. (Ex. W1, Proffitt Dep. 50:7-10; 52: 24-25; and 53:1-7.)

168.    At Cooper's request, on October 29, 2020, her doctor changed her driving restriction to three hours driving per day. (Ex. W1, 55:11-23; Ex. U, Cooper Dep. 69:20-23.)

169.    Cooper told Lt. Proffitt on October 30, 2020, that her restrictions had been changed and she could go. (Ex. U, 72:24-73:4.)

170.    Proffitt spoke to Captain Hyman about the last-minute driving restriction change and Capt. Hyman told him they would just stay with the denial. (Ex. W1, 56:15-20; 57:3-11; Ex. Y1, Hyman Dep. 33:6-10; 34:19-22.)

171.    Cooper says that Jones's Week in Review emails were "threatening" and that "it was well known in his emails that if you spoke out against him, that you were against him if you said anything. You're against the agency." (Ex. U, Cooper Dep. 84:13-85:16, 87:8-16, 122:20-123:12; Ex. A2, Cooper's Resp. to Def.'s Interrog. No. 14.)

172.    Yet Cooper does not recall the dates of Col. Jones' Weeks in Review emails or what they said, other than Jones may have complimented the number of her DUI arrests efforts in one but used the word "his" instead of "her" when referring to them. (Ex. U, 85:24-87:5.)

173.    The Week in Review Jones drafted in early February 2020 referenced someone in Troop A with 3 DUI arrests in one night. Jones did not know who that was at the time he wrote it. (Ex. B, Jones Aff. ¶ 7.)

174.    She does not recall the specifics of any other Week in Review and does not recall the words used but alleges a canoe reference and "if you are not in my canoe, you are out of the loop or club." (Ex. U, Cooper Dep. 87:6-88:8.)

175.    Cooper said her basis for hostile work environment at Troop C was the office she was assigned to located at the Manhattan KHP building. She was in an office like Lt. Proffitt. (Ex. U, 89:23-90:20.) She said "the highway patrol had two offices against the wall, so those were not cubicles, they were enclosed offices. And one office was for Lieutenant Proffitt and the other office was for the rest of the troopers to share. So the office that I was in was the troopers' office". (Ex. U, 90:8-15.) Cooper testified she included in the claim that she rarely saw anyone when working. (Ex. U, 92:17-20.)

176.    Cooper adds she was told she needed to be the best trooper she could, to do her limited duty assignment to the best of her abilities. (Ex. U, 94:5-12.)

177.    When asked for **each specific incident** that created a hostile work environment, Cooper said only that (1) Proffitt drove to her station to ensure she was working (2) drove to her home to see why she was not at the station (3) checked her whereabouts (4) followed up on her assignments (5) once asked her husband if she was enjoying her job. (Ex. B2, Cooper Resp. to Interrog. No. 13).

178.    Cooper made no complaints about the alleged hostile work environment while she was employed, though she had reported unrelated sexual harassment by a coworker when she worked in Kansas City. (Ex. U, Cooper Dep. 106:25-107:3; 107:12-25; 108:1-14.) Cooper testified she has no evidence Col. Jones or Lt. Col. De Vore were aware while she was working of her complaints of hostile work environment or gender discrimination. (Ex. U, 104:17-105:8.)

179.    No one threatened to fire Cooper, nor did they yell at her, and she does not recall anyone telling her that her job was in jeopardy. (Ex. U, 199:5-16.) Cooper resigned in a December 17, 2020 letter, effective December 31, 2020. (Ex. C2, Ex. 55)

180.    Cooper testified that if she had not resigned from KHP she would have continued her limited duty, given birth, gone on 8 weeks maternity leave, then returned to work as a trooper at Troop C in Manhattan. (Ex. U, 111:6-20; 122:1-4.)

181.    She applied for jobs at Security Benefit and Bankers Life, the KBI, FBI and DEA while she was working for KHP. The KBI and DEA applications were before she had transferred to Troop C because she was ready then to leave the KHP. (Ex. U, 111:22-113:8.) She was ready to leave KHP because she wanted to pursue work involving human trafficking, and she was upset about how the KHP treated her friend's suicide. (Ex. U, 113:12-114:9.)

182.    Cooper applied for the Security Benefit and Bankers Life personal financial planning jobs while at Troop C, because she had decided to leave the KHP to work in her undergraduate field. (Ex. U, 114:24-115:16.)

183.    Cooper sent a letter to Col. Jones dated March 15, 2022, two and a half months after she resigned, asking to return to Troop C, because she was missing her job as trooper. (Ex. U, 188:10-23; Ex. D2; Ex 28.)  Cooper said in the letter that she resigned because of her change in short-term goals, that she was pregnant with her first child and living in a new area with her husband. (Ex. U, 189:9-17.)

184.    The only two things that suppressed Cooper's speech were (1) when co-workers asked her if she was one of the troopers featured in the television interviews whose identities were concealed because there were rumors that female troopers were being questioned about whether they were the interviewees and (2) statements in Jones's Week in Review emails. (Ex. U, 129:8-130:1; 133:4-18.)

185.    At the end of the summer of 2020, while still at Troop A, she drafted a letter to the Governor complaining about KHP, but she was afraid to send it because she was afraid that she would be fired. (Ex. U, 123:10-25, 124:13-16, 125:22-126:3; Ex. D2; Ex. 56.)

186.    The letter was the only speech she claims was suppressed. (Ex. U, 132:17-23.) But the pretrial order says she was deterred from speaking online through social media. (ECF 194, 22:e,i.)

187.    The letter complained that the agency did not allow mourning bands as long as she had hoped for a trooper who committed suicide, how they were not initially allowed to make a "last call" on the radio for that trooper, how the debrief about the suicide was not as prompt as she hoped, how Jones and De Vore had "completely revamped the structure and placement of people

with the agency," and how her "mentors and friends have been disrespected by sexism and sexual

harassment" though her "peers and immediate supervisors have given [Cooper] every opportunity

[Cooper's] male counterparts receive." (Ex. U, 124:1-12; Ex. 56.)

## IV.    ARGUMENTS AND AUTHORITIES

### A.    Jones and De Vore Should Be Granted Summary Judgment on Plaintiffs' First Amendment Prior Restraint Claims (Counts 4, 11, 18, 25, and 28).

#### 1.    Plaintiffs do not present a fact question about whether they suffered an injury in fact for standing.

Plaintiffs' initial burden is to demonstrate standing by presenting admissible evidence to

demonstrate she has been injured by prior restraint and that the court's order will redress her injury.

*Cole v. Gossen*, 402 F.Supp. 3d 992, 1003-04, 1007, n.12 (D. Kan. 2019).

Each plaintiff "bears the burden of establishing standing as of the time [she] brought this

lawsuit and maintaining it thereafter." *Santa Fe All. for Public Health & Safety v. City of Santa

Fe*, 993 F.3d 802, 813 (10th Cir. 2021). She must allege facts that establish that Jones and De Vore

"actually chilled" her protected speech and "that this chilling effect was caused by [her] objectively

justified fear of real consequences*.*" *Brammer Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d

1175, 1183 (10th Cir. 2010). If one's speech is not chilled, she has no First Amendment claim.

*McGuire v. Tarrytown*, No. 08-2049, 2011 U.S. Dist. LEXIS 67760, *17 (S.D.N.Y. June 22,

2011)(Summary judgment granted when Plaintiff had no evidence of a change in behavior before

and after alleged Statements).

Each plaintiff must prove that she had her speech chilled due to "an objectively justified

fear of real consequences," *D.L.S. v. Utah*, 374 F.3d 971, 975 (10th Cir. 2004) (citations omitted)

and that "a person of ordinary firmness" would have been chilled from engaging in constitutionally

protected activity. *Smith v. Plati*, 258 F.3d 1167, 1176-77 (10th Cir. 2001) ("[P]erson of ordinary

firmness" standard was applied to gauge whether the speech was chilled.)*; see also Hoke v. Swender*, 421 F. Supp. 3d 1164, 1171 (D. Kan. 2019)("The question is whether the action [of the employer] would dissuade a reasonable person from exercising First Amendment rights.")

