# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **SUSAN PFANNENSTIEL, et al.,** | |
| **Plaintiffs,** | |
| **v.** | **Case No. 5:21-cv-04006-HLT** |
| **KANSAS, STATE OF, et al.,** | |
| **Defendants.** | |

## MEMORANDUM AND ORDER

Plaintiffs Susan Pfannenstiel, Amber Harrington, Natasha McCurdy, Kimberly Meader, and Jarah Cooper bring claims under 42 U.S.C. § 1983 and Title VII against Herman Jones, Jason De Vore, and the State of Kansas. The 15 claims stem from each woman's employment with the Kansas Highway Patrol ("KHP").

Defendants move for summary judgment on all claims. Doc. 195. The Court finds that Jones and De Vore are entitled to qualified immunity on Plaintiffs' § 1983 claims because Plaintiffs do not identify clearly established law. Plaintiffs' Title VII claims against the State also fail for the reasons discussed. Plaintiffs' request to file a surreply (Doc. 208) is also denied because the reply did not raise new arguments or rely on inappropriate caselaw.

## I.       BACKGROUND[1]

Plaintiffs are current and former KHP employees. Doc. 194 at 2. Jones became KHP Superintendent in April 2019. De Vore became Lieutenant Colonel in May 2019. SOF 1.

---

[1]   The following facts are properly supported and either not genuinely disputed or construed in favor of Plaintiffs. Additional facts are taken from stipulations in the pretrial order. Doc. 194.

A.      **Pfannenstiel**

Pfannenstiel was the HR director for the KHP from 2017 until September 2020. SOF 12. She reported to Major Scott Harrington at the KHP and Craig Kibbe at the Department of Administration ("DOA"). *Id.* Kibbe's boss at the DOA was Kraig Knowlton. *Id.* Pfannenstiel's duties included overseeing EEOC matters. SOF 13. She took complaints of discrimination, investigated them, and reported them up the chain of command. *Id.* If complaints were against an agency head, she would report them to her supervisors at the DOA. *Id.*

In October 2019, Pfannenstiel and Jones had the following exchange over instant message:

> [10/10/2019 4:13 PM] [Jones] Getting our money's worth from you this week huh!
>
> [10/10/2019 4:13 PM] [Pfannenstiel] what an understatement (facepalm emoji) It's all good (thumbs up emoji)
>
> [Jones] Well at least I know you're not sleeping on the company's couch. (smiley with tongue hanging out emoji)
>
> [Pfannenstiel] WE have a couch? Wait...no one told me
>
> [10/10/2019 4:17 PM] [Jones] See, you've been soooooo busy, you didn't even notice the beige couch in the corner. Since you're not using it I'm going to have it removed and place elsewhere. (mmm emoji)
>
> [10/10/2019 4:18 PM] [Pfannenstiel] I see, ok fine (sleep emoji)
>
> [10/11/2019 8:25 AM] [Jones] And you came back?!
>
> [10/11/2019 8:25 AM] [Pfannenstiel] Yes sir
>
> [10/11/2019 8:27 AM] [Jones] I guess you don't need that couch after all huh!
>
> [10/11/2019 8:27 AM] [Pfannenstiel] I guess not
>
> [10/11/2019 8:39 AM] [Jones] Have a great day and thank you for all that you do to advance the agency and Kansas. (thumbs up emoji)

[10/11/2019 8:40 AM] [Pfannenstiel] I am dedicated to the KHP and OPS as well. Have a nice day.

[10/11/2019 8:40 AM] [Jones] Yelp ma'am!

Doc. 194 at 3-4. Pfannenstiel felt harassed because of the exchange. SOF 43. She found the messages offensive and suggestive. *Id.* Scott Harrington observed Pfannenstiel to be visibly shaken by the exchange. SOF 189. He took it to mean something sexual and thought Pfannenstiel did too. *Id.*

In December 2019, KHP Major Mike Murphy went into Pfannenstiel's office, closed the door, and said he wanted to demonstrate the way a female employee had approached him. SOF 44. He got close to Pfannenstiel's face and grabbed her hands, which had been in her lap. *Id.* She pushed him back, said he was in her personal space, and he moved back. *Id.* (including response and reply). Pfannenstiel was interviewed as part of an investigation later initiated by the governor, but she did not complain about the instant messages or the incident with Murphy. SOF 37.

By February 2020, Jones and De Vore knew that unidentified individuals were being critical of Jones and his leadership team. SOF 25. On February 10 or 11, 2020, Pfannenstiel met with Jones and De Vore to discuss an anonymous letter that had been sent to the governor. SOF 47-48 (including response). The letter accused Pfannenstiel of not doing her job by allowing misconduct to occur and not reporting it. SOF 50. Jones and De Vore said the letter "had [Pfannenstiel's] name all over it" when it accused her of shirking her job duties. SOF 49, 51. According to Pfannenstiel, Jones said that "if he found out who wrote the [anonymous letter to the governor] or who had anything to do with this information, he would see that they have a parting of the ways with this agency." *See* SOF 47 (including response). Jones's posture was very threatening and both he and De Vore were in uniform with weapons showing. *Id.* De Vore said Pfannenstiel should watch what she says in the future because people were being critical of her.

*Id.*; SOF 52. Pfannenstiel reported this meeting to Knowlton and Kibbe, and Knowlton said that while the tone of the message was not ideal, it was good advice. SOF 53.

Pfannenstiel also alleges interference with her work as HR director. SOF 190. She contends it was impossible for her to direct her staff because policies and regulations were being usurped. *Id.* Her statements, recommendations, and input were discounted at staff meetings in front of management staff. *Id.* Jones also discounted her suggestions regarding policy changes and hiring and left her out of conversations that required the HR director's input. *Id.* She was treated like a secretary. *Id.*

Pfannenstiel specifically claims she was retaliated against when interview panels were changed without informing her and other policies were changed without vetting the changes through her or consulting her. SOF 46 (including response). These two complaints are reflected in emails from March 20, 2020, and May 12, 2020, though it's not clear when the actual underlying events occurred. *See id.*

On July 23, 2020, Pfannenstiel sent an email saying there had been "a major shake up here" and wished to change her retirement date. SOF 56.[2] This was the date Josh Kellerman and Scott Harrington were fired. *Id.*; Doc. 194 at 5. Pfannenstiel retired on September 1, 2020, after providing 2.5 weeks' notice. SOF 57. Her employment was not terminated, and she was not asked to resign. *Id.* Kibbe and Knowlton offered to transfer Pfannenstiel to a different department, but she declined. SOF 58 (including response and reply). However, there was no specific job offer. *Id.* She filed an EEOC complaint on September 10, 2020. Doc. 194 at 4.

---

[2]    The email was sent to a KPERS employee. Doc. 196-31 at 3.

B.      **Harrington**

Harrington is a KHP captain.[3] *Id.* On August 16, 2019, Harrington attended a meeting with Jones and De Vore. *Id.* Jones touched or "smacked" Harrington on the back of her shoulder. *Id.*; SOF 73. Harrington told Jones it was highly inappropriate. SOF 73. Jones touched her again and said "there, I take it back." *Id.* On October 31, 2019, Jones was going down a row of chairs at a training, and when he came behind Harrington, he placed his hand on her shoulders and started patting them and then brushed against her arm. *Id.* According to Harrington, he "purposely glided his hand across [her] left arm nice and slow." *Id.* (response). On December 27, 2019, Harrington was presenting plaques at a retirement ceremony, and although she did not realize it at the time, another officer said he saw Jones put his hands on her shoulders. *Id.* Jones has not touched Harrington since December 2019. Doc. 194 at 4. Jones's executive assistant stated she never saw Jones touch any male employee the way he touched Harrington. SOF 191. Jones has never made a suggestive or offensive comment to Harrington, and she has not seen him touch other women. SOF 70. Nor has she heard De Vore suggest women should not be in law enforcement or make offensive jokes about women. SOF 71.

Harrington said Pfannenstiel told her about the February meeting Pfannenstiel had with Jones and De Vore. SOF 65 (including response). She also claims that a "Week in Review" email from December 5, 2020, authored by Jones suppressed her speech because it referenced social media and stated "we should remind ourselves of how not to tarnish the reputation of the [KHP]" and "to conduct ourselves in a manner that adheres to and abides by the polices of the [KHP]." SOF 6-7, 64 (including responses). Harrington does not use social media. SOF 63. Jones would

---

[3]   Plaintiff Amber Harrington and Scott Harrington are siblings. For clarity, the Court refers to Plaintiff Harrington as "Harrington," and Scott Harrington by both names.

sometimes use an analogy involving a canoe, meaning that "if someone is not rowing properly, that throws the movement forward off. So my . . . analogy is that we all need to be in a line to move forward." SOF 3 (including response). According to Jones, those who didn't "get in the canoe" would be dealt with, but the parties dispute what "dealt with" would entail. *See id.* (including response and reply). Harrington stated that the "canoe" statement also suppressed her speech. SOF 65 (response). Harrington spoke to legislators about Jones's conduct in 2019, 2020, and 2022. SOF 67. She contends she would have spoken to more legislators and more openly but for the hostile work environment at the KHP. *Id.* (response); SOF 69. However, neither Jones nor De Vore knew Harrington had spoken to legislators about Jones. SOF 68.