No Plaintiff has admissible evidence of a credible threat of consequence for statements they were forbidden from making in the future, so none have standing. In *Cole*, 402 F.Supp. 3d at 1004, n. 8, protesters did not have standing to challenge a ban on handheld signs when they had never attempted to hold signs in their hands. Being challenged when they unfurled two-story banners was not the same as holding handheld signs. Failure to show injury personal to them meant no standing. *Id*. at 1008-09.

Suggestions about speech do not cause an injury in fact without consequences*. Gilmore v. Beveridge*, No. 22-cv-2032-HLT, 2022 U.S. Dist. LEXIS 140026, *17 (D. Kan. August 5, 2022). Even if a directive carries a threat of consequence, if none materializes, there is not an injury in fact. *Carpenter v. Sch. Dist. No. 1*, No. 16-cv-1706, 2017 U.S. Dist. LEXIS 60349, *19-20 (D. Colo. April 20, 2017)(Employee directed not to speak about shortcomings in program she managed, but she ignored the directive, employer failed to enforce its threat, she had no standing.)

### a. Pfannenstiel does not have standing because she cannot establish an injury in fact.

Pfannenstiel's First Amendment claim rests on a single meeting with Jones and De Vore in February 2020 about an anonymous letter to the Governor.  She denies that she wrote the letter.[6] (SOF 50). She claims Jones said if they found out who wrote the letter, that person would lose their job. This does not give her standing because at most the conversation was about *past speech*

---

[6] This court earlier dismissed Pfannenstiel's claim that Jones and De Vore's alleged accusatory Statements to her in the meeting on February 11, 2020, about the anonymous letter to the Governor were First Amendment retaliation. (ECF 98, p. 38-39.)

*by someone other than Pfannenstiel*, not her future speech. Jones did not say why the letter writer would lose their job. If it was for falsely accusing Pfannenstiel, she had no reason to be afraid.

De Vore allegedly advised Plaintiff that "she should watch what she says in the future." (SOF 53). This is not a specific limitation on speech as a matter of law. *See Artus v. Town of Atkinson*, No. 09-87, 2009 U.S. Dist. LEXIS 96063 (D. N. H. Oct. 19, 2009)("watch what [you] say" is not the kind of threat that would curb the expression of a "reasonably hardy" person.)

Pfannenstiel claims Jones and De Vore told her that the letter had "her name all over it," accusing her of writing it. (SOF 50). Jones and De Vore meant it literally— the letter mentioned her three times, so her name **was** all over it. Her supervisor Knowlton agreed De Vore gave "good advice" to be careful what she said and to whom, given the atmosphere at KHP. (SOF 52). De Vore testified that he warned her about others who might take her statements out of context and criticize her. No one told her not to criticize Jones or De Vore. (SOF 53). She claims she had previously complained to KSTA, but Jones and De Vore did not know that, and no one told her *not* to talk to KSTA.

De Vore can ask Pfannenstiel not to talk about certain topics as long as he does not accompany that request with a threat. *Dirks v. Board of County Comm'rs*, No. 15-CV-7997, 2016 U.S. Dist. LEXIS 68510, *22-23, n. 70 (D. Kan. May 23, 2016). De Vore's non-threatening advice would not have chilled the speech of a "reasonably hardy" person.

In the pretrial order she claims she wanted to speak to the Governor and to her bosses at D of A about the treatment of female employees. (ECF 194:20). Her interrogatories said she was chilled in performing her duties to **those within the KHP**.

If Plaintiff did not feel threatened to be terminated, **she would have addressed Col. Jones** concerning the allegations and his interactions with others in the agency per her regular duties as Human Resources Director of the agency. Further, Plaintiff was unable **to assist the complainants**

**as she normally would have** due to the fear of retaliation if she spoke up more frequently against the unfair treatment and harassment of women at the Kansas Highway Patrol. (SOF 43)

Pfannenstiel is like the plaintiff in *Gilmore*, who was removed from the podium at a school board meeting for complaining about issues not germane to the school district, then asked for an injunction because she was afraid of removal if she spoke on issues that *were* germane to the school board meeting. This court held that "consequences for one type of behavior do not credibly demonstrate future consequences for different behavior." *Id.* at *25. "Subjective fear is not enough to create a credible threat of future enforcement." *D.L.S.* 374 F.3d at 975.

There is no admissible evidence Jones or De Vore gave Pfannenstiel a "directive not to speak" to the Governor or to her bosses at D of A. She claims that her speech to Kibbe and Knowlton was deterred, but she spoke to them frequently, even offering unsolicited advice on who the Governor should appoint to replace Jones and De Vore. (SOF 55) There is no evidence that she was told not to speak to Kibbe or Knowlton or that she was threatened with consequences if she did. She explicitly denied that the social media policy violated her First Amendment rights. (SOF 56). Her First Amendment claim should be dismissed.

### b. Harrington has not suffered an injury in fact.

Harrington claims she was stopped from speaking to legislators, from using social media and from answering legislative committee questions without clearing her answers with Dean. (ECF 194:20 3b.i.) These are distinguishable from *Gilmore* and *Cole*. In those cases, the speakers alleged that their speech was chilled because they had been retaliated against for similar behavior in the past. Negative consequences for past speech can be the basis of an objective concern of future consequence. Harrington's speech was not chilled. She informed KHP in the present lawsuit that she had spoken to legislators about Jones. (Doc. 1, p. 43-44, ¶¶ 384-387.) In almost two years since making those Statements, she has not been terminated or punished for failing to follow a directive

and she has continued to speak to legislators. (SOF 68). There is no evidence of "an objectively justified fear of real consequences" if she spoke to legislators. No one knew she had been talking to them, and no one told her not to. (SOF 69-70). She has no evidence of a threat "beyond her subjective belief." *Durstien v. Todd*, No. 19-0029, 2022 U.S. Dist. LEXIS 156119 at *43 (S.D.W. Va. Aug. 30, 2022). When asked what threats she relied on, Harrington testified her fear of real consequences was derived from: (1) De Vore's statements at an inservice that "they need to quit talking outside of our troop or outside of the agency if we don't have anything good to say," and (2) Jones' statements in the December 2020 Week in Review about social media. (SOF 63, 65). But neither of these mentioned specific protected speech and neither threatened consequences.

Harrington was not injured by Jones's suggestions in a December 2020 Week in Review email that employees should refrain from certain Statements on social media because *Harrington testified that she does not use social media*. (SOF 64). The week in review email referred to the social media policy ADM-31, which specifically carves out restrictions of speech by employees as private citizens on matters of public concern. (SOF 65). Harrington does not participate in social media, so any fear she had of "real consequences" could not have been objectively justified.

As for the "responding to legislative committee questions without first clearing it with Major Dean," she has no evidence that that instruction carried a threat of consequence.

### c. McCurdy does not have standing because she has not demonstrated an injury in fact and cannot meet her burden to establish redressability.

McCurdy claims she was deterred from speaking online, but in discovery the only threat she disclosed was that her speech was threatened when Pfannenstiel told her (while trying to get McCurdy to join the lawsuit) that De Vore had told Pfannenstiel that if the complaints against Jones were not withdrawn, those who complained would lose their jobs. (SOF 106). But there is no admissible evidence that De Vore ever said that. It was not addressed to any future Statements

38

of McCurdy, who had already made allegations against Jones. To State a claim for prior restraint, the Statement must be "issued in advance of the time that such communications are to occur." *Durstien*, 2022 U.S. Dist. LEXIS 156119 at *42-43 (citing *Alexander v. United States*, 509 U.S. 544, 550 (1993). In *Durstien*, a school administrator ordered a teacher to shut down anti-Muslim tweets and to delete the account on which they were posted. The court ruled that this was not a prior restraint because the order was about Statements had already been made. *Id.* McCurdy has not made a claim about Statements that she has already made—only a claim that her future Statements were chilled.