Harrington filed an EEOC complaint on September 10, 2020. Doc. 194 at 4. She alleged discrimination and retaliation occurring on August 1, September 10, October 2, 14, and 31, and December 27, 2019. *Id.*

On May 13, 2020, Harrington was told that troopers under her command would be trained by the KLETC, which is the state law enforcement training academy, instead of by the KHP. SOF 192. Harrington estimated that it would costs $18,000 to train troopers through KLETC. *Id.* She believed this was done to retaliate against her. *Id.*

In August 2020, Major Andrew Dean became Harrington's supervisor. Doc. 194 at 4. Dean was not aware that Harrington had complained of discrimination or a hostile work environment until he learned of her EEOC complaint. SOF 77. Shortly after Harrington filed the EEOC complaint in September 2020, Dean asked Harrington to have her troops stay near the Capitol and Cedar Crest, and to have a schedule for officers at the Capitol. SOF 79-80. Dean wanted to ensure uniformed officers were present when legislative bodies or committees were in session. *Id.* Harrington believes this request was made in retaliation for her EEOC complaint. *Id.*

In January 2021, a KHP employee complained to Dean about how she was being treated by Harrington. SOF 82. Harrington believes Dean convinced the employee to complain because they are acquainted socially. SOF 83. The KHP Professional Standards Unit ("PSU") is the KHP's internal affairs unit. Doc. 194 at 4. As a result of the allegations, the PSU requested permission from Jones to suspend Harrington pending the outcome of the investigation. SOF 86. Jones subsequently put Harrington on administrative leave with pay in the spring of 2021 while the PSU investigated the complaints against her. SOF 95. When she was placed on administrative leave, her patrol car and keys were taken, and her email access was suspended. SOF 97. According to Defendants, this was done because they suspected Harrington was making derogatory statements about KHP leadership and was trying to organize a rebellious attitude among her subordinates. *Id.* This was also shortly after Jones was served with a summons in this case. SOF 95 (response). Harrington denies she was insubordinate. SOF 93 (including response) The PSU found the harassment allegations against Harrington to be unsubstantiated. SOF 88. But the PSU determined Harrington had been insubordinate. SOF 98. Harrington believes her supervisors manipulated the PSU process due to procedural differences in how her case was handled. SOF 90.[4]

Harrington returned to work on June 14, 2021. SOF 99. That same day, Dean gave Harrington an unsatisfactory review, citing the PSU investigation findings. SOF 100. The unsatisfactory review did not prevent Harrington from applying for a promotion. *See* SOF 101. According to Dean, he reprimanded her and placed her on a 150-day performance review because of the PSU investigation. SOF 102. She completed the review period successfully. *Id.*

---

[4]   Plaintiffs controvert many of the facts surrounding the PSU investigation because a jury could rely on the totality of the circumstances to find Jones's or Dean's testimony about this event unworthy of belief. But whether there is a genuine dispute of fact on a particular <u>issue</u> does not mean a particular <u>fact</u> itself is in dispute.

On January 6, 2022, Dean sent an email to Harrington and several other KHP employees stating that inquires or requests received from the media, the legislature, or the governor's office should be vetted through the chain of command before responding. SOF 81. According to Harrington, this had never been a requirement before. *Id.* (response).

Harrington has not lost out on promotions or wages since Jones took over as Superintendent. SOF 59.

### C.     McCurdy

McCurdy became a KHP state trooper in 2016 and is still employed by the KHP. Doc. 194 at 4. She worked out of the Troop B office in Topeka. *Id.*

McCurdy alleges four incidents with Jones. First, on April 19, 2019, Jones pulled McCurdy in for a hug. SOF 107. The hug was unwelcome. SOF 112 (including response). She never discussed it with Jones, even though her mentor advised her to if she was uncomfortable with Jones hugging her. SOF 111. Second, in September 2019, Jones hugged McCurdy at a KU football game, even though McCurdy had extended her hand for a handshake. SOF 113 (including response). She described it a quick, chest-to-chest, tight hug. *Id.* Third, Jones hugged McCurdy in February 2020. She does not recall the details other than it was awkward. SOF 114. Fourth, at a June 2020 training, Jones tries to get McCurdy's attention by calling "woman, woman, hey woman" from the other end of the table. SOF 115. McCurdy found it disrespectful. *Id.* (response). Jones testified he called her "woman" because he could not remember her name. SOF 116. McCurdy never reported these incidents to HR. SOF 117. Pfannenstiel later learned about them from someone else. *Id.* Pfannenstiel told her other people had complained about Jones, but McCurdy didn't learn the details of those complaints until later. *See* SOF 118.

Neither Jones nor De Vore spoke to McCurdy about the KHP social-media policy or what she could say or not say. SOF 104. McCurdy claims her speech was suppressed in three ways. First, in 2021, a KHP lieutenant told McCurdy that a KHP captain was monitoring her social media for Jones. SOF 105. Second, De Vore told Pfannenstiel at some point that all complainants' jobs would be terminated if the harassment allegations against Jones did not disappear. *Id.* Third, McCurdy contends the KHP's social-media policy suppressed her speech. *Id.* (response).[5] Neither Jones nor De Vore asked a KHP captain to monitor anyone's social media. SOF 4. McCurdy was also told by a KHP lieutenant to be careful of her social-media posts, but neither Jones nor De Vore instructed him to relay that to McCurdy. SOF 121. And even though someone complained to HR on McCurdy's behalf, nothing bad happened to her as a result. SOF 119.

McCurdy states that, if her speech had not been suppressed, she would have shared her side of the story about her interactions with Jones and explained her feelings so others would not think badly about her and would have shared posts on social media about sexual harassment and the hostile work environment. *See* SOF 120 (including response and reply).

McCurdy filed an EEOC complaint on September 25, 2020. Doc. 194 at 4.

### D.      Meader

Meader began working as an administrative assistant at the KHP in 2017. Doc. 194 at 5. Meader's supervisor was Kellerman, until Kellerman was fired in July 2020. *Id.* Major Eric Sauer became Meader's supervisor on August 9, 2020. *Id.*

---

[5]   It's unclear what portion of the social-media policy McCurdy is stating suppressed her speech. KHP has two policies. One relates to KHP official social-media accounts (as opposed to personal social-media accounts). The only provision of that policy highlighted by Plaintiffs says: "Employees are cautioned that information posted to social media can have detrimental effects on one's professional life and/or personal life." SOF 9 (including response). The policy relating to personal social-media accounts states that employee speech may be protected if it relates to matters of public concern where the employee is speaking as a private citizen. SOF 10.

Meader alleges a sex-based hostile work environment based on four incidents. First, in October 2019, Jones grabbed Meader's hands to show how cold his hands were, which made Meader uncomfortable. SOF 127. In October or November 2019, Jones shook Meader by the shoulders and sang "shake it for me," which Meader found to be uncomfortable and sexual in nature. SOF 128. Meader did not tell Jones to not touch her during or after these incidents. SOF 129. In February 2020, Jones stood close behind Meader for an extended time to the point she could feel his breath on her neck and asked if she was uncomfortable. SOF 130. Meader responded, "yeah, kind of." *Id.* Jones laughed and walked away. *Id.*

From March to May 2020, Meader worked from home because of COVID-19. SOF 132. The fourth incident with Jones occurred when she returned to work in late May 2020. SOF 133. Jones shook her hand and joked about welcoming a new employee. *Id.* When he reached for her hand, which was in her lap, Jones grazed her leg. *Id.* Meader was uncomfortable. *Id.* Jones rubbed Meader's right shoulder as he walked away. *Id.* Jones did not touch Meader after May 2020. SOF 134. But Meader testified that Jones made "frequent" comments about her posture and how she was sitting, including that a lot of "girls" or "people" don't sit with their legs crisscrossed. *Id.* (response). But Meader didn't find those comments to be sexual harassment. *Id.* (reply).

Meader did not initially report her complaints to HR. SOF 135. But when she returned to work in May 2020, Meader complained to Pfannenstiel. Doc. 194 at 5. Pfannenstiel told her she needed to make a statement or gesture to Jones that his actions were unwelcome, but Meader never did. SOF 136. Meader never saw Jones touch anyone else inappropriately, though she was aware that Jones had told another female KHP employee that "she sounded like a sex phone [operator]." SOF 137. Jones's executive assistant stated she never saw Jones touch any male employee the way he touched Meader. SOF 191.

Meader spoke to De Vore less than five times, and none were about her speech. SOF 122. Jones never said anything to Meader verbally that made her feel like she couldn't speak out. SOF 123. But Meader did recall some emails sent by Jones that referenced "picking the right people to hang out with" and "making sure you're in the right group." *Id*. [6] Meader states that, had her speech not been suppressed, she would have expressed support for Scott Harrington and Kellerman. SOF 124. Meader also states she wanted to express support for statements Scott Harrington and Kellerman made about the illegal activities of Jones and De Vore, though she has not identified any such statements. SOF 125.

On September 10, 2020, Meader was offered a job with Ag Partners Cooperative. SOF 142. On September 14, 2020, Sauer met with Meader and discussed arriving on time, limiting breaks, and spending too much time in a coworker's office. SOF 139. Meader assumed this limited her from taking lunch breaks with that coworker. SOF 140. Meader submitted her resignation to the KHP on October 5, 2020, stating that she had accepted another position with a private company. SOF 143; Doc. 194 at 5. Meader's last day with the KHP was October 9, 2020. Doc. 194 at 5. On December 1, 2020, Meader filed an EEOC complaint alleging discrimination between April 2019 through October 2020. *Id*.

### E.     Cooper

Cooper started working for the KHP as a state trooper in 2017. SOF 146. She began dating another trooper, Lucas Byron, in April 2020. SOF 147. She learned she was pregnant in October 2020. *Id*. She requested and was granted a hardship transfer in October 2020 to Troop C. SOF 148. On October 20, 2020, she began a limited duty assignment due to pregnancy. *Id*.

---

[6]   In response to the statement that Jones never said anything to suppress speech, Meader controverts this fact in part and refers to the December 5, 2020 "Week in Review" email that referenced the KHP's social-media policy. SOF 123 (response). But as Defendants point out, Meader resigned the KHP in October 2020, so its not clear how she would have seen that email. *Id*. (reply).

Lieutenant Proffitt supervised both Cooper and Byron. SOF 149. At one point, Proffitt "corrected" Byron for bring Cooper a water bottle at the office instead of going to his work area. SOF 150. Cooper contends this was unusual because troopers working in the field were usually afforded leniency. *Id.* (response). Proffitt also counseled Byron about excessive texting. SOF 152. Proffitt said Cooper and Byron should expect others to look at them differently because of their relationship. SOF 149. However, Cooper was never disciplined while at Troop C, though Byron was. SOF 153. Cooper testified that working with Proffitt caused her anxiety. SOF 201.

Proffitt testified that he goes to all his trooper's residences once or twice a year for emergency response purposes. SOF 154. Proffitt had gone to another trooper's residence twice because that trooper was suspected of being at home during work hours. SOF 157.[7] He had been to Byron's residence before Cooper moved there. SOF 154. On a few occasions,[8] Proffitt went by the apartment when Cooper and Byron both lived there. Once he went to find Cooper when he thought she was supposed to be at work but was not. SOF 155. Another time, Proffitt was seeing if Byron was timely going to his work assignment. SOF 156. Cooper also testified that Proffitt once went to the office and her home to check her whereabouts, and that he also told her about another time he went to her home to look for her. SOF 196-197. Cooper also testified that her husband once caught Proffitt "spying" on the apartment at 7:15 a.m., before work hours. SOF 198.[9]

Cooper was limited to driving one hour per shift because of a medical condition that made driving while pregnant uncomfortable. SOF 159. She also had light duty restrictions and was given a limited duty assignment that required her to be in the office from 8 a.m. to 5 p.m. SOF 160.

---

[7]   Plaintiffs supplement these facts by distinguishing Proffitt's conduct as "stak[ing] out" Cooper's residence.

[8]   The precise number of times Proffitt went to Cooper and Byron's residence is not entirely clear from the record.