Also, no reasonable person would have been in fear of losing their job due to the alleged Statement of De Vore, given the uncontroverted evidence that no one's employment was terminated. De Vore denies making the Statement to Pfannenstiel, but if he had, it had no teeth. It has been years since De Vore's alleged statement and no Plaintiff has withdrawn her complaint and no Plaintiff has been fired either. McCurdy specifically testified that "nothing bad" has happened to her in the years since she has complained about Jones. (SOF 120).

### d. Meader has not suffered an injury in fact.

Neither Jones nor De Vore spoke to Meader personally about what she should or should not say. (SOF 124-25). She claims in the pretrial order that she was "deterred from speaking online through social media" (ECF 194:21) but she does not say what they did to deter her speech. In discovery, she claimed that the Week in Review emails said things they did not say, like "picking the right people to hang out with" and "making sure you are in the right group." (SOF 124), none of which involve social media. Meader claims that if her speech were not suppressed, she "would have expressed support for the statements made by Scott Harrington and Josh Kellerman through social media about the illegal activities of Col. Jones and Lt. Col. De Vore." Jones and De Vore

know nothing about Kellerman or Harrington "speaking out about [their] illegal activities." (SOF 125.) Meader did not identify in her Rule 26 disclosures or produce in discovery in this case or mention in the pretrial order any statements that were made by Harrington or Kellerman on social media about the alleged "illegal activities of Jones and DeVore." At most, she bases her claim on "subjective apprehensions that [Jones or De Vore] might act unlawfully." *Finstuen v. Crutcher* 496 F.3d 1139, 1144 (10th Cir. 2007), which is insufficient. Also, without a threat of consequence, the vague statements are not actionable prior restraint on speech.

### e. Cooper cannot establish standing because she has not suffered an injury in fact.

Cooper contends there were threats in Jones's Week in Review emails, and these made her afraid to speak out online and to the Governor. (SOF 173, 187-189). She does not remember specific words in any emails, though she thinks they referred to getting into a canoe. (SOF 176). Jones has denied ever making threats or referring to a canoe in those emails and has produced all of them to Plaintiffs in this litigation. (SOF 4). None contain any of the Statements that Cooper alleges. Cooper has not disclosed any threats about consequences for online comments or actions by De Vore and Jones that limited her speech.

### 2. There is no evidence that either Jones or De Vore personally violated any Plaintiff's First Amendment Rights or that if they did, they should have known they were committing constitutional violations.

### a. Neither Jones nor De Vore can be liable for the acts of others.

In a § 1983 claim, personal liability must be predicated on the individual's personal involvement in the claimed violation. *Henry v. Storey,* 658 F.3d 1235, 1241 (10th Cir. 2011). For De Vore or Jones to be liable as a supervisor under § 1983 for the actions of others, he must have directed or acquiesced in the unlawful conduct, and there is no evidence of that. *Allen v. Miami*

*Cty.,* No. 95-1149-JTM, 1997 U.S. Dist. LEXIS 15648, at *20 (D. Kan. Sep. 15, 1997) (citing *Woodard v. Worland*, 977 F.2d 1392, 1399-1400 (1993)).

There is no admissible evidence that De Vore or Jones, who did not speak directly to any Plaintiff about speech, limited the speech of any of these Plaintiffs. McCurdy complains about Captain Witham and Lt. Whepley, but Witham, Jones and De Vore deny that Jones or De Vore were involved in any of her social media. (SOF 5, 122.) There is no evidence that De Vore wrote the Week in Review emails. None of the Plaintiffs have admissible evidence of Jones or De Vore's personal involvement in anything about which they complain.

**b. Jones and De Vore are entitled to qualified immunity.**

In the face of Jones and De Vore's qualified immunity defense, Plaintiffs had to not only prove that Jones and De Vore personally violated their First Amendment rights, but also prove that their right was "clearly established" at the time Jones and De Vore engaged in the conduct. *Klaasen v. Univ. of Kan. School of Med.*, 84 F.Supp. 3d 1228, 1248 (2015). Plaintiffs' burden in this analysis is "heavy." *Hoke,* 421 F. Supp. 3d at 1170.

Each Plaintiff must respond with evidence that both had to have known that their conduct was unconstitutional. *Verdicia v. Adams*, 327 F.3d 1171, 1174 (10th Cir. 2003); *Duncan v. Gunter,* 15 F.3d 989, 992 (10th Cir. 2014.) Plaintiffs cannot point to case law in which "the specific conduct" of which they complain has been found to be a violation of free speech. *See Hirt v. U.S.D. No. 287*, No. 17-CV-2279, 2019 U.S. Dist. LEXIS 70477, *44 (D. Kan 2019); *Irizarry v. Yehia*, No.20-cv-2881, 2021 U.S. Dist. LEXIS 2333019, *18-27 (D. Colo. June 8, 2021)(facts of restraint on speech must be very similar). Jones and De Vore are entitled to qualified immunity.

**c. The speech Jones and De Vore allegedly suppressed is not constitutionally protected speech.**

Whether any of the speech that the Plaintiffs' claim was suppressed is protected by the First Amendment is a question of law for the court, which should make it easy to grant judgment on these claims. *Koch v. City of Hutchinson*, 847 F.2d 1436, 1452 (10th Cir. 1988). There is no prior restraint claim if the speech that is suppressed is not protected by the First Amendment, so the court looks at the speech the employees would utter if the restriction were set aside. *Maldonado v. City of Altus*, 433 F.3d 1294, 1310 (10th Cir. 2006).

For public employees' speech to be protected by the First Amendment, it must be made outside of their official duties and about matters of public concern. *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). The Tenth Circuit broadly defines "outside of their official duties" so that speech that "reasonably contributes to or facilitates the employees' performance" is pursuant to the employee's duties and therefore not protected. *Klassen*, 84 F. Supp. 3d at 1252. Likewise, for speech to be considered a "matter of public concern," it must be of a quality and detail that it would assist the public in evaluating government performance. *Koch*, 847 F.2d at 1447; *see also Milwaukee Deputy Sheriff's Ass'n v. Clarke*, 574 F.3d 370, 379 (7th Cir. 2009)(suggesting the sheriff was not courageous was not a matter of public concern).

In addition, the Tenth Circuit has said that when the interest of the employee in making the Statement is less than the employer's interest in promoting the efficiency of the public services it performs, the speech is not protected. *Belcher v. City of McAlester*, 324 F.3d 1203, 1206 (10th Cir. 2003). In deciding whether speech is protected, the court can consider the manner, time and place of an employee's expression as well as the context. A part of the context is whether the employee's speech uses "less disruptive internal channels of communication." *Id.* at 1208-09. Law enforcement agencies have a "heightened governmental interest in maintaining harmony." *Koch*, 847 F.2d at 1452.

### d. The speech allegedly suppressed was pursuant to Pfannenstiel, Harrington and Cooper's official duties, not their speech as citizens.

All Plaintiffs were asked in discovery what they would have said had their speech not been restrained. Speech by employees pursuant to their official duties can be controlled by their employer without running afoul of the First Amendment. *Garcetti,* 547 U.S. at 421. For example, Harrington testified that among her duties is answering questions in legislative committees on behalf of KHP. She claims her future speech was restricted because in legislative committee meetings if she has an inquiry where she was presenting on behalf of KHP, she needed to run the answer by Dean. (ECF 194, 20, 3. B.i.) Answering legislator's questions is a part of her official duties. Major Dean is merely instructing her how to perform her official duties, not limiting what she says as a citizen. "Speech directed at an individual or entity within an employee's chain of command is often found to be pursuant to that employee's official duties." *Rohr*, 596 F.3d at 747; *Vigil v. Tweed*, No. 18-829, 2022 U.S. Dist. LEXIS 160043, *36. (D. N. M. Sept. 26, 2022)(Safety complaints of employee whose job involved monitoring patient safety constitutionally protected because "it is not this court's role to oversee the speech between [an employee] and his supervisors.")