[9]   Defendants object to this fact as hearsay. But even if Plaintiffs rely on hearsay for purposes of summary judgment, it's likely there would be an admissible way to present this evidence at trial.

Although Proffitt was her direct supervisor, she received her limited duty work assignments from Lieutenant Edna Cordner. SOF 161. Cooper contends she was treated differently than a male trooper who was also on limited duty because of an injury, in that Cooper was micromanaged. SOF 162. Specifically, Cooper states that the other trooper told her that he was allowed to work from home and could come and go as he pleased. SOF 199. Cooper had similar restrictions, but her work came with strict limitations on when and where she did her work. *Id.* Although Cordner managed both limited duty assignments, the male trooper belonged to a different troop, had different restrictions, and reported to a different superior. SOF 163-164. Cooper's supervisors also discussed having her check VIN numbers, but they didn't want her to have direct personal contact with the public. *See* SOF 200 (including reply). But it was unclear whether that was because of COVID-19 concerns. *See id.*

One of Cooper's claims of discrimination is based on the fact that she was not allowed to attend a human-trafficking training class in November 2020. SOF 165. The four-day class was in Topeka, which would have required Cooper to drive to and from Topeka for each of the four days. SOF 166. Cooper's supervisors told her she could not attend the class because it would require her to exceed her one-hour driving restriction. SOF 167. Cooper denies that it would have violated the restriction because the restriction was limited to one hour of driving per shift, and her travel to and from the seminar would have been on her own time. *Id.* (response). Cooper requested that her doctor change her driving restriction to three hours. SOF 168. But after she informed her supervisors that the restriction had been changed, they still denied her request to attend the class. SOF 169-170.

Cooper bases her hostile-work-environment claim on the fact that she was assigned to an office at the Troop C headquarters and that Proffitt told her she needed to be the best trooper she

could be, do her limited duty assignment to the best of her abilities, and make sure she was doing exactly what she was supposed to be doing. SOF 175-176 (including responses). Cooper also cites the water bottle incident and alleges that Proffitt drove to her workstation to ensure she as working, drove to her home to see why she was not working, checked on her whereabouts, followed up on her assignments, and asked her husband if she was enjoying her job. SOF 177.

Cooper contends that Jones's "Week in Review" emails were "threatening" and that "it was well known in his emails that if you spoke out against him, that you were against him if you said anything." SOF 171. She doesn't recall the dates or any other specifics of the emails. *See* SOF 172-174. But she did recall a reference about a canoe. SOF 174. She also states that a co-worker asked her if she had participated in the television interview (discussed below). SOF 184.

In the summer of 2020, Cooper had drafted a letter to the governor complaining about the KHP, but she was afraid to send it for fear she'd be fired. SOF 185. The letter stated that the KHP did not allow mourning bands to be worn as long as she had hoped after a trooper had committed suicide, that they were not allowed to make a "last call" on the radio for that trooper, that the debrief on the suicide was not as prompt as Cooper had hoped, that Jones and De Vore had revamped the KHP's structure, and that her "mentors and friends have been disrespected by sexism and sexual harassment," though Cooper herself had been given equal opportunities as her male counterparts. SOF 187.

Cooper never complained about an alleged hostile work environment. SOF 178. No one threatened to fire her or indicated her job was in jeopardy. SOF 179. Cooper submitted a resignation letter on December 17, 2020, effective December 31, 2020. *Id.* Had she not resigned, she would have continued limited duty, taken eight weeks of maternity leave, and returned to work at the KHP. SOF 180. She applied to several jobs, both before and after she transferred to Troop

C. SOF 181. She wanted to leave the KHP because she wanted to do more work combatting human trafficking and because she was upset with how the KHP treated her friend's suicide. SOF 181-182. However, a little over two months after she resigned, she wrote to Jones and asked to return to Troop C because she missed her job. SOF 183. She said she had resigned because of a change in her short-term goals, having her first child, and moving to a new area with Byron. *Id.*

Cooper filed an EEOC on December 2, 2020, alleging discrimination between October 20, 2020, and November 30, 2020. Doc. 194 at 6.

### F.    Investigations, Interviews, and Complaints

In the fall of 2019, Pfannenstiel documented some employee complaints about Jones making comments or touching them on the back or shoulder. SOF 15. But none of the employees were willing to go on the record. *Id.* Pfannenstiel later said she stopped forwarding complaints to the DOA because there could be no resolution without a formal complaint. SOF 17.

Harrington eventually did agree to have a meeting with Knowlton on February 21, 2020, which prompted the DOA to perform an investigation. SOF 19. As part of the investigation, the DOA interviewed Harrington, Meader, Pfannenstiel, and two others. SOF 21 (including response). Harrington stated that she hoped the investigation would "get rid" of Jones, De Vore, and certain other KHP leadership. SOF 22. But Harrington denies she ever said she was part of a "coup" to get rid of Jones and De Vore. SOF 20. The DOA investigation ultimately concluded that it could not substantiate the allegations of sexual misconduct or harassment by Jones. SOF 23. Despite the findings, the governor ordered an investigation into the complaints. *See* SOF 32. That investigation concluded the conduct was not sexual harassment under either KHP policy or Title VII. SOF 36.

Jones testified he did not see the DOA report until his deposition in 2022, and although Knowlton informed Jones about the investigation in June 2020, he did not provide a copy of the

report. SOF 28. However, Plaintiffs contend that April McCollum, who was Jones's executive assistant, testified that she recalled seeing a copy of the report. Though she could not recall where she had seen it, it may have possibly been in the newspaper or in Jones's mail. *See* SOF 27-28 (including response and reply). De Vore did not know of the details of the DOA report until his deposition, though he overheard someone tell Jones that the DOA had investigated complaints of sexual harassment. SOF 29.

Pfannenstiel, Harrington, McCurdy, and Meader did an interview with a journalist on August 17, 2020. SOF 41. The interviews aired on October 15, 2020, November 12, 2020, and December 5, 2020. *Id.* In the televised interviews, faces were shadowed and voices disguised. *Id.* Cooper also did a televised interview after she left the KHP. Doc. 194 at 6. Neither Jones nor De Vore questioned any female employees about the interviews or told anyone to question other employees about participating in the interviews. SOF 5.

## II.    STANDARD

Summary judgment is appropriate if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant to demonstrate that genuine issues remain for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). In applying this standard, courts view the facts and any reasonable inferences in a light most favorable to the non-moving party. *Henderson v. Inter-Chem Coal Co.*, 41 F.3d 567, 569 (10th Cir. 1994). "An issue of material fact is genuine if a reasonable jury could return a verdict for the nonmoving party." *Id.* (internal quotation and citation omitted).

III.     **ANALYSIS**

There are fifteen claims remaining in this case. Doc. 194 at 20-22.[10] Plaintiffs assert claims against Jones and De Vore individually under 42 U.S.C. § 1983 for First Amendment violations (Counts 4, 11, 18, 25, 28). Meader also asserts a § 1983 claim against Jones individually for hostile work environment (Count 24). Cooper asserts a Title VII discrimination claim based on sex and pregnancy[11] against the State (Count 29). Plaintiffs assert Title VII sex-based hostile-work-environment claims against the State (Counts 6, 13, 20, 27, 30). Finally, Pfannenstiel asserts a Title VII retaliation claim against the State (Count 7) and Harrington asserts two Title VII retaliation claims against the State (Counts 14, 15).

A.      **Proposed Surreply**

The Court initially considers Plaintiffs' motion for leave to file a surreply. Doc. 208. Surreplies are not typically permitted and are only allowed in rare circumstances, including where the movant raises a new argument in a reply brief. *See Dodson Int'l Parts, Inc. v. Williams Int'l Co., LLC*, 2020 WL 4904049, *1 (D. Kan. 2020).

Plaintiffs contend that Defendants argued for the first time in the reply that Plaintiffs are not allowed to rely on acts directed toward others in support of their hostile-work-environment claims. Doc. 208 at 2.[12] But as Defendants point out, this was not a new argument—it was in response to an argument made by Plaintiffs. *See* Doc. 201 at 38. Addressing an argument made in a response is not a new argument. *See Deffenbaugh v. Winco Fireworks Int'l, LLC*, 2009 WL 662650, *1 (D. Kan. 2009). And as Defendants also point out, they did not argue that Plaintiffs are

---

[10]   The Court previously dismissed several claims and some additional parties. *See* Doc. 98 at 40-42.

[11]   Although this is how the claim is phrased in the pretrial order, Doc. 194 at 22, Cooper does not otherwise discuss or argue pregnancy discrimination.

[12]   The Court notes that Plaintiffs' proposed surreply is not limited to this issue, although this is the only issue cited in the motion for leave. *See, e.g.*, Doc. 208-1 at 2-3.

not allowed to rely on acts directed toward others, only that the timing of such allegations does not support Plaintiffs' claims. *See* Doc. 207 at 21.

Plaintiffs also argue that they should be allowed to file a surreply because Defendants relied on a case, *Hirase-Doi v. U.S. W. Commc'ns, Inc.*, 61 F.3d 777 (10th Cir. 1995), *abrogated on other grounds by Burlington Indus. v. Ellerth,* 524 U.S. 742 (1998), *and Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), which they contend "is in conflict with, or inconsistent with, the Circuit's more recent decision in" *Hernandez v. Valley View Hospital Association*, 684 F.3d 950 (10th Cir. 2012), and that a surreply is needed to explain why *Hernandez* applies to the facts of this case. Doc. 211 at 2. But Plaintiffs cited to *Hernandez* in their response. *See* Doc. 201 at 38. Further, the Court notes that Plaintiffs rely on *Hernandez* in their proposed surreply to suggest that a plaintiff can rely on hostile acts towards others even if she just learned of those other acts in the <u>context of the lawsuit</u>. This is not what *Hernandez* held. *Hernandez* specifically says that harassment of others can be considered as long as the plaintiff "knew about the offending behavior." *Hernandez*, 684 F.3d at 959 (internal quotation and citation omitted). In *Hernandez*, there was a fact issue about whether the plaintiff knew of a particular racially offensive comment before summary judgment. But that was not dispositive of the claim because the plaintiff had heard several other racially tinged comments and jokes. Further, the defendant's argument in that case was not tied to <u>when</u> the plaintiff learned it, but whether she could rely on comments not directed at her personally. *Id.* In other words, the plaintiff in *Hernandez* could rely on the comment even if it was not directed at the plaintiff personally, but the Tenth Circuit did not find that she could rely on it even if she only learned about it during the litigation. *See id.*

Accordingly, the Court denies Plaintiffs' motion for leave to file a surreply.[13]

---

[13]   Even if the Court did substantively consider the proposed surreply, it would not change the outcome of this order.