Pfannenstiel claims that her speech that was suppressed was reports to her bosses or the Governor about gender discrimination. (ECF 194:20.) Documenting and investigating and communicating about gender discrimination is a part of her job duties. The speech that she claims was squelched was speech she would have exercised pursuant to her official duties as HR director, and not in her role as citizen.

Though no one told her not to, Cooper is unhappy that she did not send a letter to the Governor about the way KHP handled a trooper's suicide and the way De Vore and Jones had

"revamped" the "structure and placement of people within the agency." (SOF 188). These are all issues advanced in her role a trooper, not as a citizen.

First Amendment law does not allow the court to step in and interfere with managers trying to give direction to employees who don't like those directions. It cannot be used to give employees control over an agency that they do not run. As the Tenth Circuit noted in *Green v. Board of County Commissioners*, 472 F.3d 794, 801 (10th Cir. 2007), there are many ways to protect the public interest outside of expanding First Amendment claims to legislate "expressions employees make pursuant to their professional duties."

> e. **Speech about internal department management disputes or personal reputation is not constitutionally protected because it is not a matter of public concern.**

To be constitutionally protected, speech must be about matters of public concern and "the court may consider the motive of the speaker and whether it is calculated to disclose misconduct or merely deals with personal disputes and grievances unrelated to the public's interest." *Brammer-Hoelter*, 492 F.3d at 1205. The speech Plaintiffs have alleged was suppressed is not constitutionally protected because it is about their own personal issues and opinions and not about matters of public concern.

McCurdy testified that had her speech not been suppressed, she would have liked to have shared her interactions with Jones so people could "hear her side" of the story and "hopefully be a little more understanding" of her. (SOF 121). She wanted to "explain her feelings" so other troopers would "not think badly" of her. In *Arndt v. Koby*, 309 F.3d 1247 (10th Cir. 2002), a police officer was not allowed to make Statements to the press explaining actions for which the press had criticized her. Summary judgment was granted because defending her law enforcement actions

and reputation were personal matters, not a matter of public concern. *Id.* at 1254. McCurdy's concern about others' opinions of her are clearly not matters of public concern.

Harrington testified that when asked a question in a hearing (where she was appearing on behalf of KHP) she wanted to speak to legislators without having to run her responses by her management. She does not explain how in this official capacity she was going to speak to legislators about matters of public concern, nor can she establish that having to tell her chain of command about the inquiry means her protected speech if any would be squelched. Her employer can have rules about how KHP wants to coordinate responses between departments. This is an internal matter and not one of public concern. She also complains that she was stopped from sharing about low morale at KHP. Morale is an internal matter and not a matter of public concern. *Connick v. Myers*, 461 U.S. 138, 148 (1983).

Pfannenstiel was explicitly asked in discovery what she would have said if her speech was not chilled and she referred only to speech necessary for acting as an HR director, **not** to reporting misconduct outside of KHP, which could be a matter of public concern. (SOF 43).

Cooper wanted to send a letter to the Governor about how the KHP had reacted to a trooper suicide because she wanted KHP to agree to troopers wearing mourning bands, give the deceased a "last call" on the radio, and to be more expedient on the debrief about the suicide. (SOF 188). Not matters of public concern. *Wilson v. Littleton*, 732 F.2d 765, 769 (1984). (Police officer expression of grief not matter of public concern.) She did not like the way Jones and De Vore had "revamped the structure and placement of people within" KHP. These are not reports of misconduct, but are internal management disputes.

Cooper's statements in the unsent letter to the Governor that "her mentors and friends were disrespected" because they were female are not matters of public concern because they are not the

kind of Statements that would sufficiently inform the public of the way the government operated so that the public could make an evaluation of KHP's performance. Complaining that your friends are disrespected is not a report of governmental misconduct. Instead, it is the kind of "personal grievance" that is not protected by the First Amendment.

Meader's "suppressed speech" was nothing more than her own personal opinion about the terminations of managers she liked. It was not linked to matters of public concern.

### f.  KHP has an interest in promoting the efficiency and sound operations of its office.

No government employee's right to speech is absolute. Public entities, especially first responders and quasi-military operations like KHP, have a heightened interest in maintaining a disciplined work environment because of the importance of discipline, morale, harmony, uniformity and trust in the ranks. Limiting social media and public comment is commonly allowed for these types of agencies without running afoul of the First Amendment. *See e.g., Belcher*, 324 F.3d at 1209; *Blan v. Correct Care Solutions, LLC*, 17-CV-182, 2017 U.S. Dist. 227076, *22-27 (D. N.M. Dec. 11, 2017)(limiting comments on social media protected corrections officers' safety); O'*Laughlin v. Palm Beach Cty,* 500 F.Supp. 3d 1328 (S.D. Fla. 2020)(harmony within the fire department justified restriction of negative comments on social media).Likewise, when Harrington is answering questions about KHP to a legislative committee, her superiors have an interest in insuring that her answer is coordinated with other agencies and other agencies are coordinating with her.

### g.  If it allows claims to proceed, the Court should grant summary judgment on compensatory and punitive damages.

### (1) Harrington and McCurdy have no compensatory damages for First Amendment violation, and Pfannenstiel, Meader and Cooper do not if constructive discharge fails.

For a *constitutional* violation, Plaintiffs are entitled to compensatory damages only if they have proof of out-of-pocket expenses or other costs. Harrington and McCurdy have not alleged that they incurred any expenses because of the alleged violation of their First Amendment rights. If Pfannenstiel, Meader and Cooper's constructive discharge claims fail, they too fall short of proof of compensatory damages. "The deprivation of constitutional rights, standing alone, does not entitle a plaintiff to general damages. Plaintiffs must demonstrate 'actual injury' to recover damages under Section 1983 for violation of their constitutional rights." *Lippoldt v. Cole*, 468 F.3d 1204, 1220 (10th Cir. 2006).

> **(2) There is no evidence of behavior by Jones and De Vore that would justify punitive damages.**

In order to recover punitive damages for a violation of First Amendment rights, Plaintiffs must allege and prove that Jones and De Vore were motivated by evil motive or intent, or showed reckless or callous indifference to the federally protected rights of others. *McGhee v. Biamont*, 348 Fed. Appx. 418, 419, 2009 U.S. App. LEXIS 22312, *1 (10th Cir. October 9, 2009). Plaintiffs do not have evidence to raise fact questions about any of any of these.

**B. The State is Entitled to Summary Judgment on Pfannenstiel (Counts 6-7), Harrington (Counts 13, 14, 15) and Cooper's (Counts 29-30) Title VII Claims because they failed to timely exhaust their administrative remedies**

Title VII plaintiffs must exhaust their claims by filing a charge with the EEOC within 300 days from the date of the incident. *Reynard v. Washburn Univ.*, No. 19-4012, 2022 U.S. Dist. LEXIS 182728, *19, (D. Kan. Oct. 5, 2022), *appeal docketed,* No. 22-3248 (Nov. 4, 2022). "[P]laintiff's claim in court 'is generally limited by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination submitted to the EEOC.'" *Id.* At a minimum, "the *charge* must contain facts concerning the discriminatory and retaliatory actions underlying each claim[.]" *Id.* (quoting *Jones v. U.P.S., Inc.*, 502 F.3d 1176,

1186 (10th Cir. 2007)) "The ultimate question is whether the conduct alleged [in the lawsuit] would fall within the scope of an EEOC investigation which would reasonably grow out of the charges actually made [in the EEOC charge]." *Id.* at 1164-65. *Simmons v. Sunrise Senior Living Servs.,* No. 19-2437, 2020 U.S. Dist. LEXIS 44827, *7-8, (D. Kan. March 16, 2020).

### 1. Harrington did not timely exhaust her administrative remedies for incidents that occurred more than 300 days before September 10, 2020, for events that took place prior to her September 10, 2020 EEOC filing but were not included in that filing, for retaliation and for unrelated events that occurred after she filed her EEOC complaint.