**B.      42 U.S.C. § 1983 Claims**

All Plaintiffs assert § 1983 claims against Jones and De Vore in their individual capacities for violation of the First Amendment. Doc. 194 at 20-22. Meader also asserts a § 1983 claim against Jones alleging a sex-based hostile work environment. *Id.* at 21. Jones and De Vore have asserted various defenses to these claims, including qualified immunity.

### 1.      Plaintiffs' § 1983 First Amendment Claims (Counts 4, 11, 18, 25, 28)

Jones and De Vore raise several arguments in favor of summary judgment on the First Amendment claims. They argue that Plaintiffs did not suffer any cognizable injury to their First Amendment rights, that neither Jones nor De Vore spoke directly to any Plaintiff about her speech, and that the speech at issue is not constitutionally protected because it was either not made as a citizen or did not touch on an issue of public concern. *See* Doc. 196 at 39-51. Jones and De Vore also assert qualified immunity. *Id.* at 46.

Individuals sued in their individual capacities under § 1983 may assert qualified immunity. *Gutierrez v. Cobos*, 841 F.3d 895, 899 (10th Cir. 2016). The "assertion of qualified immunity creates a presumption that [the defendant is] immune from suit." *Perea v. Baca*, 817 F.3d 1198, 1202 (10th Cir. 2016). Once qualified immunity is asserted, the burden shifts to the plaintiff to show that the defendant violated a constitutional right that was clearly established at the time of the conduct. *Guiterrez*, 841 F.3d at 900. "When a defendant moves for summary judgment based on qualified immunity, a plaintiff must show a violation of clearly established law because, [u]nlike most affirmative defenses, the plaintiff bear[s] the ultimate burden of persuasion to overcome qualified immunity." *Id.* (internal quotation and citation omitted). If, and only if, a plaintiff meets this burden, then the traditional summary-judgment burden shifts back to the

defendant to show there is no genuine issue of material fact for trial. *Rojas v. Anderson*, 727 F.3d 1000, 1004-05 (10th Cir. 2013).

Here, Plaintiffs do not respond to the assertion of qualified immunity by Jones and De Vore on the First Amendment claims at all. Although they respond to some of the substantive arguments for certain Plaintiffs,[14] Plaintiffs fail to identify any clearly established law that aligns with the facts of this case as to any of the First Amendment claims. Based on this, the Court is obliged to find that both Jones and De Vore are entitled to qualified immunity on Plaintiffs' § 1983 First Amendment claims (Counts 4, 11, 18, 25, 28).

### 2.    Meader's § 1983 Hostile-Work-Environment Claim (Count 24)

Meader asserts a § 1983 claim against Jones for hostile work environment.[15] Doc. 194 at 21. Jones asserts qualified immunity. Doc. 196 at 59. As explained, once a defendant asserts qualified immunity, the burden shifts to the plaintiff. *Guiterrez*, 841 F.3d at 900.

To avoid a qualified-immunity defense, a plaintiff must not only show that the facts demonstrate a constitutional violation, but also that the violation was clearly established under Tenth Circuit or Supreme Court precedent. *See Pauly v. White*, 874 F.3d 1197, 1222 (10th Cir. 2017). There need not be a case that is factually identical. *Id.* But "existing precedent must have placed the statutory or constitutional question beyond debate" *Id.* (internal quotation and citation omitted). "[T]he right cannot be defined at a high level of generality; instead, the key is whether

---

[14]   As to Defendants' substantive arguments, Plaintiffs only respond as to Pfannenstiel and Cooper. *See* Doc. 201 at 33-35. They do not address the arguments as to Harrington, McCurdy, or Meader. *See Loudon v. K.C. Rehab. Hosp., Inc.*, 339 F. Supp. 3d 1231, 1242 (D. Kan. 2018) ("By failing to respond to Defendant's arguments, Plaintiff has abandoned this claim.").

[15]   Sexual harassment may be actionable under § 1983 and may be brought independent of a Title VII claim if it has a substantive basis other than Title VII, such as Equal Protection. *Mitchell v. City & Cnty. of Denver*, 112 F. App'x 662, 671 n.11 (10th Cir. 2004); *Notari v. Denver Water Dep't*, 971 F.2d 585, 587 (10th Cir. 1992).

the specific conduct has been clearly established as a constitutional violation." *Lincoln v. Maketa*, 880 F.3d 533, 537 (10th Cir. 2018); *see also Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).

In response to Jones's assertion of qualified immunity, Meader offers a brief and conclusory statement that "it has long been clearly established that a supervisor cannot subject an employee to a hostile work environment." Doc. 201 at 51. She cites to *Chavez v. New Mexico*, 397 F.3d 826 (10th Cir. 2005). The Court finds that Meader has not overcome Jones's assertion of qualified immunity on her § 1983 hostile-work-environment claim on the clearly established prong of the defense.[16]

The extent of her argument is that it is generally clearly established that a supervisor cannot subject an employee to a hostile work environment based on sex. Doc. 201 at 51. But the Supreme Court has repeatedly admonished lower courts to not apply such a high level of generality. *City of Tahlequah, Oklahoma v. Bond*, 142 S. Ct. 9, 11 (2021) ("We have repeatedly told courts not to define clearly established law at too high a level of generality.").

Although it is not clear whether Meader intends to rely on the facts of *Chavez* to show clearly established law, or just the general holding, the Court does not find that those facts would have put Jones on notice that his conduct in this case was unconstitutional. In *Chavez*, the defendant subjected women who worked with him to demeaning treatment because of their sex in

---

[16]  Meader does argue that there are sufficient facts from which a jury could conclude that she experienced a hostile work environment for purposes of both her § 1983 claim and her Title VII claim. Doc. 201 at 49-51. As discussed below, Meader has not demonstrated she was subjected to an objectively severe or pervasive hostile work environment under Title VII. Not all the facts in Meader's Title VII claim focus on actions by Jones. *Id.* at 50. As the Court has previously held, while it may be appropriate to consider all conduct by all actors for purposes of a Title VII claim, a "defendant is only liable under § 1983 when his own actions are independently sufficient to create a hostile work environment." Doc. 98 at 26-27 (quoting *Raspardo v. Carlone*, 770 F.3d 97, 115 (2d Cir. 2014)). To the extent Meader cannot establish a hostile work environment based on the conduct of both Jones and Sauer for purposes of her Title VII claim, it follows that she could also not establish a constitutional violation based solely on the conduct of Jones. Thus, although the Court discusses the "clearly established" prong above, Jones is also entitled to qualified immunity on the "constitutional violation" prong as well, for reasons discussed in the Title VII analysis below.

the following ways: situating himself in a chair "in an intimidating, forcefully seductive manner (almost vulgar)," asking a plaintiff to accompany him and his children trick-or-treating in a way that was intended to be "seductive," forcefully rubbing his front side against a plaintiff's backside, ogling a plaintiff's body, walking close to a plaintiff and calling her a "fucking bitch," staring at a plaintiff in a "lewd and lascivious manner" that prompted her to leave the room (which she did while he "massag[ed] his genitals"), and finally sexually propositioning a plaintiff in exchange for not issuing a reprimand letter. *Chavez*, 397 F.3d at 833-34. In addition to these incidents involving a specific defendant, one plaintiff experienced someone anonymously scratching her name off her mailbox and replacing it with "bitch," and another plaintiff received anonymous mail containing pictures of male genitalia with stickers that read "eat me bitch," "bite me," and "fuck me." *Id.* at 834. There were also numerous incidents of sex-neutral or retaliatory harassment, including a physical attack of a plaintiff, contacting authorities and alleging false criminal accusations, pursuing a plaintiff on the interstate in an aggressive and dangerous manner, and leaving a voicemail telling a plaintiff to "prepare to die." *Id.* at 834-35.

These facts are considerably different from Jones's conduct toward Meader, which involved three incidents of non-sexual touching that made Meader uncomfortable, the "shake it for me" incident, and the comments about her posture (which Meader did not believe was sexual harassment). Even assuming Meader had knowledge of some of the other incidents involving Jones, the Court does not find that *Chavez* would have put Jones on notice that he was creating a sex-based hostile work environment sufficient to sustain a § 1983 claim.

Accordingly, Jones is entitled to qualified immunity on Count 24, Meader's § 1983 hostile-work-environment claim.

C.      **Title VII Claims**

1.      **Cooper's Title VII Discrimination Claim (Count 29)**

Cooper asserts a Title VII disparate-treatment claim. The pretrial order alleges that the State "discriminated against Cooper, including constructively discharging her from employment, because of her gender and pregnancy." Doc. 194 at 22. But in response to the summary-judgment motion, Cooper abandons her constructive-discharge claim. Doc. 201 at 40 ("Ms. Cooper abandons her claim for constructive discharge under Title VII."). Accordingly, the Court considers her claim based on the other employment actions she complains about.

Where a plaintiff relies on circumstantial evidence to establish discriminatory intent, courts rely on the familiar *McDonnell Douglas* burden-shifting framework. *Bennett v. Windstream Commc'ns, Inc.,* 792 F.3d 1261, 1266 (10th Cir. 2015). A plaintiff must first establish a prima facie case of discrimination. *Id.* This includes evidence that: "she is a member of a protected class, she suffered an adverse employment action, and the challenged action occurred under circumstances giving rise to an inference of discrimination." *Id.* If a plaintiff meets this initial burden, the burden shifts to the defendant to "articulate a legitimate, nondiscriminatory reason for its actions." *Id.* If the defendant meets that burden, the burden shifts back to the plaintiff to show that the explanation is pretext. *Id.*

Under this standard, the Court finds that Cooper has failed to point to evidence that would support a prima facie case of discrimination under Title VII, particularly as to the second and third elements.

For purposes of a Title VII disparate-treatment claim, an adverse employment action is a "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."

*Throupe v. Univ. of Denver*, 988 F.3d 1243, 1252 (10th Cir. 2021) (internal quotation and citation omitted). Inconveniences or alterations in job duties are not enough. *Id.*

As noted above, Cooper has abandoned her claim of constructive discharge. She instead contends she was subjected to adverse employment actions because she was subjected to "far more rigid conditions for her same limited duty assignment" than a similarly situated male, she was prohibited from having contact with the public, she was not allowed to attend a training, and Proffitt surveilled her home. Doc. 201 at 52-53. She contends these actions "materially altered the conditions of the workplace." *Id.* at 53.