Harrington's EEOC complaint was filed September 10, 2020. (SOF 40). She alleged harassment by Jones that she claims occurred in August, September, October and December 2019. All of the dates except December—the time he touched her shoulders, and **she did not notice when it allegedly happened**-- occurred more than 300 days prior to her filing, and so are time-barred.

Her EEOC complaint, though filed in 2020, alleges only gender discrimination that occurred in 2019. Her EEOC charge did not cite to any discrimination in 2020, nor did it cite **a single retaliation fact.** (See Ex. T.) Case law requires at least some facts about what was retaliatory in her charge, so she has failed to exhaust her administrative remedies as to her retaliation claim or anything that happened in 2020.

Much of what she complains about in the pretrial order—her negative performance evaluation and her PIP—are not included in her earlier filed EEOC charge. They are only exhausted if they were "reasonably related" to facts about retaliation in the earlier charge, but none are reasonably related to her 2019 EEOC charge. She never exhausted her administrative remedies as to the 2021 allegations against Dean or the PIP or the unsatisfactory evaluation.

### 2. Cooper did not exhaust her administrative remedies because she did not allege hostile work environment or constructive discharge.

Cooper filed her EEOC charge December 2, 2020, alleging she was discriminated against because of her sex on 11/4/20, 11/16/20 and 11/19/20. (SOF 41). She did not mention or exhaust a claim for hostile work environment. (Ex. T). *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1410 (10th Cir. 1997)(Plaintiff did not exhaust Title VII hostile work environment claims because allegations were not reasonably related to the hostile environment allegations). She limited her dates of discrimination between 10/20 and 11/30/20. She quit December 31, but her charge did not mention constructive discharge or anything reasonably related to constructive discharge. She has not exhausted her administrative remedies for hostile work environment or constructive discharge.

**C. The State should be granted summary judgment on all plaintiffs' hostile work environment claims (Counts, 6, 13, 20, 27, 30) because there is not evidence of severe and pervasive harassment based on gender and there are not fact questions about the Faragher defense**

**1. No severe or pervasive harassment**

To establish a hostile work environment, a plaintiff must show 1) she is a member of a protected group, 2) she was subject to unwelcome harassment, 3) the harassment was based on her membership in the protected class, and 4) due to the harassment's severity or pervasiveness, the harassment altered a term, condition, or privilege or her employment and created an abusive working environment. *Ross v. Pentair Flow Techs.*, No. 2:18-cv-02631-HLT, 2021 U.S. Dist. LEXIS 20364, at *22 (D. Kan. Feb. 3, 2021); *Rithmixay v. AutoZoners, LLC*, No. 2:21-cv-02332-HLT, 2022 U.S. Dist. LEXIS 194457, at *9 (D. Kan. Oct. 25, 2022). There must be evidence that "the environment was both objectively and subjectively hostile or abusive." *Morris v. City of Colo. Springs*, 666 F.3d 654, 664 (10th Cir. 2012). The court considers "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."

*Throupe v. Univ. of Denver*, 988 F.3d 1243, 1252 (10th Cir. 2021)(hearing of rumors of affair four times and being reported to Title IX office not severe or pervasive); *Sprague v. Thorn Ams.*, 129 F.3d 1355, 1365-1366 (10th Cir. 1997)(Summary judgment granted because five sexually-charged comments over sixteen months did not alter the work environment.); *Frank v. Heartland Rehab. Hosp. LLC*, No. 20-2496, 2022 US. Dist. LEXIS 29116, *5-6 (D. Kan. Feb. 17, 2022)(Coworker saying date was "a dick meeting" and that her breasts were "those bad boys" and asking about online dating and suggesting "firemen only want one thing" and looking her up and down 5-7 times and telling her she looked nice not severe or pervasive.).

Inadequate allegations of severe and pervasive conduct justify the grant of summary judgment. *Morris,* 666 F.3d at 664. (citations omitted)(Doctor/supervisor "flick[ed]" her on the head with his finger twice, threw a piece of human tissue at her, said "get your ass in gear" or "get someone in here who knows what they are doing." ); *see also Williams v. CoreCivic, Inc.*, No. 17-2310, 2019 U.S. Dist. LEXIS 222788, *25 (D. Kan. July 23, 2019)(Vague allegations of discriminatory treatment coupled with a handful of discriminatory comments is insufficient for hostile work environment.)

In pretrial discovery Pfannenstiel identified only her having documented others' complaints of sexual harassment as the basis for her hostile work environment claim. (SOF 46). But doing her job, which was to document and investigate those complaints, cannot meet the definition of hostile work environment because it is not **based on her gender.** A male HR director would have performed the exact same duties. It cannot be the law that an employer has a duty to investigate, but that every HR employee who documents and investigates complaints is creating a hostile work environment for himself or herself. In the pretrial order she complains about a single

meeting about the anonymous letter[7], the brief and innocuous IM/emoji conversation and another instance when Murphy was demonstrating another employee's invading his space. (SOF 44-45). Pfannenstiel cannot demonstrate severe or pervasive conduct directed toward her because of her sex.

Harrington's allegations lack evidence of either severity or pervasiveness. There were no lewd comments or improper statements to Harrington by Jones or De Vore. (SOF 71-72). She never saw him touch any other female. There were three occasions where her shoulders and/or back were touched briefly in a non-sexual way. She testified that she did not even notice the third one when it happened, she just heard about it. (SOF 74). They stopped in December 2019. Harrington and Jones worked in different buildings. (SOF 61). No reasonable juror could find that Harrington's work environment was made so hostile as to alter the terms and conditions of employment when looking in light of *all* the circumstances.

Meader bases her hostile work environment claims on four encounters with Col. Jones: touching her hands to show how cold he was, shaking her shoulders and singing, standing behind her and asking "are you uncomfortable?" and laughing; shaking her hand to "welcome the new employee" and grazing her leg as he grabbed her hand. (SOF 128-134). Meader characterized the incidents as "uncomfortable" or "weird" rather than sexual. (SOF 128, 134).

A reasonable juror could not find that these few incidents, to which she never objected over a period of eight months, was objectively hostile or abusive. The contact was not severe, not physically threatening or humiliating, not accompanied by overtly sexual comments, and would not unreasonably interfere with a reasonable employee's work performance. *Throupe*, 988 F.3d at 1252.

---

[7] The pretrial order says that Jones and De Vore "repeatedly" accused her of sending in anonymous letters to the Governor ECF 194, p. 7, but there is only evidence of one meeting in February 2020. (SOF 48-54).

These incidents occurred sporadically, and Jones had no contact with Meader for the two months she worked at home or for the five months leading up to Meader's voluntary resignation, so the conduct was not frequent. (SOF 133,135). Grabbing someone's hands twice, shaking someone's shoulders while saying "shake it for me" and asking "are you uncomfortable" while standing behind them once does not present the "steady barrage of opprobrious comments" needed to survive summary judgment. *Rithmixay,* U.S. Dist. LEXIS 194457 at *10. This conduct, none of which was mean-spirited or lewd, is "simple teasing" and "isolated incidents" that do not amount to discriminatory changes in the conditions of employment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998).

The State did not subject McCurdy to a hostile work environment based on her gender that unreasonably interfered with the terms and conditions of her employment. Three, (or two and a half) hugs and being called "woman" when Jones could not remember her name, spread out over more than a year are insufficient to rise to the level of "severe and pervasive" harassment. She did not think the hugs were sexual when they were happening, she just thought they were unprofessional. (SOF 113). She knows Jones hugs males also. (SOF 109). She had no issues continuing to work. "Nothing bad" happened after she was contacted by HR and interviewed in the independent investigation in the summer of 2020. (SOF 120). After June 2020, there were no other interactions with Jones that McCurdy would categorize as unpleasant. (SOF 116).