Notably, Cooper does not rely on any one of these actions as an independent adverse employment action. Nor does it appear that any of these actions would rise to that level. Having Proffitt "surveil" her home, while perhaps unwelcome or actionable in some other context, does not reflect any material change in her employment status or compensation for purposes of sustaining a Title VII discrimination claim. Cooper's work assignments changed at some point, but that was because she was on a limited duty assignment because of her pregnancy. She complains of having "more rigid" working conditions than another male trooper, but she has not pointed to any facts suggesting that her own "rigid" working conditions would rise to the level of an adverse employment action.[17] *See Piercy v. Maketa*, 480 F.3d 1192, 1203 (10th Cir. 2007) (stating that the Tenth Circuit does not consider "a mere inconvenience or an alteration of job responsibilities to be an adverse employment action" (internal quotation and citation omitted)). Although she claims she was prohibited from having direct contact with the public, the exhibit cited does not support that allegation. *See* SOF 200 (including reply). Rather, Cooper testified that

---

[17] To the contrary, Cooper states that the male trooper told her that he was permitted to work from home and could come and go as he pleased, while she "had strict limitations placed on where and when she was to do her work." SOF 199. The Court has no trouble concluding that having reasonable limitations on where and when an employee works is not an actionable adverse employment action under Title VII.

her supervisors considered a particular assignment for her but declined to give it to her because they did not want her to have contact with the public. *See id.*; *see also* Doc. 202 at 91. There's no evidence that she was prohibited from having contact with the public, even to the extent that could be considered an adverse employment action.

Finally, she complains that she was denied permission to attend a training she wanted to attend. But that alone is not an adverse employment action. *Bruce v. Unified Sch. Dist. 259*, 2018 WL 2463305, at *12 (D. Kan. 2018) ("The denial of training, by itself, does not constitute an adverse employment action."). Cooper points to no facts that missing that training resulted in a significant change in her employment status or benefits. *See id.* ("To constitute an adverse action, an employee must show they were denied training and the lack of training negatively affected the employee's advancement opportunities or otherwise injured the plaintiff."). Accordingly, the Court finds that no reasonable jury could find that Cooper suffered an adverse employment action.[18]

Even if Cooper could establish an adverse employment action, her claim would fail on the third element of her prima facie case. In terms of circumstances that raise an inference of discrimination, Cooper argues that a male trooper who was also on light duty assignment had greater flexibility than Cooper was afforded, and that Proffitt never "staked out and surveilled with binoculars the residence of any male Troopers under his command." Doc. 201 at 53. Differential treatment of similarly situated employees can raise an inference of discrimination. *E.E.O.C. v.*

---

[18]  The Court notes that Cooper claims these activities collectively altered the terms of her employment. This is more typical of an argument made as part of a hostile-work-environment claim, i.e. where a series of actions that may not independently be actionable coalesce into one unlawful employment action. *See Throupe*, 988 F.3d at 1251. The Court in this case has previously noted that claims of Title VII discrimination are redundant of a Title VII hostile-work-environment claim where the discrimination claim is simply based on the allegedly hostile work environment. *See* Doc. 98 at 20-22 (addressing claims by other Plaintiffs). Here, Cooper's Title VII disparate-treatment claim and her hostile-work-environment-claim likewise seem to be based on the same conduct.

*PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007). "Individuals are considered 'similarly-situated' when they deal with the same supervisor, [and] are subjected to the same standards governing performance evaluation and discipline . . . ." *Id.* at 801.

The facts relied on by Cooper fail to raise an inference of discrimination. *See Fisher v. Basehor-Linwood Unified Sch. Dist. No. 458*, 851 F. App'x 828, 836 (10th Cir. 2021) ("[A]t summary judgment, the court must determine whether plaintiff has adduced enough evidence to support a finding that the other employee and plaintiff were sufficiently similarly situated to support an inference of discrimination." (internal quotation and citation omitted)). Although the male trooper was also given light duty assignments by Cordner, it is undisputed that the male trooper belonged to a different troop, had different restrictions, and reported to a different superior. Similarly, it is undisputed that Proffitt went to the residences of several of the troopers he supervised, including male troopers. He also went to the residence Cooper and Byron shared to check on Byron. And at the time he allegedly "staked out and surveilled with binoculars" Cooper's residence, it was also Byron's residence. Under these facts, no reasonable jury could conclude that Cooper was subjected to disparate treatment based on sex.

Accordingly, the Court finds that the State is entitled to summary judgment on Cooper's Title VII discrimination claim because she has failed to point to a genuine question of material fact sufficient to support a prima facie case of disparate treatment.[19]

---

[19] Defendants also argue—albeit briefly—that decisions about Cooper's employment were made for legitimate, non-discriminatory reasons. Doc. 196 at 62. In response, Cooper does not argue the existence of any facts showing that these reasons were pretextual. *See* Doc. 201 at 52-53. This is an independent and alternative reason to grant summary judgment on this claim.

### 2.      Plaintiffs' Title VII Hostile-Work-Environment Claims (Counts 6, 13, 20, 27, 30)

Plaintiffs assert Title VII hostile-work-environment claims against the State. Title VII prohibits a hostile or abusive working environment based on sex. *PVNF, L.L.C.*, 487 F.3d at 798. Where a series of separate acts constitute an unlawful employment practice, a plaintiff may assert a hostile-work-environment claim. *Throupe*, 988 F.3d at 1251. "To overcome summary judgment on this claim, the plaintiff must show (1) [she] was discriminated against because of [her] sex, and (2) that the discrimination was sufficiently severe or pervasive such that it altered the terms or conditions of [her] employment." *Id.*

"Proof of either severity or pervasiveness can serve as an independent ground to sustain a hostile work environment claim." *Id.* at 1252. In determining whether the conduct was severe or pervasive, courts consider the totality of the circumstances, including the frequency of the conduct, its severity, whether it was physically threatening or humiliating or a mere offensive utterance, and whether it interfered with the employee's performance. *Id.* Whether conduct is severe or pervasive is assessed both objectively and subjectively. *Id.* "This means the plaintiff must: (1) subjectively perceive the conduct to be severe or pervasive, and (2) show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult." *Ford v. Jackson Nat'l Life Ins. Co.*, 45 F.4th 1202, 1228 (10th Cir. 2022) (internal quotation and citation omitted). Additionally, "derogatory comments need not be directed at or intended to be received by the victim to be evidence of a hostile work environment." *Hernandez*, 684 F.3d at 959. Summary judgment is appropriate if the facts would not allow a reasonable jury to find that the alleged harassment was sufficiently severe or pervasive. *Sanderson v. Wyoming Highway Patrol*, 976 F.3d 1164, 1177 (10th Cir. 2020).

### a.      Pfannenstiel (Count 6)

Pfannenstiel bases her hostile-work-environment claim on the instant messages sent by Jones and Murphy's attempt to grab her hands, both of which she claims were overtly sexual in nature. Doc. 201 at 40-41. She also points to acts of harassment that were facially sex-neutral but which she alleges were part of an overall pattern of harassment: the February 2020 meeting with Jones and De Vore where they confronted her about the letter to the governor, and the fact that Jones and De Vore began discounting her suggestions and input about HR-related matters beginning in late March or early April 2020. *Id.* at 41. Pfannenstiel also points to the "sexually hostile culture" at the KHP, arguing that she was aware of harassing behaviors by Jones directed toward others, including Jones touching Harrington and Meader in 2019, and Jones singing the "shake it" song towards Meader. *Id.* at 41-43.[20]

The Court will assume without deciding that at least some of the conduct she identifies— the instant message and Murphy's attempt to grab her hands—could be considered as facially sex based.[21]  The Court will also assume that Pfannenstiel subjectively perceived the working environment to be hostile.

The issue then becomes whether Pfannenstiel has presented sufficient facts from which a jury could conclude that a reasonable person would perceive the conduct complained of to be severe or pervasive. As to severity, the Court finds that nothing Pfannenstiel alleges rises to the

---

[20]   Plaintiffs also cite to other incidents of harassment of which Pfannenstiel was aware. *See* Doc. 201 at 42-43. But other than the incidents noted above, none of the additional incidents are supported factually in the record. Plaintiffs cite to exhibits or deposition testimony that do not appear to have been included as exhibits in this case. Nor are there statements of fact addressing these allegations with proper support in accordance with Federal Rule of Civil Procedure 56(c) and D. Kan. Rule 56.1(b). *See* SOF 45 (including response and reply).

[21]   The Court has previously found that neither of these actions in isolation was sufficient to state a § 1983 hostile-work-environment clam against either Jones or Murphy, based solely on each Defendant's respective conduct. Doc. 98 at 31, 33-34. As to the instant messages, the Court questioned whether they could even reasonably be considered as harassment at all. *Id.* at 33. However, at summary judgment, Plaintiffs are entitled to all inferences in their favor.

level of conduct typically considered severe for purposes of a hostile-work-environment claim. *See Frank v. Heartland Rehab. Hosp., LLC*, 2022 WL 486793, at *3 (D. Kan. 2022), *aff'd* 2023 WL 4444655 (10th Cir. 2023). The only physical incident is the one with Murphy. But that was in the context of him trying to show Pfannenstiel how another employee acted towards him. *See* SOF 44. Although Pfannenstiel found the incident to be subjectively disturbing, the facts do not suggest a finding that it was objectively severe. Pfannenstiel also alleges that Jones and De Vore intimidated her during the February 2020 meeting and that they were wearing their service weapons. But there are no allegations that they touched or assaulted Pfannenstiel, nor would it be unusual that individuals would be wearing weapons while working at the KHP. In considering the context of this particular workplace, this does not rise to the level of severe harassment. *See Morris v. City of Colo. Springs*, 666 F.3d 654, 668 (10th Cir. 2012) (finding that being hit with pericardium tissue was not severe harassment because "[i]n the surgical context, unlike many employment settings, workers regularly see, and otherwise encounter, human tissue, blood, and other bodily fluids of other human beings," and that "at least with respect to an isolated incident, such workers are objectively less likely than workers employed in an unrelated context to be threatened when their clothed body comes into contact with such human biological products, or to view clothed-body contact with such products—albeit unwelcome as here—to be severe").