Cooper was only at Troop C two months. She complained that Proffitt checked to see when she was working, followed up on her assignments, and asked her husband if she was enjoying her job. (SOF 178). Cooper did not like Proffitt's rules and supervision, but nothing she has alleged is a hostile work environment based on her sex. Being assigned to work in an office without windows (the same office where her coworkers worked) is not hostile and not based on her sex. Proffitt's

checking on her happened to her husband the same way it happened to her. She cites no overtly gender-discriminatory conduct and her claims fails without it because "facially sex-neutral conduct can "support a finding of gender animus sufficient to sustain a hostile work environment claim when that conduct is viewed in the context of other, overtly gender-discriminatory conduct." *Throupe*, 988 F.3d at 1251. Nothing that happened was physically threatening or humiliating or interfered with her work performance.  There is no severe and pervasive harassment based on gender.

### D. There are no questions of material fact about whether KHP exercised reasonable care to prevent harassment and that Plaintiffs failed to take advantage of corrective or preventative opportunities.

The State has raised an affirmative defense because it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior" and [Plaintiffs] "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher,* 524 U.S. at 807; *Hanks v. Spirit Aerosystems, Inc.*, No. 16-1007-JTM, 2017 U.S. Dist. LEXIS 141486, at *42 n.3 (D. Kan. Aug. 31, 2017).

 The State distributed an anti-harassment, anti-retaliation and/or anti-discrimination policy and investigated harassment allegations when it received notice of the allegations. *Helm*, 656 F.3d at 1288-1291. These Plaintiffs were "unreasonably delayed in using the employer's preventative/corrective opportunities." *Id*. at 1277, 1291 (where court held it was unreasonable for the employee to have waited years to report sexual harassment, and affirmed that an unexplained delay of two or two and half months was also unreasonable.)

After Meader complained about two incidents with Jones, Pfannenstiel told her to make some statement or gesture to Jones that indicated his conduct was unwelcome. (SOF 137). Meader already knew that KHP policies instruct those subjected to unwelcome conduct to communicate that. But despite the policies and Pfannenstiel's instruction, Meader never told Jones his behavior

was unwelcome and would not come forward with a complaint to D of A for several months. (SOF 137). Had she talked to Jones or complained to D of A, he would have stopped teasing her.

Harrington did not come forward until months after her last encounter with Jones (SOF 20)—the one she did not even notice when it happened. (SOF 74c) Pfannenstiel never told Jones his IMs were unwelcome, and she did not have further incidents with him. Despite being told to talk to him by various people she confided in, including her close mentor, and talking to Susan Pfannenstiel about a one-on-one with Col. Jones, McCurdy never spoke directly with Jones, even on the 3rd alleged hug when she could have spoken to him privately. (SOF 108, 111-12,114-15, 118-19). McCurdy never complained either to her chain of command or to HR, but after someone else complained and her complaints were shared with Jones, she had no more trouble. Cooper did not complain to either HR or up her chain of command, though that avenue was open to her and was one she had used previously in Troop A. (SOF 179).

### E. Jones should be granted summary judgment on Meader's claim for violation of her constitutional rights (Count 24) because there were only four incidents over more than a year and he is qualifiedly immune and there is no evidence to justify the award of compensatory or punitive damages.

The State adopts is Title VII arguments about the dearth of severe or pervasive conduct by Jones. More "is required to State a claim for a constitutional violation…than for a statutory claim under Title VII." *Miller v. Regents of the Univ. of Colo.,* No. 98-1012, 1999 U.S. App. LEXIS 16712, at *30 (10th Cir. July 19, 1999) (internal citations omitted). Meader simply does not have evidence that she was subjected to a hostile work environment. Additionally, Jones is qualifiedly immune. She cannot demonstrate that he knew that the few incidents between them—incidents she dubbed as "weird," not sexual—were clearly a violation of her constitutional rights. No case cites facts so mild as a violation of equal protection. Finally, she does not have evidence that would

justify compensatory damages or evidence of the kind of motive that would justify punitive damages.

**F. Summary Judgement is required regarding Cooper's Title VII Sex Discrimination versus the State (Count 29). There is no genuine issue of material fact that the State discriminated against Cooper.**

**1. Cooper cannot prove a prima facie case of discrimination or pretext**

In order to state a claim for gender discrimination, an employee must allege that she is a member of a protected class, that she was qualified for her position, that she suffered an adverse employment action, and that she was treated less favorably than those outside her protected class. *Cole v. Ruidoso Municipal Schools*, 43 F.3d 1373, 1380 (10th Cir. 1994).

**a. Nothing she complains about is adverse employment action.**

An adverse action results in "a significant change in employment status," such as termination, failure to promote, or ineligibility for things like promotions. *Williams*, 2019 U.S. Dist. LEXIS 222788, at *13 (citing *Aquilino v. Univ. of Kan.*, 268 F.3d 930, 934 (10th Cir. 2001)). To be an adverse employment action, the action must have a significant impact on an employee's status. *Id; see also, Budenz v. Sprint Spectrum*, L.P., 230 F. Supp. 2d 1261, 1275 (D. Kan. 2002).

The record does not contain an adverse employment action against Cooper. Her allegations in the pretrial order included being reprimanded for the water bottle, being "micromanaged," having her supervisor check her residence to see if she was home when she was supposed to be at the office and not being allowed to attend an optional training class. (ECF 194, 12). Not being allowed to go to single training or travel opportunity that is not tied to a workplace consequence is not an adverse employment action as a matter of law. *Walker v. Wormuth*, No. 20-CV-2338, 2021 U.S. Dist. LEXIS 212270, *20 and fn.44 (D. Kan. Nov. 3, 2021).

**b. There is no evidence Cooper was treated differently because of her gender.**

Her complaints that she was treated unfairly because of her relationship with her husband are not actionable. Preferential (or, presumably, negative) treatment because of a romantic relationship does not raise issues of gender discrimination. *Taken v. Okla. Corp. Comm'n*, 125 F.3d 1366, 1369 (10th Cir. 1997); *Huffman v. City of Prairie Vill*., 980 F. Supp. 1192, 1199 (D. Kan. 1997)(police officer who claimed she was treated poorly because of relationship with coworker did not State a claim for gender discrimination.)

She says she and her husband were criticized and that their supervisor was keeping tabs on their attendance by checking to see if they were home when they should have been working. (SOF 151-159). Those could not be based on gender because those things happened to both of them. Also, it is uncontroverted that supervisors check on the locations of male employees in the same way Proffitt checked on her.

She claims Trooper Garcia was treated more favorably in work assignments than she, but she cannot establish that he is a comparator or that she was treated differently. She must do this to survive summary judgment. *Fisher v. Basehor-Linwood Unified Sch. Dist. No. 458*, 851 F. App'x 828, 836 (10th Cir. 2021)*(*citing *Riggs v. AirTran Airways, Inc., 497 F.3d 1108, 1117 (10th Cir. 2007).* Garcia worked in a different Troop and had different restrictions that were due to a physical injury and had a different supervisor. (SOF 164). *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997)("Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline."); *Otte v. UMB Bank N.A.*, No. 2:19-cv-02351-HLT-GEB, 2021 U.S. Dist. LEXIS 105070, at *19 (D. Kan. June 4, 2021).

Proffitt continued to be Cooper's supervisor even when she was receiving light duty assignments from Cordner. (SOF 162). That is the same way other light duty employees were managed. (SOF 165).

### c. Decisions about Cooper's employment were made for legitimate non-discriminatory reasons.

When Cooper, already on limited duty, transferred to Troop C, Lt. Hyman did not have work for her and was told by Major Murphy to check with Lt. Cordner, who had a project for Cooper to work on. (SOF 162). This is a legitimate, nondiscriminatory reason for her to be assigned to work for Cordner.

### G. The State and Jones and De Vore should be granted summary judgment on Pfannenstiel, Meader and Cooper's claims for constructive discharge.