Nor do the incidents Pfannenstiel complains of amount to pervasive harassment. At most, she complains of three specific incidents (the instant messages, Murphy grabbing her hands, and the meeting with Jones and De Vore), and then the discounting of her input and suggestions by Jones and De Vore, which she says disrupted her work. The Court finds that this does not rise to the level of objectively pervasive harassment. *See Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1366 (10th Cir. 1997) (finding no hostile work environment where the plaintiff alleged four

inappropriate comments and an incident where a supervisor put his arm around her and looked down her dress); *Throupe*, 988 F.3d at 1253-55 (finding that spreading rumors about a professor's relationship with a student, subjecting him to a Title IX investigation, giving him a written warning, being assigned a less desirable teaching schedule, and being yelled at on one occasion was neither severe nor pervasive harassment); *Brown v. LaFerry's LP Gas Co.*, 708 F. App'x 518, 522-23 (10th Cir. 2017) (finding that being given the "cold shoulder" or "silent treatment" by coworkers, in addition to three racist comments, does not "alone or in combination" show a severe or pervasive hostile work environment). In other words, no reasonable jury could conclude Pfannenstiel's workplace was "permeated with discriminatory intimidation, ridicule, and insult" based on these isolated and seemingly unrelated incidents. *Ford*, 45 F.4th at 1228.[22]

Pfannenstiel also alleges she was constructively discharged as a result of the hostile work environment. "Under federal law, '[c]onstructive discharge occurs when the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign.'" *Bennett*, 792 F.3d at 1269 (quoting *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 534 (10th Cir.1998)). It is an objective standard. *Id.* "[T]he plaintiff's subjective views of the situation are irrelevant." *Id.* (internal quotation and citation

---

[22] Pfannenstiel alleges she was aware of Jones's actions toward Harrington and Meader, and Harrington, McCurdy, and Meader all point to the fact that they were interviewed together for the August 2020 television interview. Each argue that this is relevant to their individual hostile-work-environment claims because it made them aware of Jones's harassment of other women in the workplace. *See* Doc. 201 at 41, 47, 49-51. As an initial point, the Court notes that neither party provides any facts regarding what was said at the interview, or what Harrington, McCurdy, or Meader learned about Jones's actions toward others. Nor do any of them allege contemporaneous conduct toward them in that same time period. Assuming specifics were discussed at the interview, and each contends they were experiencing a hostile work environment at that time, evidence of an overall harassing environment may be considered as long as the particular plaintiff knew of the behavior at the time. *See Ford*, 45 F.4th at 1232 ("And we've held that evidence directed at others—who are not the plaintiff—is relevant in this analysis."); *see also supra* Section III.A. But as explained, the Court assumes that each Plaintiff subjectively perceived the workplace as hostile. Plaintiffs provide no analysis as to how their knowledge of Jones's conduct toward others would cause a reasonable person to believe the work environment was pervasively hostile. Regardless, "even if [this] highly generalized second-hand knowledge is considered as part of the totality of the circumstances, it does not change the outcome of this motion." *See Frank*, 2022 WL 486793, at *3 n.4.

omitted). Further, a plaintiff's burden is substantial. *PVNF, L.L.C.*, 487 F.3d at 805. The fact that a plaintiff can show events that would meet the definition of an adverse employment action is not sufficient in and of itself to show constructive discharge. *Id.* Nor is the question whether the employee resigned because of the employer's actions. *Id.* Rather, the issue is "whether the employee had any other reasonable choice but to resign in light of those actions." *Id.* at 806 (internal quotation and citation omitted).

Pfannenstiel points to two facts that a jury could rely on to find that a reasonable person in her position would have felt they had no choice but to resign. *See* Doc. 201 at 44-45. First, Jones and De Vore were excluding her from conversations that should have had HR input and making policy changes without consulting her, which hamstrung her performance as HR director. *Id.* Second, Pfannenstiel believed her job was in jeopardy because of the comments made by Jones and De Vore in the February 2020 meeting. *Id.* Once Scott Harrington and Kellerman were fired in July 2020, Pfannenstiel "figured she was next" because she was not in Jones's "canoe," which caused her to move up her retirement date. *Id.*

The Court is not persuaded. First, the Court has found that Pfannenstiel was not subjected to an objectively hostile working environment. It follows that she has also not shown that she was subjected to working conditions so intolerable that a reasonable person would have been compelled to quit. *See Bennett*, 792 F.3d at 1269; *see also Brown*, 708 F. App'x at 523 ("In order to state a constructive discharge claim on this basis, the plaintiff must allege facts sufficient to show <u>both</u> that a hostile work environment existed and that this environment was 'so intolerable that a reasonable person would have felt compelled to resign.'" (emphasis added)). The fact that Pfannenstiel herself felt that her performance as HR director was hamstrung is of no import because her subjective view of the situation is irrelevant. *See Bennett*, 792 F.3d at 1269.

Second, the fact that she feared her job was in jeopardy and that she would be fired does not establish constructive discharge. *See PVNF, L.L.C.*, 487 F.3d at 805. Rather, the issue is whether Pfannenstiel had no choice but to quit. *See id.* Here, the facts belie that was the case. Pfannenstiel was planning to retire and only moved up her date when Scott Harrington and Kellerman were fired. She gave that notice on July 23, 2020, but didn't retire until more than a month later, after providing notice. *See* SOF 56-57. This delay cuts against any claim she was constructively discharged. *See Bermudez v. City of Topeka, Kansas*, 2020 WL 206766, at *8 (D. Kan. 2020) ("Further, the last incident complained of occurred in September 2017. Bermudez then waited another two months before resigning, and then gave two-weeks notice. That belies any claim that she was suffering an intolerable work environment."); *see also Cappell v. Dep't of Army*, 2014 WL 5782389, at *8 (D. Kan. 2014). Accordingly, the State is entitled summary judgment on Pfannenstiel's hostile-work-environment claim (Count 6) and her claim for constructive discharge.

### b.      Harrington (Count 13)

Harrington's hostile-work-environment claim is based on the three times Jones touched her, including the October 31, 2019 incident that she claims had "sexual overtones." Doc. 201 at 47. She also argues she became aware that Jones harassed other women when they were interviewed together in August 2020. *Id.* Finally, she points to retaliatory acts that occurred in 2020 and 2021, including requiring her troopers to be trained by KLETC, the PSU investigation, her performance improvement plan and unsatisfactory review, and "multiple acts of intimidation by Major Dean." *Id.* at 48.

The first issue is whether Harrington has presented facts from which a jury could conclude that she suffered discrimination based on her sex. *Throupe*, 988 F.3d at 1251. Her argument on this point is based on her characterization of the incident on October 31, 2019, when Jones placed

his hand on her shoulders and started patting them and then brushed against her arm. According to

Harrington, he "purposely glided his hand across [her] left arm nice and slow." SOF 73 (including

response). Harrington characterize this event in the response brief as having "sexual overtones."

Doc. 201 at 47.

The Court is dubious that this is sufficient evidence for a jury to conclude that Harrington

experienced a hostile work environment based on sex. Harrington acknowledges being touched on

other occasions by Jones, and though apparently unwelcome, she does not consider them as

sexually motivated. *See Throupe*, 988 F.3d at 1253-54 (finding that initiating a Title IX

investigation because of a "male faculty member" having a relationship with "female student" did

not create a triable question of fact on whether the alleged discrimination was based on sex).

Even if Harrington could raise an inference of discrimination based on sex, her hostile-

work-environment claim would fail on the severe or pervasive element. The Court will assume

that Harrington found the environment to be subjectively hostile. But the facts don't support a

finding that it was objectively hostile or abusive in terms of either severity or pervasiveness.

Harrington's claim is largely based on the three touching incidents by Jones in 2019, and

then subsequent actions by Dean in 2020 and 2021, which Harrington contends were retaliatory.

The Court questions whether the events of 2020 and 2021 are properly considered as part of

Harrington's sex-based hostile-work-environment claim, to the extent she has sufficient evidence

to sustain one.[23] *See Brown*, 708 F. App'x at 522 ("If retaliation was Mr. Applegate's sole

---

[23]   The Court additionally questions whether the events from 2021 are properly considered in this case at all.
Defendants argue that Harrington has not exhausted her administrative remedies for, among other things, events
that occurred after she filed her September 2020 EEOC complaint. Doc. 196 at 53. They specifically argue
Harrington has "never exhausted her administrative remedies as to the 2021 allegations against Dean or the PIP or
the unsatisfactory evaluation." *Id.* The only EEOC complaint in the record for Harrington is her September 2020
EEOC complaint, which obviously does not reference events from 2021. Failure to exhaust is an affirmative
defense, which is a defendant's burden to establish. *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1185-86 (10th Cir.
2018). However, Plaintiffs do not respond to this argument, other than to say that Harrington did exhaust her
administrative remedies and that the Court can consider events that occurred both before and after the 300-day

motivation for this conduct, then this retaliatory conduct does not support Mr. Brown's claim of racially motivated harassment."); *but see Chavez*, 397 F.3d at 835 (finding that alleged acts of retaliation are relevant to a hostile-work-environment claim).

The Tenth Circuit has stated that although courts "must consider the entirety of the record" in determining whether a pervasively hostile work environment exists, a court need not simply accept a plaintiff's "claim that all the discriminatory conduct [s]he identifies was part of the same hostile work environment." *Throupe*, 988 F.3d at 1255 n.3. "To determine whether these acts are part of the same hostile work environment . . . [we look] at the type of these acts, the frequency of the acts, and the perpetrator of the act." *Id.* (alteration in original). "[A] plaintiff may cite acts of harassment that are either facially sex based or facially sex neutral if context indicates that acts that may appear neutral in isolation could be understood by a jury to be part of an overall animus and pattern of sexual discrimination and harassment." *Sanderson*, 976 F.3d at 1174. In other words, "if it reasonably could be inferred that the [facially sex neutral] conduct was related to gender or arose out of a context in which admittedly sex and gender-related conduct occurred, then it is for the fact finder to decide whether such an inference should be drawn." *Id.* (quoting *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1097 (10th Cir. 1999)); *see also Chavez*, 397 F.3d at 833 (finding that a plaintiff "can use a substantial amount of arguably gender-neutral harassment to bolster a smaller amount of gender-based conduct on summary judgment").

Here, Harrington alleges that Jones touched her back or shoulders three times in 2019. But her allegations about events in 2021 are of an entirely different nature, bear no obvious connection

---

statutory time period. Doc. 201 at 39. Although there are references in the amended complaint to a subsequent EEOC complaint by Harrington, *see* Doc. 65 at 4; *see also* Doc. 26-1 at 1, 6-7 (right to sue notices to Harrington referencing different EEOC complaints), it does not appear that any subsequent EEOC complaints are included in the record, and no one indicates what they addressed.

to the times Jones touched her, and were generally by someone other than Jones.[24] Harrington also characterizes these acts as retaliatory. Doc. 201 at 48. Harrington makes no attempt to explain how or why these allegedly retaliatory events form part the same sex-based hostile work environment that allegedly began in 2019 when Jones touched her, or that these acts were motivated by sex. Nor does Harrington (or any Plaintiff who relies on sex-neutral conduct) point to facts from which a jury could make that inference.[25]

To the extent the retaliatory actions from 2020 and 2021 are not considered, Harrington cannot create a triable hostile-work-environment claim based on the three incidents of Jones touching her. None of these events can be characterized as severe, as they all involved touching on her back our shoulders in the presence of others, and in one instance, Harrington did not even notice the contact. *See* SOF 73. Nor would this conduct be considered objectively pervasive harassment, for reasons like those discussed in the context of Pfannenstiel's claim. *See Sprague*, 129 F.3d at 1366; *Brown*, 708 F. App'x at 522 ("[W]e have stated that isolated incidents, such as Mr. Brown alleges here, are sufficient to support a hostile work environment claim only when they

---

[24] It appears Jones may have put Harrington on administrative leave at the request of the PSU. SOF 95 (including response).