### 1. The pretrial order does not allege constructive discharge claims.

Plaintiff's counsel has said verbally that the First Amendment claims against Jones and De Vore were the basis for the constructive discharge claims of Pfannenstiel, Meader and Cooper and there are damage itemizations for those, but no Plaintiffs included the claim in the factual or legal allegations in the pretrial order. (ECF 194, p. 20, a.1; 21, d. ii.; 22, e.1.) Meader does not allege constructive discharge in her facts or in her legal claims in the pretrial order either for her 1983 claims or her Title VII claim against the State. (ECF 194, p. 21, d; p.10-11.) Allegations not included in the pretrial order should be considered waived. *Hirt v. USD No. 287*, No. 17-cv-2279, 2019 U.S. Dist. LEXIS 70477, *30 (D. Kan. April 24, 2019).

### 2. Plaintiffs cannot present genuine issues of fact about whether their working conditions were intolerable or whether a reasonable person would have felt compelled to resign.

To prevail on a constructive discharge claim, a plaintiff must establish through discriminatory conduct, the employer subjected her to intolerable working conditions such that a

reasonable person in the employee's position would feel compelled to resign. *See Bennett v. Quark, Inc.*, 258 F.3d 1220, 1229 (10th Cir. 2001); *Lara v. Unified Sch. Dist. # 501*, 350 F. App'x 280, 283 (10th Cir. 2009) (citing *MacKenzie v. City & County of Denver*, 414 F.3d 1266, 1281 (10th Cir. 2005). The Tenth Circuit has noted that the bar to meet constructive discharge "is quite high" as the plaintiff must demonstrate she "had no other choice but to quit." *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1221 (10th Cir. 2002). The conditions of employment must be *objectively* intolerable; the plaintiff's subjective perception of the environment is not relevant. *Sanchez*, *v. Denver Pub. Sch.*, 164 F.3d 527, 534 (10th Cir. 1998) (citing *Yearous v. Niobrara County Mem'l Hosp.*, 128 F.3d 1351, 1356 (10th Cir. 1997)). Even the finding of a hostile work environment does not necessarily mandate a finding of constructive discharge. *Campbell v. Kansas State Univ.*, 780 F. Supp. 755, 765-66 (D. Kan. 1991).

In determining whether a work environment is objectively intolerable, a plaintiff's failure to apply for available job transfers (*Sanchez*, 164 F.3d at 534); resigning three months after the most significant incident, applying/interviewing for jobs before resigning (*Land v. Midwest Office Tech., Inc.*, 114 F. Supp. 2d 1121 (D. Kan. 2000)); failing to report the alleged negative treatment to HR, providing notice of resignation and completing the notice period (*Klindt v. Honeywell Int'l*, 303 F. Supp. 2d 1206, 1218 (D. Kan. 2004; *Bermudez v. City of Topeka*, No. 5:18-CV-4141-HLT-ADM, 2020 U.S. Dist. LEXIS 5747 at *18-19 (D. Kan. Jan. 14, 2020)) are all factors courts have determined indicate the plaintiff resigned of her own free will.

### a. There is not a genuine issue of fact about whether Pfannenstiel was constructively discharged.

No one suggested to Pfannenstiel that she leave, in fact, they offered her a transfer. (SOF 59). There is no evidence of working conditions so intolerable that a reasonable person in her position would have felt compelled to resign. Her February 2020 meeting about the letter happened

more than six months before retirement, so did not make her work conditions intolerable. She had contemplated retiring months earlier and had been asking KPERS to calculate her benefits for months. (SOF 57). Pfannenstiel accelerated her retirement date the same day Majors Kellerman and Harrington were terminated, but has no proof that their leaving made her work conditions intolerable. (SOF 57).  She provided two and half weeks' notice before retiring. (SOF 58). She admits she had the opportunity to work in another position, but she was not interested. (SOF 59).

### b.  Meader was not constructively discharged

There is no material issue of fact about whether Meader's work environment was so intolerable that a reasonable person in her position would have felt compelled to resign. Five months passed between her last encounter with Jones and her resignation and nothing bad had happened to her. (SOF 135). She got a job even before Sauer asked her to quit visiting so much during work hours. She waited until she obtained another job before resigning from KHP, and she worked at KHP for nearly a month after she received her job offer. (SOF 143, 146). These facts, similar to those in *Land*, *Klindt*, and *Bermudez*, all demonstrate Meader voluntarily resigned of her own free will.

### c.  Cooper was not constructively discharged.

Cooper cannot prove intolerable working conditions through discriminatory conduct such that a reasonable person in the employee's position would feel compelled to resign. Cooper planned to leave the KHP altogether before she even transferred to Troop C. (SOF 183). She applied for more jobs while in Troop C because she wanted to change to a career more in keeping with her college degree. (SOF 184). She gave two weeks' notice before she resigned. (SOF 180). She then reapplied to the KHP within a couple of months after she departed, telling Col. Jones in writing that she previously quit for reasons unrelated to her lawsuit. (SOF 184). Cooper did not

seek a transfer when she was unhappy after two months, though she knew from experience that one likely would have been granted. She did not even file a complaint with HR or her change of command before voluntarily quitting. She was at Troop C a very brief time. There is no evidence her work conditions were intolerable.

### H. The State should be granted summary judgement on Pfannenstiel and Harrington's Title VII claims for retaliation (Counts 7, 14, 15) because they did not establish their prima facia case.

A prima facia case of retaliation requires a plaintiff to show: (1) she engaged in protected activity; (2) she suffered an adverse employment action during or after her protected activity, which a reasonable employee would have found materially adverse; and (3) there was a causal connection between the protected activity and the adverse action. *Reynard*, 2022 U.S. Dist. LEXIS 182728, *22 (quoting *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1219 (10th Cir. 2013)). *See also, Singh v. Cordle*, 936 F.3d 1022, 1042 (10th Cir.2019).

Protected activity requires opposition to illegal discrimination. "[T]he relevant question ... is not whether a formal accusation of discrimination is made but whether the employee's communications to the employer sufficiently convey the employee's reasonable concerns that the employer has acted or is acting in an *unlawful* discriminatory manner." *Garcia-Paz v. Swift Textiles, Inc.*, 873 F. Supp. 547, 560 (D. Kan. 1995) (emphasis added) (opposition related to "personal grievance[s]" rather than unlawful employment practices is *not* protected activity)*; see also Meier v. Shawnee Mission Med. Ctr., Inc.*, No. 18-cv-2368, 2019 U.S. Dist. LEXIS 160896, *28, (D. Kan. September 19, 2019)(Summary judgment granted because complaint that supervisor "would raise his voice and be visibly angry, was dismissive of information she provided, embarrassed her, would make accusations towards her and would not listen to or believe what she said" was not adequate evidence of protected activity.); *Lucas v. Office of Colo. State Pub. Def*, 705 Fed. App'x 700, 706 (10th Cir. Aug. 4, 2017)(Even calling it a "hostile work environment" is

inadequate without a reference to race or gender discrimination); *Taher v Wichita St. Univ.,* 526 F. Supp. 2d 1203, 1221 (D. Kan. 2007) (no protected activity exists where plaintiff complained of "discrimination" and "harassment," but did not complain that such action was motivated by his national origin).

Proving a causal connection requires proof that decisionmakers knew of the protected activity. There is no fact question about when Jones and De Vore learned that there had been complaints. In June 2020, Jones learned there had been unsubstantiated allegations, but not who made them or what they were. (SOF 28). In July 2020, he learned from Cooper and Mock about Meader, McCurdy and Harrington's complaints. (SOF 34-35). Pfannenstiel never made accusations in the independent investigation, so it makes sense that he did not learn about her allegations about the IMs then. An employer's action against an employee cannot be *because* of that employee's protected opposition unless the employer knows the employee has engaged in protected opposition.