[25] This stands in contrast to the facts of *Sanderson*. In *Sanderson*, the plaintiff was a trooper in the Wyoming Highway Patrol. *Sanderson*, 976 F.3d at 1168. She endured years of rumors of sexual promiscuity and degrading nicknames and found it difficult to make friends with male colleagues because it would lead to rumors of sexual relationship, and she faced rumors that she used sex to gain career advantages. *Id.* at 1168-69. She then joined a specific troop that had a reputation of "not accept[ing] females," where she endured more rumors. *Id.* at 1169. On one occasion, the plaintiff responded to a radio call while she was in the bathroom, and another trooper told her not to answer the radio while she was "douching." *Id.* The plaintiff generally felt ostracized and attempts to connect with colleagues were often rebuffed. *Id.* She told a supervisor on one occasion that it was "no wonder no female makes it in the O division" because the "guys in the division make it down right miserable for any female." *Id.* The plaintiff was subsequently demoted. *Id.* at 1169-70. The Tenth Circuit concluded that the plaintiff had presented evidence that the culture of the work environment was sexually hostile, including that the troop in question did "not accept females." *Id.* at 1174-75. Against that backdrop, the court concluded it was appropriate to consider facially sex-neutral conduct—being ostracized and excluded by coworkers—as part of an overall sexually hostile "environment." *Id.* at 1175. This was particularly appropriate given the evidence that the troop in question "as a whole does not accept females." *Id.*; *see also O'Shea*, 185 F.3d at 1098-99 (finding that work environment with frequent derogatory and sexual comments "contributed to a work environment that was charged with gender bias and sexual animus" and created "genuine issues of material fact as to whether [certain gender neutral] conduct was based on gender or sexual animus").

are 'threatening and severe' or 'especially egregious or extreme.'"). Even if the Court did consider the events in 2020 and 2021, this would still not rise to the level of objectively severe or pervasive harassment, given the isolated nature of the events and the length of time involved. *See Throupe*, 988 F.3d at 1253-55 (finding that spreading rumors about a professor's relationship with a student, subjecting him to a Title IX investigation, giving him a written warning, being assigned a less desirable teaching schedule, and being yelled at on one occasion was neither severe nor pervasive harassment).

Accordingly, the Court grants summary judgment to the State on Harrington's hostile-work-environment claim (Count 13).

### c.    McCurdy (Count 20)

McCurdy's hostile-work-environment claim is based on Jones giving her three hugs over the course of 10 months and his calling out to her "woman, woman, hey woman." She also argues she became aware that Jones harassed other women when they were interviewed together in August 2020. Doc. 201 at 49.

The Court will assume without deciding that these facts could show that Jones's conduct was based on sex and that McCurdy found the conduct subjectively hostile. It then turns to whether the actions McCurdy complains of are sufficiently severe or pervasive from an objective perspective. *Throupe*, 988 F.3d at 1252. On this point, McCurdy's hostile-work-environment claim fails.

First, none of the conduct about which McCurdy complains was objectively severe. *See Morris*, 666 F.3d at 667-68 (distinguishing minor touching incidents from more clearly severe instances of sexual assault and noting that "other courts have required the conduct to be especially egregious or extreme where only isolated incidents are alleged"). Even to the extent they were

unwelcome, the hugs McCurdy complains of and the context in which they occurred do not rise to the level of severity typically required to sustain a hostile-work-environment claim. *See Brown*, 708 F. App'x at 522 ("Most incidents found to meet this standard involve some kind of physical assault.").

On the issue of whether Jones's conduct toward McCurdy was objectively pervasive, *Morris* is instructive. There, the plaintiff was flicked on the head twice in a two-week period, had pericardium tissue thrown at her, and was yelled at and demeaned. *Morris*, 666 F.3d at 665-66. Those incidents were deemed isolated "in the context of Ms. Morris's otherwise uneventful tenure on the Heart Team." *Id.* The court found they did not objectively alter the terms and conditions of the plaintiff's employment. *See id.* at 668.

Similarly here, McCurdy claims Jones hugged her three times over 10 months. No reasonable jury could find this to be pervasive harassment. *See Throupe*, 988 F.3d at 1252 ("And 'a few isolated incidents' of discriminatory conduct does not make the harassment pervasive." (citation omitted)). This is true even when considering the "woman, woman, hey woman" comment and the fact that McCurdy was interviewed with others in August 2020. *See Sprague*, 129 F.3d at 1366 (finding no hostile work environment where the plaintiff alleged four inappropriate comments and an incident where a supervisor put his arm around her and looked down her dress); *Vajdl v. Mesabi Acad. of KidsPeace, Inc.*, 484 F.3d 546, 551-52 (8th Cir. 2007) (finding no severe or pervasive harassment where coworkers frequently commented on the plaintiff's body and requested dates, and one touched her bangs and wiped water off her pants); *Morris*, 666 F.3d at 663-64 ("Title VII does not establish a general civility code for the workplace." (internal quotation and citation omitted)).

Accordingly, the Court finds that no reasonably jury could find for McCurdy on her hostile-work-environment claim, and the State is entitled to summary judgment on Count 20.

### d.      Meader (Count 27)

Meader's hostile-work-environment claim is based on three incidents of Jones touching her (including the "shake it" incident), the time he stood very close to her, his comments about her posture, and Sauer telling her not to have lunch with a colleague. She also argues she became aware that Jones harassed other women when they were interviewed together in August 2020, and she was aware that Jones told a co-worker she had a voice like a "sex phone operator." Doc. 201 at 50-51.

The Court will again assume without deciding that these facts could show that the conduct toward Meader was based on sex and that Meader found the conduct subjectively hostile. But as with McCurdy, the Court finds that these facts do not create a triable issue as to whether the harassment of Meader was objectively severe or pervasive.

As to severity, the conduct Meader complains of—no matter how unwelcome or unprofessional—is again not the sort of conduct that is typically severe enough to stand alone even as an isolated incident. *See Throupe*, 988 F.3d at 1255 ("We have found conduct sufficiently severe to overcome summary judgment in only particularly threatening or humiliating circumstances."); *see also Morris*, 666 F.3d at 667-68.

As to pervasiveness, the Court finds, as with McCurdy's claims, that these few isolated incidents do not create a triable issue of fact as to whether Meader suffered an objectively pervasive hostile work environment. *See supra* Section III.C.2.c. Even considering Jones's comments—the "shake it for me" remark, the remark about the co-worker's voice, and the comments about Meader's posture—along with Sauer telling Meader not to spend so much time in a co-worker's

office—this conduct does not establish a pervasively hostile work environment. *See Frank*, 2022 WL 486793, at *3 (finding no pervasive harassment where the defendant "made four inappropriate comments, complimented [the plaintiff's] shirt five to seven times while looking her up and down, and frequently looked at [the plaintiff] and told her how nice she looked over a four-month period"); *Akonji v. Unity Healthcare, Inc.*, 517 F. Supp. 2d 83, 87-88, 97-99 (D.D.C. 2007) (finding no severe or pervasive harassment when supervisor hugged the plaintiff and touched her buttocks, tried to kiss her, commented on her appearance, asked her to accompany him on a weekend trip, and stared at her often); *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 458-59, 464-65 (6th Cir. 2000) (concluding no severe or pervasive harassment despite instances of physically invasive conduct, including a supervisor grabbing the plaintiff's buttocks and saying that "she controlled [the plaintiff's] ass and she would do whatever she wanted with it," along with repeated unwanted sexual advances). Accordingly, the State is entitled to summary judgment on Meader's hostile-work-environment claim (Count 27).[26]

### e.      Cooper (Count 30)[27]

Cooper's hostile-work-environment claim is essentially the same as her Title VII discrimination claim. *See supra* Section III.C.1. She claims she was given restrictions beyond what her doctor ordered, was "isolated in an office" and not permitted to have contact with the general

---

[26]  In the pretrial order, Meader asserts damages for lost wages. Doc. 194 at 32. But she does not explicitly assert a claim for constructive discharge. *Id.* at 21. Defendants move for summary judgment on any constructive-discharge claim asserted by Meader because it was not preserved in the pretrial order and there is no genuine issue of fact that would support such a claim. Doc. 196 at 62, 64. Plaintiffs do not address whether or to what extent Meader intended to assert a constructive-discharge claim, nor do they point to facts that would create a genuine question of fact on such a claim. Accordingly, the Court finds that to the extent Meader is pursuing a constructive-discharge claim, Defendants are entitled to summary judgment. First, the claim was not preserved in the pretrial order. *See Zenith Petroleum Corp. v. Steerman*, 656 F. App'x 885, 887 (10th Cir. 2016). Second, Meader has not pointed to any facts to create a triable issue on such a claim. *Bermudez*, 2020 WL 206766, at *8 ("Bermudez's failure to respond to the City's arguments about her alleged constructive discharge again suggests she has abandoned that claim and is grounds for summary judgment."). Third, all Meader's substantive claims have been dismissed as part of this order. *See Brown*, 708 F. App'x at 523.

[27]  As noted above, Cooper has withdrawn her constructive-discharge claim.

public, was denied training, and had her work closely monitored and her home surveilled by Proffitt. *See* Doc. 201 at 51-52.

Defendants argue that nothing Cooper complains of demonstrates a hostile work environment based on sex. Doc. 196 at 57. The Court agrees. Although Cooper complains she was the only female trooper in Troop C, this doesn't demonstrate that any of the allegedly harassing actions she complains about were done because of her sex. Although facially neutral harassment may be considered when joined with sex-based harassment, *Sanderson*, 976 F.3d at 1174-75, here, Cooper has nothing of the latter. As discussed above, although she complains that she was treated differently than similarly situated men, she has failed to point to any such facts that would support such a conclusion. Nor is any of the conduct sexual in nature.

Further, even if Cooper could establish discrimination based on sex, the actions she complains about do not rise to the level of objectively severe or pervasive harassment, similar to the analysis discussed above for other Plaintiffs. She points to nothing that was physically threatening or humiliating. *See Throupe*, 988 F.3d at 1252. Nor has she even identified any offensive comments or remarks made to her or within her knowledge. It's not even clear how a jury could find that some of the actions she complains of were even harassment. *See* SOF 176-177 (stating that her hostile-work-environment claim was based in part on her supervisor following up on work assignments, ensuring she was completing her work, and asking her husband if she was enjoying her job). The Court concludes no reasonable jury could find that the conduct she complains of was a sexually based hostile work environment, and the State is entitled to summary judgment on this claim (Count 30).