### 1. Pfannenstiel did not engage in protected activity.

Pfannenstiel never confronted Jones or Murphy about their behavior. She claims that she "initiated a complaint" to the D of A *on behalf of other employees*. (ECF 194, p. 6). She then alleges that D of A "circulated the complaint to the KHP command staff," which is just not true. (ECF 194, p. 7). Jones, De Vore and Knowlton all testified that no one gave the report to Jones or De Vore. (SOF 29-30) Neither saw the D of A investigative report until 2022. Even when they learned there had been an investigation, Jones and De Vore did not know that Pfannenstiel herself had complained. (SOF 32)

### a. Doing her job is not opposing illegal activity.

"[E]mployees required as part of their job duties to report or investigate complaints of discrimination cannot claim that such reporting or investigating itself is a protected activity under the opposition clause because conveying another's discrimination complaint is not the same as opposing unlawful practices." *Loudon v. K.C. Rehab. Hosp., Inc*., 339 F. Supp. 3d 1231, 1238 (D. Kan. 2018); *Robinson v. Wichita State Univ.*, 2018 U.S. Dist. LEXIS 22983 (D. Kan. 2018). For Pfannenstiel to have engaged in protected activity under the manager rule, she must have "stepped outside" her role of representing the State and either filed—or threatened to file—an action adverse to defendant, actively assisted other employees in asserting their Title VII rights, or otherwise engaged in "activities that reasonably could be perceived as directed towards the assertion of rights protected by [Title VII]." *Id.* (citing *McKenzie v. Renberg's Inc*., 94 F.3d 1478, 1486-87 (10th Cir. 1996)).  And someone would have to have known about it. She did not assert her own complaint until after she retired. She complained in February,  but she did so internally. She participated in internal investigations and conferences rather than encouraging or facilitating EEOC complaints.

### b.  Pfannenstiel could not have had a good faith belief that the IMs and a single encounter with Murphy created a hostile work environment.

For protected activity, the employee must have a good faith belief that the conduct about which they complained violated Title VII. Pfannenstiel could **not** have believed that the emoji-filled brief IM exchange with Jones and the "demonstration" by Murphy a few months later created an atmosphere that was severe or pervasive that she had an actionable claim.

### c.  Pfannenstiel cannot create a fact question about whether she was subjected to materially adverse action.

In the pretrial order, she claims she was cut out of meetings, excluded from discussions about policy and procedure changes, had her recommendations ignored, "repeatedly" accused of sending anonymous correspondence to the Governor's office, and ignoring her recommendations.

(ECF 194, p.7). None of these meet the standard of material adverse employment actions. Having recommendations disregarded is just an unfortunate part of the role of an HR Director. It happens all of the time and does not negatively affect her career.

### d. Pfannenstiel cannot create a fact question about a causal connection between her complaints and the decisions about which she complains.

Central to a claim of retaliation is some evidence that the decisionmakers know of protected activity. She did not have her television clips aired or file an EEOC complaint until **after** she left KHP. Jones and De Vore did not know she was complaining of her own treatment until then.

In the pretrial order she alleges that she was cut out of meetings and her recommendations were ignored though the same recommendations were accepted "when made by her male counterparts." ECF 194, p.7. Comparing herself to unidentified males is not evidence of retaliation.

Plus, her timing is off. She cited to two instances as retaliation. In Ex 108, she advises Jones in March 2020 that she thinks he should have promoted a woman. (SOF 15). That prior to Jones or De Vore learning about any complaints she has made against Jones. In Ex 115, she complains to her supervisor Kibbe in May 2020 that people are suggesting policy modifications without taking her advice[8]. (SOF 47). This is before anyone is aware she has complained. The role of a Director of HR is to review changes and give input. (SOF 15). There is nothing nefarious or unusual or punitive to Pfannenstiel about others not taking her advice.

### e. There is no evidence that her participation in meetings or her input on policies was ignored for anything but legitimate non-discriminatory reasons.

Knowlton notes that management is not required to adopt all of HR's recommendations. (SOF 15). She has not provided evidence of any decision that was made to retaliate against her.

---

[8] Ex 115 demonstrates that despite claiming she was not consulted, she "voted" and commented, and she was consulted by the decision-making team.

**2.  Harrington cannot create issues of material fact on whether she engaged in protected activity, whether she suffered materially adverse action, whether there is a causal connection or whether there were legitimate non-discriminatory reasons for decisions about which she complains.**

Harrington alleges that when Jones "smacked" her shoulder blade with the palm of his hand in August 2019, she responded by saying "that's highly inappropriate." (SOF 74). She has claimed that he retaliated for that, but saying "highly inappropriate" is not protected activity. Calling a "smacking" on the back "highly inappropriate" could have been a protest against horseplay, or a joke, or that Jones was late , or that he was wasting her time, or that hurt. There is nothing about the statement that would have notified Jones **on their very first encounter** that she was accusing him of violating Title VII. Harrington's earliest protected activity would have been in 2020.

Much of what Harrington complains about—her 150 day PIP, her unsatisfactory review—is in the nature of increased supervision that this court found insufficiently adverse to state a claim in *Reynard*, 2022 U.S. Dist. LEXIS 182728 at *23-24. Monitoring and requiring an employee to comply with policy does not qualify as an adverse employment action. *Keller v. Crown Cork & Seal USA, Inc.*, 491 F. App'x 908, 914 (10th Cir. 2012) ("Strict application of policies, increased supervision, write-ups,…communication with her supervisors, and restrictions on her employment relationships" not adverse). Placing Plaintiff on a PIP is not a materially adverse employment action. *Payan v. United Parcel Serv.*, 905 F.3d 1162, 1172-74 (10th Cir. 2018); *see also Anderson v. Clovis Mun. Sch.*, 265 F. App'x 699, 704 (10th Cir. 2008) ("growth plan" not an adverse employment action). Here, Harrington successfully completed her review period and her performance improved. (SOF 103).

Harrington cannot establish causation. Jones did not learn she had complained until July 2020 (SOF 34-35), and the PSU investigation and unfavorable evaluation and PIP happened almost a year after that. (SOF 83). To connect her protected activity with adverse employment actions,

she must present evidence of causation based on more than speculation. *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1209 (10th Cir. 2018).

Temporal proximity can lead to a finding of pretext, but it is not enough standing alone. *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1236, n. 10 (10th Cir. 2015). Usually, it must be combined with other evidence for the adverse employment action to be pretextual. See *Hysten v. Burlington N. Santa Fe Ry. Co.*, 296 F.3d 1177, 1183-84 (10th Cir. 2002) (three-month period between the protected conduct and termination—no inference of retaliation). Decisionmakers must knew of the protected conduct. *Metzler v. Federal Home Loan Bank of Topeka*, 464 F.3d 1164, 1171-72 (10th Cir. 2006). When intervening events occur between the protected activity and the adverse action, temporal proximity has minimal probative value. *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 1001-02 (10th Cir. 2011).

The PSU investigation and her troop members' complaints coupled with the admissions she made of insubordination led to the unsatisfactory evaluation and the PIP. (SOF 94, 99). She complains about not getting a written complaint but nothing that happened to her eviscerates KHP's reasonable reliance on the PSU findings. Her accusations that Dean or others initiated the complaints against her or influenced the investigation are desperate attempts to avoid the consequences of her own actions.

PSU found that Harrington was insubordinate. Dean could not get her to follow his directions and this resulted in an unsatisfactory review and a PIP. She has no evidence that this legitimate non-discriminatory reason is pretext for discrimination. (SOF 99). Pretext is judged by the facts as they appeared to the person who made the decision, not the plaintiff. *United States ex rel. Coffman v. City of Leavenworth*, 303 F. Supp. 3d 1101, 1129 (D. Kan. 2018).

Respectfully submitted,

HITE, FANNING & HONEYMAN L.L.P.

/s/ Gaye B. Tibbets
Gaye B. Tibbets, #13240
Jon E. Newman, #16612
D. Pamela Saenz, #28948
100 N. Broadway, Ste. 950
Wichita, KS 67202-2209
Telephone: (316) 265-7741
Facsimile: (316) 267-7803
*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on December 12, 2022, the above and foregoing *Motion for Summary Judgment* was filed with the court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

/s/ Gaye B. Tibbets