In summary, the Court finds Plaintiffs have not demonstrated a genuine issue of fact as to whether they experienced a sex-based hostile work environment under Title VII.[28]

### 3.    Pfannenstiel's Title VII Retaliation Claim (Count 7)

The Court next considers Pfannenstiel's Title VII retaliation claim. Pfannenstiel's retaliation claim appears to be based on two grounds: (1) the fact that she made reports to Kibbe and Knowlton and participated in the DOA investigation, and (2) she was excluded from policy and procedure discussions and having her suggestions and input ignored and discounted after Jones found out about the DOA report in "late March or early April 2020." Doc. 201 at 56.[29]

To establish a prima facie case of retaliation under Title VII, a plaintiff must point to facts that would support the following elements: "(1) that [s]he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *Reznik v. inContact, Inc.*, 18 F.4th 1257, 1260 (10th Cir. 2021).

As an initial matter, the parties dispute whether Pfannenstiel engaged in protected opposition to discrimination, or whether she was just acting in her role as HR director. *See Loudon*, 339 F. Supp. 3d at 1238 ("Under the 'manager rule,' employees required as part of their job duties to report or investigate complaints of discrimination cannot claim that such reporting or

---

[28]   Defendants also raise a *Faragher* defense. Because the Court finds that no Plaintiffs have established a genuine question of fact to support a hostile-work-environment claim, it does not reach this argument.

[29]   The factual basis for Pfannenstiel's retaliation claim is not entirely clear. Pfannenstiel cites to SOF 190, which states that in the spring and summer of 2020, Jones and De Vore began discounting Pfannenstiel's input, left her out of conversations, and treated her as a secretary. But the evidence cited references Pfannenstiel's claim of a sex-based hostile work environment. The only specific acts of retaliation identified are two emails—one from March 20, 2020 and one from May 12, 2020—reflecting Pfannenstiel's concerns that policies and procedures were being changed without Pfannenstiel's' input. *See* SOF 46. The only protected activity that precedes the conduct in SOF 46 or SOF 190 appears to be the DOA investigation and report. The Court does note that the DOA report that Plaintiffs argue may have been mailed to Jones in "late March or early April 2020" was dated March 26, 2020. Thus, to the extent Pfannenstiel relies on an email from March 20, 2020, which referenced decisions Jones and De Vore made about interview panels, it's unclear how that could be causally linked to the DOA report.

investigating itself is a protected activity under the opposition clause because conveying another's discrimination complaint is not the same as opposing unlawful practices."). Defendants do not dispute that participation in the DOA investigation would be protected activity—just that Pfannenstiel was only involved in her role as HR director. *See* Doc. 196 at 67. But the DOA report, which is attached to Defendants' motion, reflects an interview with Pfannenstiel, and not just in her capacity as HR director. It states that Pfannenstiel reported the instant-message conversation she had with Jones and the incident with Murphy. *See* Doc. 196-29 at 8. Accordingly, for purposes of this motion, the Court will assume without deciding that Pfannenstiel engaged in protected activity when she was interviewed and participated in the DOA investigation and reported her own alleged harassment.[30] *See Loudon*, 339 F. Supp. 3d at 1238 (finding that an HR employee would need to step outside her role by filing or threating to file an adverse action, actively assisting others in asserting Title VII rights, or otherwise actively assert Title VII rights).

The second element of a retaliation claim looks to whether the employee suffered a materially adverse action. *See Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 64, 68 (2006) (concluding that antiretaliation laws are "not limited to discriminatory actions that affect the terms and conditions of employment" and that the true inquiry is whether "a reasonable employee would have found the challenged action materially adverse"). The Supreme Court has distinguished between significant harms and trivial harms, repeating the frequent refrain that Title VII is not a general civility code. *Id*. at 68. The Supreme Court has also equated "snubbing" by supervisors or coworkers as the type of "petty slights or minor annoyances that often take place at work and that all employees experience." *Id.* Here, Pfannenstiel complains only that Jones and De Vore began

---

[30]   Pfannenstiel did later file an EEOC complaint, but that was after she retired.

ignoring her input. This would appear to be the type of "petty slights" that the Supreme Court has found to not be actionable under Title VII.[31]

The third element considers a causal connection between the materially adverse action and the protected activity. "A causal connection can be inferred from the fact that the challenged action closely follows the employee's protected activity." *PVNF, L.L.C.*, 487 F.3d at 804. On this point, Pfannenstiel relies on the assertion that Jones obtained the DOA report by late March 2020 or early April 2020, and that the retaliatory actions started in mid-May 2020. *See* Doc. 201 at 56-57; *see also* SOF 46 (including response). Thus, the timing of these events is significant.

Jones testified he did not see the DOA report until his deposition in 2022. SOF 28. Knowlton testified that although he told Jones about the DOA investigation in June 2020, he did not tell Jones who complained or the substance of the allegations, and he did not give Jones the report. SOF 27-28. Pfannenstiel's argument that Jones received the DOA report in late March 2020 or early April 2020 is based on the testimony of April McCollum, who worked for the KHP as an executive assistant to Jones. McCollum testified that she recalled seeing the DOA report. SOF 28 (including response and reply); *see also* Doc. 202 at 21. She said it looked familiar, but she couldn't recall where she saw it: "I wasn't sure if I saw it—I wouldn't think it'd be in the paper, possibly, but I always opened the colonel's mail and maybe it was in there in a manila envelope." Doc. 202 at 21. She didn't recall exactly when she might have seen it, but she said it "was probably after I came back from that two-week break for COVID and opened his mail like I did every day, unless it was something I knew I couldn't open." *Id.*

---

[31] To the extent Pfannenstiel contends that Jones and De Vore discounting her input forced her to retire early, the Court has already found her constructive-discharge claim is without merit.

A question of fact "must be based on more than mere speculation, conjecture, or surmise." *Pioneer Centres Holding Co. Emp. Stock Ownership Plan & Tr. v. Alerus Fin., N.A.*, 858 F.3d 1324, 1334 (10th Cir. 2017). Here, McCollum didn't testify that Jones did receive the DOA report in late March or early April—only that she thought <u>she might</u> have seen it, and that it <u>might</u> have been when she was opening Jones's mail, and that it <u>might</u> have been after she returned from the COVID-19 break.

The Court is mindful of its obligation at summary judgment to view the facts and any reasonable inferences in a light most favorable to Plaintiffs as the non-moving parties. "But an inference is unreasonable if it requires 'a degree of speculation and conjecture that renders [the factfinder's] findings a guess or mere possibility.'" *Id.* (citation omitted). Here, the evidence cited by Pfannenstiel only suggests that McCollum thought <u>she</u> might have seen the DOA report somewhere, and it was <u>possibly</u> in Jones's mail at some unspecified point after she came back from the two-week break for COVID-19. There is no evidence cited that Jones actually received the report in the mail in late March or early April 2020, or that <u>he</u> actually saw it. And it is too far a leap to conclude that McCollum's testimony establishes as much. In other words, no reasonable jury could rely on McCollum's testimony to conclude that Jones saw the DOA report in March or April 2020 without an unreasonable degree of speculation or conjecture.

Accordingly, to the extent Pfannenstiel claims retaliatory actions beginning in May 2020 based on Jones's receipt of the DOA report, there are no facts that would support a causal connection sufficient to sustain a retaliation claim based on those events, even to the extent she could establish a materially adverse action. The State is therefore entitled to summary judgment on Pfannenstiel's Title VII retaliation claim (Count 7).

### 4.   Harrington's Title VII Retaliation Claims (Counts 14, 15)

Harrington asserts two Title VII retaliation claims in the pretrial order. Doc. 194 at 21. Although they are listed as Counts 14 and 15, the same factual basis is stated for both, namely that the State "retaliated against Harrington by giving her a negative performance evaluation and subjecting her to an unjustified and unusually lengthy performance improvement plan." *Id.* But in response to Defendants' motion for summary judgment, Harrington clarifies that her stand-alone retaliation claim is only based on the KHP's decision to have KLETC train troopers under Harrington's command, rather than the KHP. Doc. 201 at 58.[32]

The Court finds the State is entitled to summary judgment on Harrington's retaliation claims. First, and as Defendants point out, Harrington did not preserve in the pretrial order any retaliation claim based on troopers being trained by KLETC, and that claim is waived. *See Zenith Petroleum Corp.*, 656 F. App'x at 887.[33]

Second, Harrington offers no explanation as to how having troopers under her command be trained by KLETC—a state law enforcement training entity—is a materially adverse action. She does not address this at all in her response, despite it being an element of her prima facie case. Doc. 201 at 58-59. Nor is there any apparent reason why this would be materially adverse to Harrington. She does point to the fact that she estimated that it would cost the KHP $18,000 per trooper to attend the training, and that this is evidence of pretext. *Id.* at 59. But again, the analysis is slim, and the Court does not follow the argument. Even if the training was expensive or not cost

---

[32]   Harrington states that the PSU investigation, her unsatisfactory performance review and 150-day performance improvement plan, and "multiple acts of intimidation by Major Dean" are relied on as part of her hostile-work-environment claim. Doc. 201 at 58. The Court has discussed those events in that context above.

[33]   Harrington does not request leave to amend the pretrial order, and thus the Court does not consider that. Even if she did, the Court would be unwilling to allow amendment under Rules 15 or 16 at this late stage of the case, including because amendment would be futile as discussed above.

effective for the KHP, it doesn't explain how this would have been materially adverse <u>to Harrington</u>.

Accordingly, the Court grants summary judgment to the State on Harrington's retaliation claims (Counts 14, 15).[34]

## IV.    CONCLUSION

THE COURT THEREFORE ORDERS that Defendants' Motion for Summary Judgment (Doc. 195) is GRANTED. Judgment shall be entered in favor of Defendants on all claims.

THE COURT FURTHER ORDERS that Plaintiffs' Motion for Leave to File Surreply (Doc. 208) is DENIED.

IT IS SO ORDERED.

<u>Dated: July 19, 2023</u>                    <u>/s/ *Holly L. Teeter*          </u>
                                             HOLLY L. TEETER
                                             UNITED STATES DISTRICT JUDGE

---

[34]  Again, it is unclear why two claims of retaliation are asserted given Harrington's argument that her retaliation claim is only based on the KLETC training. No other claim of retaliation is argued by Harrington. Thus, the Court dismisses both counts.